IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DEATLEY CONSTRUCTION CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 041052C |
| | ) | (Judge Edward J. Damich) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

JOINT PRELIMINARY STATUS REPORT

Pursuant to the Court's Standard Special Procedures Order dated May 26, 2004, the parties submit this Joint Preliminary Status Report and proposed discovery schedule.

I. Jurisdictional Basis Upon Which Plaintiff Relies

Plaintiff's action arises pursuant to an express contract between M. A. DeAtley Construction

Company ("M. A. DeAtley") and the United States, through the Department of Transportation, Federal Highway Administration. The action is brought on an appeal from a final decision of the contracting officer. Plaintiff states that this Court has jurisdiction to entertain this action pursuant to 28 U.S.C. § 1491 and 41 U.S.C. § 609. Defendant is not aware of any reason why this Court would not possess jurisdiction to entertain the merits of DeAtley's complaint.

II. Pendency of Related Cases

The parties are not aware of any basis for transferring or remanding the case to another tribunal. The parties agree that this case should not be consolidated with any other case.

III. Material Issues of Fact and Law.

A. Plaintiff's Statement Of Facts

This case involves a contract to reconstruct approximately seven kilometers, and to

re-pave an additional seven kilometers, of the Flowery Trail Road in northeast Washington, approximately 50 miles north of Spokane, Washington. The issues in the case pertain to the suitability of rock taken from project stations 18+700 to 18+900, which M.A. DeAtley used for producing aggregate for the road. In the contract the Government represented that the subject rock met the quality requirements for aggregate base material. This representation was based upon a geotechnical analysis (of which M.A. DeAtley was unaware until well after bid time), which included a sodium sulfate soundness ("SSS") test on the rock. The SSS test predicts the degree of fragmentation of the rock caused by freeze/thaw cycles. The Government performed one test on material taken from two borings in the area of the relevant project stations, which showed a loss of less than 2% upon SSS testing. The contract allowed the use of raw material for the production of aggregate base material that had a maximum loss of 12% in the SSS test. In addition to the SSS test, the contract set a gradation limit of 10% for aggregate base material passing the 75 micrometer, or #200, sieve. This limit was set to ensure that the base would be well compacted and to increase the durability of the pavement. An excessive increase in the percentage of material passing the 75 micrometer sieve will result in increased capillary action causing water to be transported up into the aggregate base layer. The presence of moisture in the aggregate base layer during the winter months causes frost heaves. Frost heaves accelerate the breakdown of the pavement.

In November 2001, M.A. DeAtley, through its subcontractor DeAtley Crushing Company ("DeAtley Crushing"), produced aggregate from the subject rock. M.A. DeAtley took eighteen samples of the material during production (i.e., immediately after crushing) and tested the gradation. The average of the samples tested by M.A. DeAtley for passing the 75 micrometer

sieve was 7.93% passing. The results of nine Government tests on the same materials averaged 8.54 % passing. Thus, both M.A. DeAtley's and the Government's tests indicated that the material met the specifications for gradation in respect to the 75 micrometer sieve.

The borings mentioned above also indicated the material was composed of quartzite and argillite, two materials with very different weathering characteristics. Consequently, M.A. DeAtley contends that the Government should have performed separate tests on the material in order to accurately determine the characteristics of the material.

From November 2001 until August 2002, M.A. DeAtley stored the aggregate in a stockpile beside the existing road and in a windrow along the newly built sub-grade road. In August of 2002, after the material was placed on the subgrade, the parties once again tested the gradation. With regard to material from the windrowed stockpile, M.A. DeAtley's tests averaged 12.4% passing the 75 micrometer sieve, and the Government's tests averaged 10.59% passing. With regard to material from the other stockpile, M.A. DeAtley's tests averaged 11.1% passing, and the Government's tests averaged 10.8% passing. In addition, M.A. DeAtley tested samples taken directly from the stockpile (i.e., before it was placed on the roadway), and those tests averaged 10.1% passing. Based upon the foregoing results, the Government rejected the aggregate and ordered M.A. DeAtley to replace it with material that met the contract specifications.

As an alternative to replacing the material, and in a good faith effort to keep the Project progressing, M.A. DeAtley offered the Government a credit in the amount of $21,425.00, which was 25% of the contract price for the aggregate base D material. The Government refused the offer, and consequently DeAtley removed and replace the material.

To determine why the aggregate did not meet the contract limit for material passing the 75 micrometer sieve, M.A. DeAtley tested three samples using the SSS test in late August of 2002. One sample was taken from the windrow stockpile, one was taken from undisturbed (i.e., uncrushed and unweathered) material on the north side of the road from where the original source material was mined, and one was taken from undisturbed material from the south side of the road from where the original source material was mined. Notably, the Government declined M.A. DeAtley's invitation to witness the sampling. In any event, the windrow sample had a 7% loss, the sample from the south side of the road (primarily argillite) had a 14% loss (average of two samples of 8% and 19%), and the sample from the north side of the road (primarily quartzite) had a 6% loss. The results from samples taken from the south side of the road verified M.A. DeAtley's suspicion that the aggregate broke down because the source material was of poor quality.

