IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| M.A. DeATLEY CONSTRUCTION, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF TRANSPORTATION; UNITED STATES FEDERAL HIGHWAY ADMINISTRATION, WESTERN FEDERAL LANDS HIGHWAY DIVISION,<br><br>Defendant. | Case No.: 041052C<br>(Judge Edward J. Damich) |

**[Proposed] AMENDED COMPLAINT**

M.A. DeAtley Construction, Inc. ("DeAtley") for its Complaint in the above-captioned action, alleges as follows:



EXHIBIT A

## I. NATURE OF THE CASE

1. This case involves the construction of the Flowery Trail Road Project, involving DeAtley and its subcontractor DeAtley Crushing, for the United States Department of Transportation, United States Federal Highway Administration, and the Western Federal Lands Highway Division ("WFLHD"). In furtherance of its contractual obligations with the Government, DeAtley entered into a subcontract with DeAtley Crushing Company, wherein DeAtley Crushing agreed to produce the specified materials.

## II. THE PARTIES

2. DeAtley is a Washington corporation with its principle office and place of business in Clarkston, Washington. DeAtley is engaged in the business of construction services and delivery.

3. Defendant is the United States of America, United States Department of Transportation, United States Federal Highway Administration, Western Federal Lands Highway Division.

## III. FACTS

4. On February 9, 2001, DeAtley was awarded Contract No. DTFH70-01-C-00011 (the "Flowery Trail Project Contract" or "Contract") to reconstruct a portion of Flowery Trail Road. The contract included crushing of 21,500 metric

tons Aggregate D base for the Project. The project schedule called for construction over a two year period starting in 2001 and completing in 2002.

5. The aggregate source was selected by the Government and it was designated in the contract as an optional source for the contractors to use.

6. For Government's designated sources, the contract requires the Government to perform testing on the material to determine the quality and durability of the rock. The tests include the Los Angeles abrasion test, the sodium sulfate soundness test, accelerated weathering, and durability index.

7. The Federal Highways Field Materials Manual directs the Government on the timing and frequency of such testing. That manual also summarizes the Government's obligations when a Government-designated source is involved. The Government is responsible for producing a material which meets the quality requirements of characteristics as soundness, abrasion, stripping resistance of the aggregate, and the quantity in the source. The Contractor assumes responsibility for the gradation and sand equivalent. During crushing operations the Project Engineer should submit samples of aggregate to confirm the quality of the material and to make certain that the material still meets the requirements for soundness, abrasion, stripping, etc.

8. The contract contains a Government-provided design for aggregate size and gradation. The Standard Specifications contain a design range for each

size of aggregate, that the Government warrants will produce an acceptable result. The Standard Specifications further contain tolerances outside of each sieve range, which provide that he material will still be accepted based upon statistical deviation calculations, although the contractor's payment would be reduced.

9. The Government revised the Standard Specification for the Flowery Trail Project. With respect to the fine material (i.e., the #200/5 ct 75 micron sieve), the Government deleted the typical design ranges and provided that the allowable amount of fine material would be capped at 10% maximum. There were no tolerances specifically stated for this specification requirement.

10. The contract addresses the situation where no tolerances are provided. § 106.04 of the Standard Specifications states:

> When no tolerances values are identified in the contract, the work will be accepted based on customary manufacturing and construction tolerances.

11. In March 1999, the Government retained a geotechnical consultant to travel to the site for purposes of designing cut slopes for the roadway. The Government asked the geotechnical consultant if he would visually observe whether there "may" be any locations within the existing project boundaries which could possibly serve as a quarry source for crushed aggregate material.

12. In March 1999 the geotechnical consultant prepared a report which recorded his observations. The consultant performed no tests nor did he take any

borings for purposes of material source qualification. The geotech warned the Government that the Government would have to perform its own sampling and testing to verify suitability of the materials for crushed aggregate.

13. The Federal Highways Administration also maintains a Materials Manual that contains directions on how the Government should proceed with investigating, testing and qualifying a materials source. The Manual states that for material borrow sources, borings or test pits should be spaced on a grid pattern every 30 to 45 meters or less if material changed. For typical federal highway projects, four to six have holes and two to four complete sets of aggregate quality tests are required.

14. The Manual further explains that among other items, a material source investigation should provide the expected quality of processed materials and procedures necessary to obtain that quality; specific areas and elevation of nonusable materials; recommendations or uses and limitations for processed materials; and listing of potential development, processing and handling problems that may occur during construction.

15. The Government followed none of its own guidelines. The Government failed to heed the warnings of its consultant who told the Government that additional investigation sampling and testing would be required to select and qualify a source. Instead, the Government selected the site, because it contained

"the largest volume of potential aggregate production." Ignoring the advice of its independent geotech consultant, the Government took no more bore holes of the source in question.

16. The Government improperly combined material for testing from two bore logs that were taken for the purposes of testing slope stability. In actuality, the designated material source contained highly variable material which should not have been combined for a testing of rock quality. The actual condition of the source material was so poor that the Government's independent geotech would not even characterize the material as rock.

17. On April 28, 1999, the Government's test results were returned with yet another warning that the Government should not to rely on the test results where the rock is highly weathered. The Government ignored these warnings, and did not include any similar warnings in the contract.

18. The Government approved the source and certified that the source "has been found to meet the materials requirements under Sections 301 and 309." The contract also contained a drawing which depicted a cross section of the source showing an overburden depth (unusable material) of only 3.5 meters. The Government's representations proved to be untrue.

19. M.A. DeAtley relied upon the Government's representations and bid the project fully intending to use this Government-designated material source.