20. On October 2, 2001, Federal Highways and M.A. DeAtley attended a pre-construction meeting. In that meeting, the Government responded that aggregate testing such as the Los Angeles abrasion test, durability index, sodium sulfate soundness test, and accelerated weathering were not required for Government-designated sources and that the Government would perform those tests.

21. In October 2001, the contractor began crushing operations. Test holes were dug at the site. Immediately, M.A. DeAtley became concerned that the material source was not as represented. The test pits were 20' deep and no material had been encountered that gave resistance to the backhoe. The pits revealed highly fractured rock throughout the entire excavation. Mr. Cook, the Federal Highways geotechnical engineer was called to observe the condition. He noted that the rock material in the upper four to five meters was too soft to use as base.

22. The Contracting Officer's Technical Representative noted something much different. She observed that there was no competent rock in the 20' deep test pit. She felt that the material was highly variable. She observed that the material ranged from highly fractured to moderate and then back to highly fractured again. Not being the expert, she chose to stay silent and rely upon Mr. Cook that there

was competent rock. No additional tests for rock competency or durability were taken that day or at any time during production.

23. Despite its own Field Manual which mandates that a Government supplied source must yield competent material, the Government took the position that it was the contractor's responsibility to hunt and peck for competent rock in the source. The Government violated its own Manual and the contract when it performed no production testing.

24. In reliance upon the Government's assurances and the assumption that the Government had performed the proper tests, M.A. DeAtley proceeded to crush over 20,000 tons of Class D aggregate material from the designated source. During crushing the material was sampled and tested by an independent laboratory which confirmed that the crushed sample met the contract gradation requirements. The material was placed in stockpiles for placement the following spring.

25. On November 02, 2001, DeAtley, through DeAtley Crushing, commenced production of the aggregate for item Aggregate D base utilizing the WFLHD provided source. During the crushing, the material was sampled and tested by DeAtley, an independent testing laboratory, and WFLHD's laboratory, which each confirmed that the percent passing the #200 sieve of representative samples was between 7.5-8.5%. The contract specification was a 10% maximum.

26. DeAtley placed the material in stockpiles in accordance with Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects FP-96 section 307 and subsections 307.03 and 307.04. The materials remained in stockpiles from November 14, 2001 through August 19, 2002.

27. On August 19, 2002 DeAtley began the placement of the Aggregate D base on the temporary roadway. Samples of materials placed on the roadway showed an amount of material passing the #200 sieve slightly higher than contract specifications (maximum 10%).

28. On August 22, 2002, WFLHD shut down the Aggregate D base placement due to a failing test result of the gradation of the material. DeAtley and Budinger & Associates ("Budinger"), who DeAtley hired as an independent Quality Assurance Contractor, retrieved samples from WFLHD's provided source material for testing. DeAtley asked WFLHD to be present at the sampling, but WFLHD refused.

29. On August 28, 2002, DeAtley Crushing notified DeAtley that the materials produced during November 2001 were within gradation tolerances when the materials left the crushing plant. DeAtley, in a good faith effort to keep the project progressing, made an offer to provide credit to WFLHD in the amount of $21,425.00, which is 25% of the contract price for the Aggregate D base material.

WFLHD refused to accept this offer. WFLHD ordered DeAtley to remove the material off the roadway and to deliver new material.

30. On August 29, 2002, DeAtley began removing the rejected Aggregate D base and hauling it to a waste area.

31. On August 30, 2002, DeAtley received the results of the tests ran on the source material. The results showed that the material from the Government's designated source significantly failed the Sodium Sulfate Soundness test, which showed a loss greatly in excess of the specified maximum. DeAtley notified the Government of these test results and again asked them to reconsider their direction to recrush the material, since the cause of the material degrading beyond specified limits was due to poor source material.

32. On February 14, 2003, representatives from DeAtley, DeAtley Crushing, and Budinger met with representatives from WFLHD to discuss the issue of WFLHD's source material failing the Sodium Sulfate Soundness test. WFLHD referred DeAtley to the original Geotechinical testing reports on the source material, specifically Report 2-99 and they were "standing behind" those reports.

33. On September 18, 2003, DeAtley filed its claim seeking compensation in the amount of $277,833.55 and requested for a Contracting Officer's Decision.

34. On December 11, 2003, the Contracting Officer issued its final decision denying DeAtley's request.

## IV. JURISDICTION AND VENUE

35. This suit is being filed to appeal Final Contracting Officer's Decision WA PFH 158-1(2).

36. This Court has jurisdiction over this action pursuant to 41 USC §609(a)(2), 28 USC § 1491 and other applicable law. Venue of this action lies in this Court per the provisions of 41 USC §609 et. seq. and other applicable law.

## V. CLAIMS
## COUNT I
## (Breach of Contract)

37. DeAtley realleges paragraphs 1 through 36 as if set forth in their entirety.

38. The Government is charged with a duty to provide a source of materials, if one is provided, that will allow production of a product within the specifications. The Government further has the obligation to perform certain source testing on material sources to ensure that the material sources meet contract quality requirements. The Government is also charged with the obligation to act in good faith and to cooperate with the contractor, so as not to interfere with the contractor's performance.

39. The Government breached its duty to provide a source material in accordance with the specifications set forth in the contract. The Government was contractually required to perform all testing to investigate and qualify the source to insure that the source would provide sufficient quality material with reasonable production. The Government completely failed to perform appropriate source testing. The Government was contractually required to perform timely sampling and testing or production material to insure that the Class D aggregate was competent, durable and sound material, as required by the specifications. The Government failed to perform any production testing whatsoever. The Government was required to apply industry standard tolerances in its acceptance inspections. The Government applied no such tolerances, but instead improperly rejected the contractor's crushed material which was within industry tolerances. By refusing to apply industry standard tolerances, the Government breached its contract.

40. The Government breached its duty to cooperate by wrongfully rejecting Aggregate D base material offered by DeAtley in accordance with the contract.

41. The Government breached the covenant of good faith and fair dealing, damaging DeAtley thereby.