A. I'm not aware that they did.
Q. Do you know if the contractor did any of those tests during production?
A. I'm not aware if they did.
Q. Aside from the visual observation, which you say you're able to tell whether rock is competent or not and performing these tests, is there any other way to tell whether rock is competent sufficiently to prepare Class D aggregate?
Let me break that down. You say that you're able visually to tell whether rock is sufficiently durable to obtain Class D aggregate that will meet the contract requirements; is that right?
A. I can't tell by looking at a rock whether it is durable. I can just tell the extent of its fracture, whether it's one-eighth-inch or an eight-inch rock. I can tell whether it's dirt or whether it's rock. Visually that's all I can tell.
Q. Some rock that is highly fractured can still be crushed and still meet the durability requirements in a contract, right?
A. Yes.
Q. So visually you can't tell -- there's a zone there, if you will, that some rock is sufficiently durable, even though it might appear to be highly fractured, correct?
A. That is true.

Q. So is it accurate, then, that your testimony is that when you're looking at the Exhibit 3, geotechnical information, you're simply saying that rock down in Zone 3 would be better rock than in Zone 2 to obtain durable Class D rock, correct?

A. Yes.

Q. There is some rock, highly fractured or not, in Zone 2 that will clearly obtain or be sufficient to obtain Class D rock, right?

A. There is that possibility, yes.

Q. Is there anything in the contract that tells the contractor do not use rock in Zone 2 to obtain Class D rock?

A. Not that I am aware of.

Q. So you can't necessarily visually observe whether rock, which is highly fractured, would still make competent rock for Class D, right?

A. No, I can't.

Q. The only way to determine in advance whether rock is competent or not to perform Class D rock is by performing the tests set out in 703-05, to your knowledge.

A. That's my understanding.

(Deposition Exhibit No. 6 was marked for identification.)

BY MR. BLACK:

Q. I'm handing you what's been marked as Exhibit No. 6, which are meeting minutes for this particular project. Have

you seen those meeting minutes before?
A. Yes.
Q. Do you recall a weekly partnering meeting of October 2nd, 2001?
A. I don't particularly remember it, but I do see that this document is from that meeting.
Q. And you attended that meeting?
A. Yes.
Q. Did you prepare these meeting minutes?
A. Yes.
Q. At the bottom of the first page, the top of the second, there's discussions concerning quality control in the base material.
A. Okay.
Q. See where it says that?
A. Uh-huh.
Q. It says, "Linda clarified questions raised" and it goes on to talk about aggregate source testing.
A. Yes.
Q. Do you recall that the contractor, DeAtley, asked the government who was going to be doing the testing in terms of the durability of this particular source?
A. I just read that. Could you repeat the question?
Q. Sure. Do you recall that DeAtley, on October 2nd, 2001, asked if they should be the ones testing this material

By that did you intend to mean that the material source designated by the government would yield a consistent product for Class D aggregate?

A. By that I intended to mean that the government is confident that they can produce the base rock quantity they need from this 200 meters.

Q. In other words, the source would provide sufficient material that within reasonable means the contractor could supply material that would meet the contract requirements.

A. Yes.

(Deposition Exhibit No. 10 was marked for identification.)

BY MR. BLACK:

Q. Handing you a document which has been marked as Exhibit No. 10, it's a letter from DeAtley Construction to -- M.A. DeAtley Construction dated February 26, 2003. Have you ever seen this document before

A. May I look at it.

Q. Yes. I realize I don't have the transmittal from you, the government. I apologize for that.

A. I don't remember seeing this document.

Q. I'd like you to look at the second page of that letter where it talks about and it quotes the Federal Highways Administration Field Materials Manual. Is that a manual that you're familiar with?

A. I'm somewhat familiar with the manual.

(Deposition Exhibit No. 11 was marked for identification.)

BY MR. BLACK:

Q. I've handed you Exhibit 10. After reviewing that, does that refresh your recollection of seeing that letter?

A. I don't remember seeing this letter in the past.

Q. Okay. Exhibit No. 11 is a document entitled Field Materials Manual and it has an index. It's not a full manual. It's just excerpts out of that particular manual. Is that a document that you've seen before, at least the excerpts?

A. I'm not all that familiar with the manual. I do use it for reference now and then and mainly use it for students to become familiar with how we sample and test and stuff.

Q. All right. And my first question what is the purpose of the manual?

A. It's not something I drafted so I don't know.

Q. But you do use it as a reference source when you're working with younger people in your office.

A. Well, in particular the contractors usually have a lab that's unfamiliar with maybe a test or something and that's -- or how samples are done.

Q. Okay. Are you aware that there's certain editions of this manual or is there only one manual that you're aware of?

A. I do not know.