material.

Q. Okay. And that's what we're talking about, right?

A. Right.

Q. So as you sat there, then, were you able to tell how far down before competent rock was able to be used for base material?

A. If I remember right, the operator or -- was telling me that they were just reaching the hard material.

Q. That's not my question. My question is this. When you were out at the site, were you able to tell where bad rock ended and competent rock started by looking at this 20-foot deep test hole?

A. Nope. I have to rely on Kerry for that answer.

Q. The second bullet point on your Exhibit 12 is, on page 1, says, "We discussed with Cooper that the rock from the beginning of the project to Station 18+800 could well be used for base if quality testing showed compliance with the contract requirements."

Do you see where it says that?

A. Yes.

Q. Is that the -- refers to the testimony earlier where you were saying you could go outside of this designated quarry site? Is that what you're referring to?

A. This site isn't designated by the contract. It just states that it's been proven to have rock capable of producing

A. I see the overburden and the topsoil in the top meter in the picture on page 2.

Q. How far down the 20-foot hole does he need to go in order to start getting competent rock to perform per the contract requirements?

A. For Grade D?

Q. Yes.

A. He's not found it yet.

Q. How do you know that?

A. Because Kerry Cook told us so looking in the hole that this rock is too soft to use for Grade D. You can use it for select borrow, which was his immediate concern.

Q. He did that just by looking at it?

A. Yes.

Q. And that's deeper than is portrayed on Exhibit 3 in terms of where Zone 2 starts?

A. It's deeper than Zone 2 starts, but not to the bottom of Zone 2.

Q. So how was the contractor supposed to, in the Zone 2 material, determine what material was competent to use and what material was not?

A. If I were the contractor, what I would have done?

Q. If you care to answer it that way.

A. I would think that a contractor or a crushing operation would know by looking at the reports, looking at what

you see in this hole, you could tell whether they could produce whatever rock products they needed. I would assume they have had expertise or experience to do that.

Q. Because you don't have that experience, do you? You couldn't tell that by looking at it?

A. No.

Q. So you're saying the contractor should have the experience to tell by looking at it, the material in Zone 2, whether they could use that or not?

A. That would be my -- if I were the contractor, I would be running some tests and deciding what I wanted to do with this material.

Q. What kind of tests would the contractor run, durability tests, take test borings?

A. I don't know how the contractor makes the decision when they do that.

Q. You say they should take some tests. I'm asking you what type of tests. Would they be test borings?

A. Well, I think the first thing -- at this point the contractor did not know about a geotechnical report --

Q. Linda, I appreciate your answer, but let me stick with your statement the contractor should do tests. I'm asking you what tests the contractor should do to determine whether this rock in Zone 2 was competent or not?

A. I really don't know what tests the contractor in a

crushing operation would do to determine when they would start crushing.

Q. In fact, in October it's correct that you told the contractor that the government would perform the durability tests and the contractor didn't need to do it for the source in question, correct?

A. I told them that the government had done it. And on this day I told them here's a picture and showed Cooper here's the picture of what we see. And we saw that we could see these -- the difference between the topsoil and the highly fractured material.

Q. Linda, isn't it a fact that you did say on October 2nd that the contractor did not have to perform the source testing?

A. That's correct.

Q. So basically it's your position that the contractor needed to, in Zone 2 materials, pick and choose which rock was competent rock and which rock they should have discarded, correct?

A. Yes.

Q. Yet you don't know what tests, if any, the contractor could perform to do that selection process, correct?

A. That's not my expertise. I don't know which tests. I don't know how the contractor determines at what point they're going to send material to the crusher.

Q. And there's nothing in the contract documents that tells the contractor he can't use or should not use any of the materials in Zone 2, correct?

A. That's correct.

Q. Now, I'm going to hand you Exhibit No. 13, if I can, which is your daily diary dated July 7th, 2001. Is this one of the diaries you reviewed earlier, prior to your deposition?

A. Yes.

Q. I'd like you to focus on -- you're free to read the whole document, but page 3 of 3 of the document. I just discovered that there's a page 2 missing. Does yours have page 2 missing? We'll have to get that.

But my question is in reference to the first paragraph on page 3 of 3 it says, "I drove to the project and met with Sam about 3:00 p.m. The day crew was finished for the day and Sam agreed to take the excavator up to Station 18+760 to dig an exploratory hole. He dug a hole 2.5 meters from the hinge at Station 18+760 and dug down almost 3 meters. The material to this depth was very loose rock with some clay binder, but mostly rock."

Do you recall that occurring?

A. Yes.

Q. Was this an area in the designated source or outside the designated source?

A. Inside.