# DEPOSITION OF KERRY COOK

RECEIVED
SEP 14 2005
DUNN & BLACK

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| M.A. DeATLEY CONSTRUCTION, INC., Plaintiff, | ) | |
| vs. | ) | No. 041052C |
| UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF TRANSPORTATION; UNITED STATES FEDERAL HIGHWAY ADMINISTRATION, WESTERN FEDERAL LANDS HIGHWAY DIVISION, Defendants. | ) | |

DEPOSITION UPON ORAL EXAMINATION

OF

KERRY COOK

ORIGINAL

DATE TAKEN: Thursday, August 25, 2005
TIME: 9:00 a.m.
PLACE: Rider & Associates
Vancouver, Washington

COURT REPORTER: KAREN M. SMITH, CSR

APPEARANCES

FOR THE PLAINTIFF:

Mr. John C. Black
Dunn & Black
Suite 200, Peyton Building
10 North Post
Spokane, WA 99201

FOR THE DEFENDANTS:

Ms. Leslie Cayer Ohta
Department of Justice
Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

ALSO PRESENT:

Timothy Binder

# I N D E X


| Examination | Page |
|---|---|
| Examination By Mr. Black | 4 |


## EXHIBITS


| Exhibit No. | Description | Page |
|---|---|---|
| 29 | Geotechnical Report No. 2-99 | 18 |
| 30 | Memo, 4/28/99, Cook to Jacoby | 75 |
| 31 | Field Review Trip Report, June 7-9, 1999 | 79 |
| Aq 32 | E-Mail, 3/2/05, with Chapter 6 - Geotechnical, attached | 93 |

KERRY BRIAN COOK,

called as a witness in behalf of the Plaintiff, having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BLACK:

Q Mr. Cook, will you state your full name and address, please.

A Kerry Brian Cook, 1007 Northwest 51st Street, Vancouver, Washington.

Q Is that your residence address?

A Yes.

Q And you're employed with the Federal Highway Administration?

A That's correct.

Q And your position is?

A Senior geotechnical engineer.

Q When did you first become employed with Federal Highways?

A In July of 1988.

Q Do you have a degree from a university?

A Yes.

Q And what university?

A I've got a bachelor of science in geology from Oregon State University and a master of science in geotechnical engineering from Washington State University.

appropriate for a potential site for aggregate production?
A Depending on the surface exposures you may just sample the outside of the outcrop with grab samples. If it's a significant cut, as this job, you would want to have some borings that would be representative of the rock in the through-cut and test those borings for aggregate quality and combine that information with any other information you can obtain through visual reconnoissance of the surrounding rock.
Q Now, on this particular cut the -- there had been two borings taken at the time the geotech report was prepared, correct?
A That's correct.
Q And they say, "More work is needed to locate and test potential sites," correct?
A That's correct.
Q Did you feel that there was a need to take additional boring logs in the cut that is between 18+700 and 18+900?
A We selected this cut to evaluate for potential material source and in doing so we submitted the core from those two borings to our laboratory for rock quality testing and based on those results the test results showed that aggregate produced from the rock in this cut would meet our aggregate quality specifications.
At that point I went out to the site and collected

samples from the rock cut along the roadside adjacent to this site and also examined the quality of the rock in the rock cuts to assess the type of rock that could be expected to be encountered and they were consistent with the rock that was encountered in the borings, and another sample was submitted to our lab from grab samples picked up along the ditch line for preliminary immersion compression testing.

Q And that was for asphalt production?

A That's for asphalt mix design.

Q Okay. So that one dealt -- that sample dealt with asphalt mix design that you say was submitted?

A That's correct.

Q Okay. So just so I understand, first of all, how did you select or narrow down this particular source as one that you were interested in looking at?

A I reviewed the boring logs and the rock in the boring logs looked to me like it would meet our quality requirements.

Q Okay.

A And I submitted that to our lab for testing and test results showed that it did meet our quality requirements.

Q Did you look at other boring logs also in that process of elimination?

A Yes.

Q So to your -- in your mind the source between

18+700 and 18+900 actually appeared to have the best materials that you saw in all of the boring logs?
A Not necessarily. It was just the largest volume of excavation, largest volume of potential aggregate production.
Q And a lot of rock was needed for this project, right?
A Well, that rock cut contained much more volume of excavation than the aggregate that we needed for the project but it was the obvious largest volume of excavation on the project to look at for material source.
Q Okay.
A And the report also mentioned that similar rock occurred ahead on line here and that we could have evaluated those as well, and the contractor certainly had the option of using any of those, which he ended up doing.
Q Right. But just so I understand, between 18+700 and 18+900, the rock appeared to be acceptable from your review of the bore logs and the size of the cut was such that if that was approvable that it would have enough material to do the whole job, correct?
A As I understand, there was an excess quantity of excavation on this job so the material coming out of that rock cut could potentially have either been wasted or utilized in aggregate production and I understand that there was more than enough volume in that cut to take care of our aggregate needs.

the samplings on or to do the complete suite of testing, rock quality testing. I believe that takes more than one boring, depending on the depth of the boring, so in this case it took both borings to meet the amount of material that they needed for testing and that's commonly done, yes.

