# DEPOSITION OF RODNEY PRELLWITZ

RECEIVED

SEP 29 2005

DUNN & BLACK

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

M.A. DeATLEY CONSTRUCTION, INC., )
)
Plaintiff, )
)
vs. ) Case No. 041052C
)
UNITED STATES OF AMERICA; )
UNITED STATES DEPARTMENT OF )
TRANSPORTATION; UNITED STATES )
FEDERAL HIGHWAY ADMINISTRATION, )
WESTERN FEDERAL LANDS )
HIGHWAY DIVISION, )
)
Defendants. )

COPY

DEPOSITION UPON ORAL EXAMINATION

OF

RODNEY PRELLWITZ

DATE TAKEN: Thursday, September 15, 2005
TIME: 10:01 a.m.
PLACE: 1104 Main Street, Suite M110
Vancouver, Washington

COURT REPORTER: Jeannice Middaugh, RDR, CRR

APPEARANCES

FOR THE PLAINTIFF: DUNN & BLACK
BY: JOHN C. BLACK, ESQ.
10 North Post, Suite 200
Spokane, WA 99201

FOR THE DEFENDANTS: DEPARTMENT OF JUSTICE
BY: LESLIE CAYER OHTA
Attorney at Law
1100 L Street, N.W.
Washington, D.C. 20530

ALSO PRESENT: TIMOTHY J. BINDER

# I N D E X


| Examination | Page |
|---|---|
| By Mr. Black | 4 |


## EXHIBITS


| Exhibit No. | Description | Page |
|---|---|---|
| 3 | Diagram | 22* |
| 4 | Boring Logs | 20* |
| 5 | Plan Sheet | 18* |
| 27 | Photograph | 42* |
| 29 | Geotechnical Report No. 2-99 | 10* |
| 32 | PDDM - Chapter 6 | 45* |
| 40 | Photograph | 42* |


* Marked at prior depositions by other court reporters

RODNEY PRELLWITZ,

called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BLACK:

Q. Mr. Prellwitz, will you state your address, please.

A. 414 Sharrott Hill -- S-h-a-r-r-o-t-t -- Sharrott Hill Loop -- Stevensville, Montana -- with a "v," Stevensville.

Q. And by whom are you employed?

A. Currently I'm self-employed and semi-retired.

Q. And when did you leave the employ of --

A. GMT Consultants?

Q. Yes. Thank you.

A. I worked with them on the five-year open-ended contract with Federal Highways. So when I worked on projects for Federal Highways and a few other projects, I worked with GMT. Other than that, I wasn't one of their permanent employees.

Q. Okay. So you've never been a permanent employee of GMT then?

A. Not completely, no. We just did certain project works where they wanted my expertise, and I wasn't -- at that time I was on their payroll as one of their engineers.

Q. Would that be considered a contract employee then or

A. That's true.

Q. -- with Federal Highways?

A. After -- after '93 -- after I retired from the forest service.

Q. And that would be with Federal Highways; right?

A. With Federal Highways, yes.

Q. What did you understand your scope of work to be for the phase two geotechnical investigation?

A. I was assigned as the senior technical engineer on the project. And as part of our proposal, we were given certain tasks to perform. And in those tasks we were given specific things which we had to investigate and which we had to report in to -- report to the Federal Highways and to make delivery of certain samples.

Q. Do you recall what those tasks were?

A. Yes, I do.

Q. Okay.

A. They're documented in the report and -- they're summarized in there, I should say.

Q. Let me --

A. If -- would you like me to read them?

Q. Yes, or show me where they are.

A. Right. Exactly.

MS. OHTA: And you handed him Exhibit --

MR. BLACK: This is Exhibit 29. But this is actually

my copy. I think what we did just for -- we can go off the record.

(Discussion held off the record.)

MR. BLACK: Let's go back on the record.

THE WITNESS: Actually, looking at the table of contents, the very first section is an introduction and scope of work, and that starts on page 1.

BY MR. BLACK:

Q. Okay.

A. And on page 1 then it begins with the field work and the office work that we were assigned and my tasks particularly.

Q. I'll have to look over your shoulder here just so I -- I only have one copy to look at.

A. How much of this do you want me to read?

Q. Back to the -- what was it that you were specifically assigned?

A. What I was specifically assigned to do had to do with my expertise in slope stability and slope design and primarily -- for instance, we had to deal with the cuts -- the type of road cuts that would be made in this section of road.