M.A. DeAtley brought the foregoing results to the attention of the Government and requested that it investigate further. The Government refused to do so, with the exception that it tested samples of previously crushed and weathered material. However, testing of previously weathered material is of negligible value, because the material has already been degraded by natural forces and the SSS test cannot measure the amount of that degradation. Nevertheless, the Government performed the tests, obtained loss rates of 3%, 7%, and 3%, and relied upon those to discount M.A. DeAtley's results.

Based upon the above facts, M.A. DeAtley sought an equitable adjustment for costs associated with removing and replacing the aggregate in the amount of $164,223.55 for itself and $113,610.00 for DeAtley Crushing. The Government denied the request and this appeal

followed.

B. Plaintiff's Statement of Legal Issues

1.) Whether the Government breached the contract by failing to properly test source materials;

2.) Whether the Government breached its contract by approving the use of source material which did not meet contract specifications;

3.) Whether the Government breached the contract by rejecting aggregate which M.A. DeAtley had manufactured from a government approved source;

4.) Whether the Government breached the contract by refusing to compensate M.A. DeAtley for removing and replacing crushed aggregate;

5.) Whether the Government breached its contract by providing specifications which, considering

the source material provided by the Government, M.A. DeAtley could not meet;

6.) Whether the Government constructively changed the contract when it ordered M.A. DeAtley to remove the aggregate and replace it with new material;

7.) Whether M.A. DeAtley is entitled to an equitable adjustment for encountering sub-surface conditions which were materially different from those described in the contract;

8.) Whether the Government breached its contract by failing to act in good faith and cooperate with M.A. DeAtley;

9.) Whether the Government failed to mitigate its damages by unreasonably rejecting the delivered material and by ordering M.A. DeAtley to replace it;

10.) Whether replacement of the material as directed by the Government was economic waste;

11.) Whether the Governments acts substantially impaired or altered the original performance

requirements of the contract as a whole, thereby entitling M.A. DeAtley to be compensated for the fair and reasonable value for its labor, materials and services;

12.) Whether the Government has been unjustly enriched by its failure to pay M.A. DeAtley;

13.) Whether M.A. DeAtley is entitled to interest on its claim.

C. Defendant's Statement of The Factual Issues

The case involves a contract to reconstruct approximately seven kilometers and to re-pave an additional approximately seven kilometers of the Flowery Trail Road in northeast Washington, approximately 50 miles north of Spokane, Washington. The factual issues in the case pertain to the suitability of rock, taken from project stations 18+700 to 18+900, for use in producing the aggregate base material for the road. The contract represented that rock located between those stations met the quality requirements for aggregate base material, based on a geotechnical analysis using, among other tests, the "sodium sulfate soundness test ("SSS test")," a test used to predict the durability of the aggregate base material. The SSS test predicts the degree of fragmentation of the rock caused by the freeze/thaw cycles. The material taken from borings in the area of the relevant project stations showed a loss of only 2% upon SSS testing. The contract allowed the use of aggregate base material that had a maximum loss of 12% in the SSS test.

In addition to the SSS test, the contract set a gradation limit of 10% for materials passing the 75 micrometer sieve in the aggregate base material. This limit was set to ensure that the base would be well compacted and to increase the durability of the pavement. An increase in the percentage of material passing the 75 micrometer sieve will result in increased capillary action causing water to be transported up into the aggregate base layer. The presence of moisture in the

aggregate base layer during the winter months causes frost heaves. Frost heaves accelerate the breakdown of the pavement. In November 2001, DeAtley produced aggregate base material from rock taken from the area designated in the contract. While producing the aggregate base material, DeAtley's tests demonstrated that the material met the contract specification of a maximum of 10% for material passing the 75 micrometer sieve for18 tests, with results ranging from 6.3% to 9.4%, and failed for two tests with results of 10.2% and 12.1%. The results of nine Government tests on the aggregate base material ranged from 6.79% to 10% of the material passing the 75 micrometer sieve.

From November 2001until August 2002, DeAtley stored some of the aggregate base material in a stockpile beside the existing road and windrowed the rest along the newly built sub-grade road. The Government contends that DeAtley did not preserve the quality and fitness of the materials when storing the materials. The material was instead placed on a saturated base without an adequate floor and there was no attempt to protect the material from fines generated by road usage through the winter.

The aggregate base material was again tested in August 2002 when it was placed on the finished sub-grade, after having been improperly stockpiled for the winter; the aggregate base material then failed the gradation testing, with results for five test conducted by DeAtley ranging from 10.9 % to 13.3%. After being shut-down for three hours on account of the test failures, DeAtley used aggregate from the stockpile. The first test of the stockpiled aggregate passed at 9.4%. Subsequent tests, however, showed that the aggregate base material failed to meet the contract specifications with results of 12.6%, 11.8%, 11.8%, and 11.2%. The Government rejected the aggregate base material on the ground that it did not meet the contract specifications

and ordered DeAtley to remove the aggregate base and replace it with aggregate base material that met the contract specifications.

The Government contends that DeAtley is responsible for the fact the stockpiled aggregate base material became contaminated with fines between November 2001, when it was stockpiled, and August 2002, when it was used for the road's construction. The level of contamination was such that the aggregate base material did not meet the contract specifications.