Q And that's a reason you did it in this case is because you needed them combined because you didn't have enough material?

A No, I thought that the combined sample would be conservatively representative of the entire cross-section of material that would be excavated from this cut.

Q And again that's something you typically do is combine those samples or direct the materials lab to do that?

A On shorter borings we often combine core samples for material testing, yes.

Q Are you aware of any industry standards or testing literature that says you shouldn't combine the material?

A You know, it's common judgment that you don't combine materials from -- that are significantly different or that you want to test separately but in this case I purposely combined the samples because I wanted a test result that represented the combined material that would be excavated from the cut.

Q Was any material scalped or wasted in these boring logs before they were combined?

A No, I don't.

(Deposition Exhibit No. 30 marked for identification.)

BY MR. BLACK:

Q I'm handing you what's been marked as Exhibit No. 30 which is a memorandum dated April 28th, 1999 that is directed to you from Kenneth Jacoby. Have you seen that document before?

A It's directed to Kenneth Jacoby from myself.

Q Sorry about that.

A Yes, I've seen this document.

Q All right. Now, this is a document that you apparently prepared after receiving the rock quality test that you referred to the materials lab to perform?

A That's correct.

Q All right. Now, who is Kenneth Jacoby?

A He was the head of the Washington design section.

Q Okay. Out of -- and he's located in Vancouver?

A Yes.

Q So he's in the design section?

A Yes.

Q And he was the engineer that was working with you in terms of the road design?

A He's the head of the Washington design section which includes all the Washington projects, and he is the

supervisor of the designer or COTR of the consulting designer who would be working on this project.

Q Okay. I'd like you to focus on the second paragraph of this letter. It says, "Core samples tested are quartzite and argillite from the Belt Series." Is that the samples that are being referred to as the B-28 and B-29?

A Yes, those are the core samples from those two borings.

Q And the Belt Series, is that the name of the geological --

A Yes, that's the formation name for a series of argillites and quartzites surrounding the Idaho baffle area.

Q You go on to say that:

"Based on a review of the Geotechnical Report, this core is similar in rock quality to quartzite and argillite rock found in the cut slopes from 17+475 to approximately 19+700."

What was the point you were trying to make with that sentence?

A That based on visual examination of the rock within that segment of the road that the rock quality represented by the test results on the core samples could potentially be representative of the rock between these stations. And that, you know, that implies that potentially the rock between

A I don't know what their procedures are.
Q Okay. You're kind of out of the loop on that?
A I am.
Q Okay. I apparently only have one copy of this.
(Deposition Exhibit No. 32 marked for identification.)
BY MR. BLACK:
Q I'm going to hand you what's been marked as Exhibit 32. Exhibit 32 is -- appears to be an e-mail from your counsel to our office. It's actually a forward of an e-mail that you sent to her and Tim Binder attaching a PDDM with general guidelines. Can you tell me what the attached document is?
A That's a very lengthy document that provides the guidelines for project design and development.
Q And what you sent was just Chapter 6 of a much larger volume of information?
A That's right.
Q Okay. And the document is entitled what?
A Project Development and Design Manual.
Q Okay. I always have trouble with these acronyms. And is this a document published by the Federal Highway Administration?
A Yes.
Q All right. So this is the Bible, if you will?

A This provides design criteria for the project design and for the various technical groups to perform the functions that they do for development of projects.

Q Okay. And this would include your department, the geotech?

A Yes, geotechnical section is included in Chapter 6 of the PDDM manual.

Q Okay. So your job is governed by Chapter 6 of this much larger manual or are there other chapters too?

A It's not a governing document. It's more of a guideline.

Q Okay. But are there other sections that would be relevant to your scope of work or just Chapter 6?

A There's some small segments of other sections that are relevant to geotechnical engineering but predominantly Chapter 6 covers most of the work that we do.

Q Okay. And is this one of the pieces of information you get when you hire on with Federal Highways?

A I believe most people have a copy of this manual on their shelf, yes.

Q Okay. How often do you -- if at all -- go back and review the information that's in here?

A I look at it several times a year.

Q Okay.

A And right now it's under review and I'm on the

committee to rewrite it.

Q Okay. How often does it get rewritten?

A Not very often. It's been in the same condition since I've been there since 1988 and it has minor revisions that are issued periodically.

Q So since 1988 this same information has been in your office?

A Yes.

Q Okay. I'd like you to turn, if you would, to table 6-4 on page 6-13, and this table is called Guidelines for Geotechnical Drilling Investigations, correct?

A Yes.

Q Okay. And specifically it has a category, Material Sites, borrow sources and quarries. You see where it says that?

A Yes.

Q It says, "Space borings or test pits on a grid pattern every 30 to 45 meters or change of material. See where it says that?

A Yes.

Q Now, your own Federal Highway manual is recommending for material sites that you have boring or test pits on a grid pattern every 30 to 45 meters, correct?

A It's not necessarily a recommendation. These are general guidance to be used if you have no other information