MS. OHTA: We have an extra copy, so if you want to take this back and --

MR. BLACK: Thank you. That would be great.

MS. OHTA: Have a look at this.

Q. Well, there was -- in this particular area -- let's see if I can -- I can probably get -- point you to the -- why don't we just go to page 20 of the report --
A. Okay.
Q. -- your geotech report, which is Exhibit 29.
A. Okay.
Q. Page 20, there's a category, "Material Sources."
A. Mm-hmm.
Q. See where it says that?
A. I see it.
Q. Now, the material source section -- was that part of the request for proposal?
A. It wasn't specifically. What it was -- the request for proposal -- we were required to, as the centerline reconnaissance, determine the material that was there --
Q. Right.
A. -- and to segment the road based on those materials.
So as part of that requirement to give a general description, we determined that in both sections C, D and E there was suitable material that could probably be used as material source, not specific locations but somewhere in those segments. If you wanted a materials engineer who was going to look for a material source, that would be the place to look.
Q. Okay. And was that something you were specifically asked to find out?

A. As part of the reconnaissance, just in a general sense.

Q. And the sections were C, D and E?

A. C, D and E.

Q. How big were each of those sections in terms of length or distance?

Does this -- if you look at Exhibit 5, does that help you?

A. No. That notes only one of them. It would be -- hold on a second.

Q. Would a set of plans help you?

A. On page 3 -- again, now we're talking -- what exhibit is this?

Q. 29.

A. Okay. On page 3 and 4 the stationing on the segments is documented.

Segment C runs from 17+475 to 18+490.

Segment D runs from 18+490 to 19+210.

Segment E runs from 19+210 to 20+370.

Q. And these are meters?

A. Those are meters.

Q. So basically you were asked to give a general overview during your other specific chores to see -- to say whether in any one of these sections there may be sufficient material or quality material?

A. That's true.

Q. Okay. So when you said there may be, you basically were saying over the segments of C, D and E, which are many meters in length, there could be some good material?

A. That's true.

Q. Okay.

A. That's the general statement that's made.

Q. Okay. These statements under "Material Sources," such as "thin-bedded argillites and schists may be of lesser quality" -- do you see where it says that? I'm going back to page 20. Why don't you --

A. 20?

Q. Yeah. Are you there?

A. I see it.

Q. Okay. Halfway into the paragraph under "Material Sources" it says: "The thin-bedded argillites and schists may be of lesser quality, and extensive outcrops of these rock types should be avoided as material sources."

Do you see where it says that?

A. That's true.

Q. Is that something you wrote or is that Mr. Crawford?

A. No, that's something I wrote.

Q. Okay. That's just a general statement?

A. General statement.

Q. Okay. Did you observe areas of thin-bedded

argillites and schists on this particular project?

A. Oh, yes.

Q. Okay. Was there that condition, to your knowledge, within this cut, which is B-28 and B-29?

A. Not to my knowledge.

Q. Okay. You didn't observe it?

A. No.

Q. Is it possible that within zone two between those 25 meters, between B-28 and B-29, there was such conditions?

A. I have no knowledge of that.

Q. You'd have to do more test borings to determine that?

A. It wasn't our responsibility, so I'm not about to comment on that.

Q. Okay. But as an expert in geology, I should say, the only way you'd be able to tell that is if you did more borings; is that correct?

A. That's true.

Q. Going back again to page 20 of Exhibit 29, it says there -- excuse me -- it says: "Rock quality tests are required to verify the suitability of all these materials for crushed aggregate."

Is that your statement?

A. That's true.

Q. And what rock quality tests did you have in mind?

A. That wouldn't be for me to determine. That would be

for a materials engineer.
Q. You're basically fulfilling your obligation to say: "Hey, there may be some good rock out here" --
A. Exactly. Right.
Q. -- "so you need to do your own tests, Federal Highways"?
A. That's true.
You left out one very important thing. There also is that we did not recover samples for rock quality testing for material sources, which is also in that paragraph. It should be documented.
Q. Okay. Where -- where are you referring to?
A. (Indicating.)
Q. So, in other words, you did not recover --
A. No.
Q. Would you say again --
A. I'm sorry. I guess I didn't put it in there.
Q. Okay.
A. We did not --
Q. So tell me again what --
A. We did not recover any samples to be used as rock quality tests.
Q. And you weren't asked to do that?
A. No.
Q. And so it was -- when you said "Rock quality tests

are required to verify the suitability of all the materials for crushed aggregate," you had in mind that the government should go get additional samples of material and actually run additional tests?