To determine why the aggregate base material did not meet the contract limit for material passing the 75 micrometer sieve, DeAtley tested three samples of rock using the SSS test. The samples were obtained on August 23, 2002, and August 28, 2002. Of the two samples taken on August 23, 2002, one came from the windrow stockpile and one from the finished roadway slope (uncrushed rock) on the south side of the road. The sample taken on August 28, 2002, came from the finished roadway slope (uncrushed rock) on the north side of the road. With a contractually acceptable loss of 12% or less on the SSS test, the windrow sample showed a 7% loss, the south side uncrushed rock showed a 14% loss, and the north side uncrushed rock showed a 6% loss. The rock showing a 6% and 14% loss, however, was collected from the exposed faces of the cut and were not part of the rock crushed for the production of the aggregate base material.

In November 2002, the Government tested three additional samples from the same cut using the SSS test. The results of these tests were 3%, 7%, and 3%, all well within the contract specification. The Government contends that given that the rock, taken from project stations 18+700 to 18+900, for use in producing the aggregate base for the road, passed six of the seven

SSS tests, with an average 6% loss, rock located between those stations met the quality requirements for aggregate. The

Government further contends that the increase over the winter in the amount of material passing the 75 micrometer sieve was not caused by rock having a high SSS loss, but by DeAtley's failure to preserve the quality and fitness of the rock.

D. Defendant's Statement Of The Legal Issues

There are two principal legal issues in the case:

1.) Whether DeAtley can prove by the preponderance of the evidence that the conditions encountered at the project site materially differed from those set forth in the contract; that the conditions were not reasonably foreseeable based on all the information available to DeAtley at the time DeAtley submitted its bid; that DeAtley reasonably relied upon its interpretation of the contract and contract-related documents; and that as a consequence of the difference between the expected and the encountered conditions, DeAtley suffered damages.

2.) Whether DeAtley can prove by the preponderance of the evidence that the Government constructively changed the contract, by requiring work that was outside of the scope of the contract, when DeAtley was instructed to remove the aggregate base material because it did not meet contract specifications.

IV. Advisability of ADR

The parties do not believe that ADR is appropriate at this time. However, the parties will assess the possibility of ADR as the case progresses.

V. Joint Proposed Schedule

A. Joinder of additional parties: Not applicable.

B. Discovery Schedule:

i. Exchange of documents: Not applicable. The parties have already exchanged documents. Additional documents, if needed, will continue to be exchanged informally.

ii. Completion of fact witness discovery by August 1, 2005

iii. Designation of expert witnesses by January 15, 2005, and exchange of expert witness reports within 30 days of fact witness discovery being completed

iv. Completion of expert witness discovery: October 1, 2005

v. The presumptive discovery limit shall apply in this case.

vi. Neither mental examinations nor the physical examinations of the subject property are necessary in this case.

vii. Completion of all discovery by October 1, 2005

viii. While the parties agree that it is unlikely that dispositive motions will be filed, the parties request that on or before 30 days after the completion of discovery, they be allowed to file a status report regarding the appropriateness of filing dispositive motions.

ix. The parties are available for a status conference with the Court on the following dates, following the close of discovery:

a. October 3, 2005

b. October 4, 2005

c. October 5, 2005

C. The earliest date by which this case could reasonably be expected to be ready for trial

is November 1, 2005.

VI. Trial

A. The estimated length of trial is three to five days.

B. Plaintiff requests that the trial be conducted in Spokane, Washington. The subject property is located in the State of Washington.

VII. Preliminary Status Conference

The parties suggest the following three alternate dates and times for a preliminary status conference, at least seven days, but not more than twenty-one days after filing the JPSR:

a. December 15, 2004 at 2:00 p.m. EST

b. December 16, 2004 at 5:00 p.m. EST

c. December 17, 2004 at 2:00 p.m. EST

VIII. Joint Representation Concerning Early Meeting of Counsel.

Counsel represent that they have held an early meeting of counsel, conducted telephonically, on November 19, 2004. Prior to that meeting, counsel for the Government provided a proposed witness list and a proposed exhibit list.

A. Plaintiff's estimate of the litigation costs:

1. Through the end of discovery: $50,000

2. By the end of trial: $100,000

3. Through appeal, if any: $125,000

B. Defendant's estimate of the litigation costs:

1. Through the end of discovery: $30,000

2. By the end of trial: $50,000

3. Through appeal, if any: $52,000

Respectfully submitted,

PETER D. KIESLER
Assistant Attorney General

DAVID M. COHEN
Director

S/ Bryant G. Snee
BRYANT G. SNEE
Assistant Director

/s Leslie Cayer Ohta
LESLIE CAYER OHTA
Commercial Litigation Branch
Civil Division
Department of Justice

/s John C. Black
JOHN C. BLACK, ESQ.
10 N. Post Suite 200
Spokane, WA 99201-0653
509-455-8711

Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-1011
(202) 307-0972 (Fax)

Attorney for Plaintiff

Attorneys for Defendant

Dated: November 29, 2004

Dated: November 29, 2004