A. That they would have to definitely do their own sampling.

Q. And testing?

A. For that purpose, yes.

Q. And that would include testing?

A. (No audible response.)

Q. "Yes"?

A. Excuse me. I did state -- here -- the second sentence in there says: "No samples were taken for laboratory analysis, but the quartzite and diorite should be hard and durable."

Q. Okay.

A. So we didn't require -- we didn't plan to take samples for that purpose as documented.

Q. So you specifically told the government that, if they wanted to look at material for purposes of quality for designating it as a source, that they'd have to do their own sampling and testing?

A. That's true.

MS. OHTA: Now --

THE WITNESS: Sorry.

opinions concerning whether a source was a proper material source?

A. I have no knowledge of that.

Q. Okay. I'm going to hand you what has previously been marked as Exhibit 29 and -- or excuse me -- 27 and Exhibit 40. Do you recognize these cuts that are shown in these photographs as cuts that are from the Flowery Trail project?

A. They might possibly be but not in this particular area that we're talking about. The rock was much harder.

Q. Okay. So when you say "not in this particular area," you're saying in the cut that is between B-28 and B-29 the rock is much harder?

A. True.

Q. Okay. And how do you know that?

A. By looking at the cores.

Q. Okay. So by looking at the rock which -- or excuse me -- looking at the cores, which are B-28 and B-29, Exhibit 4 --

A. True.

Q. -- the rock would be much harder than as shown on the photographs, Exhibit 27 and Exhibit 40?

A. True.

Q. What do you see in these photographs in terms of the quality and competency of the rock?

A. For what purpose?

Q. For designation as a potential quarry site.

MS. OHTA: Objection. Competency.

THE WITNESS: I am not a qualified materials engineer.

BY MR. BLACK:

Q. Okay. What do you see in terms of these photographs for the quality and competency of the rock in general?

A. If I was going to put a cutslope in there, it would be flattened one to one.

Q. So in layman's terms, then, you would see in both Exhibit 27 and Exhibit 40 rock which would require a one-to-one slope?

A. Exactly.

Q. Okay. And if we look at Exhibit No. 3, that would be, in other words, zone one material?

A. At least, yes. Maybe not as good as zone one material.

Q. Okay. So the material that you're seeing in Exhibit No. 27 would be potentially equal to or maybe even worse in terms of stability for Exhibit No. 1 --

A. True.

Q. -- for zone number one. Excuse me.

A. Zone number one.

Q. The same with Exhibit 40?

A. True.

Q. And so when you're -- can you describe for me, using the bore log terminology, Exhibit 4, what type of material you're visually seeing in Exhibit 27 and Exhibit 40?

A. It doesn't even exist on this one.

Q. Oh, it doesn't?

A. No. It wasn't -- it never got to that point of weathering.

Q. How would you describe this type of material?

A. Highly weathered, very thin-bedded.

Q. Okay. Highly weathered. What type of material is it?

A. I'm not sure, looking at it. It could be decomposed granite from this appearance or some other type of intrusive rock.

Q. "Intrusive rock" being what?

A. Igneous.

Q. Igneous. Okay. Is there -- is it possible that there's -- strike that.

Are you able to see any schists or intrusions in these photographs, Exhibit 27 and 40?

A. Highly-weathered schists might have this appearance.

Q. You're pointing to Exhibit 40?

A. Exhibit 40.

Q. Okay. How about Exhibit 27?

A. It's too broken up. I couldn't tell.

Q. Okay. Are schists different than intrusions?

A. Yes. They're meta- -- highly metamorphosed.

Q. Do you see any schists in Exhibit 27 or 40?

A. Possibly 40.

Q. Okay. All right. For purposes of -- strike that.

Would the -- strike that as well.

Would you characterize this rock in this cut as highly variable?

A. In terms of the discontinuities, the bedding planes, and joint sets, yes.

Q. Are you able to determine whether the rock is competent in nature?

MS. OHTA: Objection. Rel- -- objection. Competency.

THE WITNESS: What exactly are you meaning in terms of "competent"?

BY MR. BLACK:

Q. Well, okay. That's a fair question. Let's see if I can -- I'm going to hand you what's been marked previously as Exhibit 32. Let see if we can --

MS. OHTA: There's no question pending with this.

MR. BLACK: Well, Counsel --

MS. OHTA: Okay. Oh, that's yours.

MR. BLACK: -- I know you're trying to be helpful, but just -- let's set this there for a second.

MS. OHTA: All right. It's just our copy.
MR. BLACK: I understand that. I'm not going to take it. Let me get to the sampling here. Okay. Let me keep this together.
Q. I'm going to hand you Exhibit No. 32 and --
MS. OHTA: It's important that you put it between us so I can also look at it.
BY MR. BLACK:
Q. What I'm going to do is turn to the second page. And what this document is -- it's a manual that comes from Federal Highways.
Have you ever seen any Federal Highways manuals?
A. No.
Q. Okay. And it's chapter 6, the geotechnical section. Okay. And what I'd like you to do is turn to -- and I'll help you here -- a table in here, Exhibit 6.5, and ask you to take a look at that.
A. Mm-hmm.
Q. It's a table entitled "Field Classifications for Soil and Rock."
Have you ever seen a table similar to this in any of the information you use in your occupation?
A. Yes.
MS. OHTA: Okay. Please allow me time to --
THE WITNESS: Sorry.

MS. OHTA: -- interpose an objection if I think it's appropriate.

I object on the same grounds previously stated: That he is here as a fact witness to testify about his role in generating the geotechnical report in connection with this contract, and he is not here as a retained expert to testify about other matters.

So I just think that it is inappropriate for you to be drawing on his expertise in areas that he did not cover in his report.

MR. BLACK: Thank you.

Q. You said that you've seen charts similar to this in other publications. Is this -- is this information something that you utilize in performing your tasks?

A. To some degree, especially in the soils end of it, yes.

Q. Okay. Is this a -- is the organization of this table something that's very common in the geotechnical area?

A. It's not unusual.

Q. Now, can you describe for me, using the photographs of Exhibit 27 and 40, what is the nature of the material that you visually observe from those photographs?

MS. OHTA: Objection. Competency.

BY MR. BLACK:

Q. And I guess if it's any better for you, let's talk

about the rock hardness section.

A. I'll have to speak in terms of slope stability.

Q. That's fine.

A. And what I would do -- in both of these cases I would treat those as residual soil. I wouldn't even call them competent enough to be called rock.

Q. Okay.

A. I would treat those as very dense, residual soils and design the slope accordingly.

Q. Okay. And is there -- would you characterize the rock shown in photographs 27 and 40 as very soft rock or even something less than that?

A. I would call it a granular soil. And then depending on the -- if we ran a standard penetration test, we would determine the relative density. And that's the resistance SPT you're seeing there. We could use that in the classification.

Q. Okay. But in terms -- can you use the -- can you characterize using the language in the hardness section?

A. (No audible response.)

Q. "No"?

A. It's not a rock when you call it a soil. It's not a rock anymore.

Q. So the material in these two cuts, Exhibit 27 and 40, wouldn't even be characterized as rock? Is that what you're saying?

A. That's true.
Q. And so the table which is Exhibit 6.5 is a classification that's intended for rock?
A. Oh, no. It's soil and rock.
Q. Soil and rock.
A. Exactly. Cohesive soil, granular soil, and rock hardness. They're all there.
Q. Okay. So I understand what you're saying. So you can't even use the rock hardness column?
A. No.
Q. Okay. Are you familiar with any publications that are industry-wide in the geotechnical area that would detail the process of investigating and qualifying a source for material?
MS. OHTA: Yes, same objection as previously stated. This is far beyond what Mr. Prellwitz is here for. He is a fact witness. We're not required to subpoena him because he came voluntarily. But pursuant to a subpoena, he would only be required to answer questions that he was a percipient witness of -- that is, the observations and the work he did in preparing the geotechnical report which is at issue in this case.
BY MR. BLACK:
Q. You can go ahead and answer.
MS. OHTA: If you choose to answer it.