IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| M.A. DeATLEY CONSTRUCTION, INC., Plaintiff, vs. UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF TRANSPORTATION; UNITED STATES FEDERAL HIGHWAY ADMINISTRATION, WESTERN FEDERAL LANDS HIGHWAY DIVISION, Defendant. | Case No.: 041052C (Judge Edward J. Damich) **[Proposed] AMENDED COMPLAINT** |

M.A. DeAtley Construction, Inc. ("DeAtley") for its Complaint in the above-captioned action, alleges as follows:

## I. NATURE OF THE CASE

1. This case involves the construction of the Flowery Trail Road Project, involving DeAtley and its subcontractor DeAtley Crushing, for the United



EXHIBIT A

States Department of Transportation, United States Federal Highway Administration, and the Western Federal Lands Highway Division ("WFLHD"). In furtherance of its contractual obligations with the Government, DeAtley entered into a subcontract with DeAtley Crushing Company, wherein DeAtley Crushing agreed to produce the specified materials.

## II. THE PARTIES

2. DeAtley is a Washington corporation with its principle office and place of business in Clarkston, Washington. DeAtley is engaged in the business of construction services and delivery.

3. Defendant is the United States of America, United States Department of Transportation, United States Federal Highway Administration, Western Federal Lands Highway Division.

## III. FACTS

4. On February 9, 2001, DeAtley was awarded Contract No. DTFH70-01-C-00011 (the "Flowery Trail Project Contract" or "Contract") to reconstruct a portion of Flowery Trail Road. The contract included crushing of 21,500 metric tons Aggregate D base for the Project. The project schedule called for construction over a two year period starting in 2001 and completing in 2002.

5. The aggregate source was selected by the Government and it was designated in the contract as an optional source for the contractors to use.

6. For Government's designated sources, the contract requires the Government to perform testing on the material to determine the quality and durability of the rock. The tests include the Los Angeles abrasion test, the sodium sulfate soundness test, accelerated weathering, and durability index.

7. The Federal Highways Field Materials Manual directs the Government on the timing and frequency of such testing. That manual also summarizes the Government's obligations when a Government-designated source is involved. The Government is responsible for producing a material which meets the quality requirements of characteristics as soundness, abrasion, stripping resistance of the aggregate, and the quantity in the source. The Contractor assumes responsibility for the gradation and sand equivalent. During crushing operations the Project Engineer should submit samples of aggregate to confirm the quality of the material and to make certain that the material still meets the requirements for soundness, abrasion, stripping, etc.

8. The contract contains a Government-provided design for aggregate size and gradation. The Standard Specifications contain a design range for each size of aggregate, that the Government warrants will produce an acceptable result. The Standard Specifications further contain tolerances outside of each sieve range, which provide that he material will still be accepted based upon statistical deviation calculations, although the contractor's payment would be reduced.

9. The Government revised the Standard Specification for the Flowery Trail Project. With respect to the fine material (i.e., the #200/5 ct 75 micron sieve), the Government deleted the typical design ranges and provided that the allowable amount of fine material would be capped at 10% maximum. There were no tolerances specifically stated for this specification requirement.

10. The contract addresses the situation where no tolerances are provided. § 106.04 of the Standard Specifications states:

> When no tolerances values are identified in the contract, the work will be accepted based on customary manufacturing and construction tolerances.

11. In March 1999, the Government retained a geotechnical consultant to travel to the site for purposes of designing cut slopes for the roadway. The Government asked the geotechnical consultant if he would visually observe whether there "may" be any locations within the existing project boundaries which could possibly serve as a quarry source for crushed aggregate material.

12. In March 1999 the geotechnical consultant prepared a report which recorded his observations. The consultant performed no tests nor did he take any borings for purposes of material source qualification. The geotech warned the Government that the Government would have to perform its own sampling and testing to verify suitability of the materials for crushed aggregate.

13. The Federal Highways Administration also maintains a Materials Manual that contains directions on how the Government should proceed with investigating, testing and qualifying a materials source. The Manual states that for material borrow sources, borings or test pits should be spaced on a grid pattern every 30 to 45 meters or less if material changed. For typical federal highway projects, four to six have holes and two to four complete sets of aggregate quality tests are required.

14. The Manual further explains that among other items, a material source investigation should provide the expected quality of processed materials and procedures necessary to obtain that quality; specific areas and elevation of nonusable materials; recommendations or uses and limitations for processed materials; and listing of potential development, processing and handling problems that may occur during construction.

15. The Government followed none of its own guidelines. The Government failed to heed the warnings of its consultant who told the Government that additional investigation sampling and testing would be required to select and qualify a source. Instead, the Government selected the site, because it contained "the largest volume of potential aggregate production." Ignoring the advice of its independent geotech consultant, the Government took no more bore holes of the source in question.

16. The Government improperly combined material for testing from two bore logs that were taken for the purposes of testing slope stability. In actuality, the designated material source contained highly variable material which should not have been combined for a testing of rock quality. The actual condition of the source material was so poor that the Government's independent geotech would not even characterize the material as rock.

17. On April 28, 1999, the Government's test results were returned with yet another warning that the Government should not to rely on the test results where the rock is highly weathered. The Government ignored these warnings, and did not include any similar warnings in the contract.

18. The Government approved the source and certified that the source "has been found to meet the materials requirements under Sections 301 and 309." The contract also contained a drawing which depicted a cross section of the source showing an overburden depth (unusable material) of only 3.5 meters. The Government's representations proved to be untrue.

19. M.A. DeAtley relied upon the Government's representations and bid the project fully intending to use this Government-designated material source.

20. On October 2, 2001, Federal Highways and M.A. DeAtley attended a pre-construction meeting. In that meeting, the Government responded that aggregate testing such as the Los Angeles abrasion test, durability index, sodium

sulfate soundness test, and accelerated weathering were not required for Government-designated sources and that the Government would perform those tests.

21. In October 2001, the contractor began crushing operations. Test holes were dug at the site. Immediately, M.A. DeAtley became concerned that the material source was not as represented. The test pits were 20' deep and no material had been encountered that gave resistance to the backhoe. The pits revealed highly fractured rock throughout the entire excavation. Mr. Cook, the Federal Highways geotechnical engineer was called to observe the condition. He noted that the rock material in the upper four to five meters was too soft to use as base.

22. The Contracting Officer's Technical Representative noted something much different. She observed that there was no competent rock in the 20' deep test pit. She felt that the material was highly variable. She observed that the material ranged from highly fractured to moderate and then back to highly fractured again. Not being the expert, she chose to stay silent and rely upon Mr. Cook that there was competent rock. No additional tests for rock competency or durability were taken that day or at any time during production.

23. Despite its own Field Manual which mandates that a Government supplied source must yield competent material, the Government took the position

that it was the contractor's responsibility to hunt and peck for competent rock in the source. The Government violated its own Manual and the contract when it performed no production testing.

24. In reliance upon the Government's assurances and the assumption that the Government had performed the proper tests, M.A. DeAtley proceeded to crush over 20,000 tons of Class D aggregate material from the designated source. During crushing the material was sampled and tested by an independent laboratory which confirmed that the crushed sample met the contract gradation requirements. The material was placed in stockpiles for placement the following spring.

25. On November 02, 2001, DeAtley, through DeAtley Crushing, commenced production of the aggregate for item Aggregate D base utilizing the WFLHD provided source. During the crushing, the material was sampled and tested by DeAtley, an independent testing laboratory, and WFLHD's laboratory, which each confirmed that the percent passing the #200 sieve of representative samples was between 7.5-8.5%. The contract specification was a 10% maximum.

26. DeAtley placed the material in stockpiles in accordance with Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects FP-96 section 307 and subsections 307.03 and 307.04. The materials remained in stockpiles from November 14, 2001 through August 19, 2002.

27. On August 19, 2002 DeAtley began the placement of the Aggregate D base on the temporary roadway. Samples of materials placed on the roadway showed an amount of material passing the #200 sieve slightly higher than contract specifications (maximum 10%).

28. On August 22, 2002, WFLHD shut down the Aggregate D base placement due to a failing test result of the gradation of the material. DeAtley and Budinger & Associates ("Budinger"), who DeAtley hired as an independent Quality Assurance Contractor, retrieved samples from WFLHD's provided source material for testing. DeAtley asked WFLHD to be present at the sampling, but WFLHD refused.

29. On August 28, 2002, DeAtley Crushing notified DeAtley that the materials produced during November 2001 were within gradation tolerances when the materials left the crushing plant. DeAtley, in a good faith effort to keep the project progressing, made an offer to provide credit to WFLHD in the amount of $21,425.00, which is 25% of the contract price for the Aggregate D base material. WFLHD refused to accept this offer. WFLHD ordered DeAtley to remove the material off the roadway and to deliver new material.

30. On August 29, 2002, DeAtley began removing the rejected Aggregate D base and hauling it to a waste area.

31. On August 30, 2002, DeAtley received the results of the tests ran on the source material. The results showed that the material from the Government's designated source significantly failed the Sodium Sulfate Soundness test, which showed a loss greatly in excess of the specified maximum. DeAtley notified the Government of these test results and again asked them to reconsider their direction to recrush the material, since the cause of the material degrading beyond specified limits was due to poor source material.

32. On February 14, 2003, representatives from DeAtley, DeAtley Crushing, and Budinger met with representatives from WFLHD to discuss the issue of WFLHD's source material failing the Sodium Sulfate Soundness test. WFLHD referred DeAtley to the original Geotechinical testing reports on the source material, specifically Report 2-99 and they were "standing behind" those reports.

33. On September 18, 2003, DeAtley filed its claim seeking compensation in the amount of $277,833.55 and requested for a Contracting Officer's Decision.

34. On December 11, 2003, the Contracting Officer issued its final decision denying DeAtley's request.

## IV. JURISDICTION AND VENUE

35. This suit is being filed to appeal Final Contracting Officer's Decision WA PFH 158-1(2).

36. This Court has jurisdiction over this action pursuant to 41 USC §609(a)(2), 28 USC § 1491 and other applicable law. Venue of this action lies in this Court per the provisions of 41 USC §609 et. seq. and other applicable law.

## V. CLAIMS
## COUNT I
### (Breach of Contract)

37. DeAtley realleges paragraphs 1 through 36 as if set forth in their entirety.

38. The Government is charged with a duty to provide a source of materials, if one is provided, that will allow production of a product within the specifications. The Government further has the obligation to perform certain source testing on material sources to ensure that the material sources meet contract quality requirements. The Government is also charged with the obligation to act in good faith and to cooperate with the contractor, so as not to interfere with the contractor's performance.

39. The Government breached its duty to provide a source material in accordance with the specifications set forth in the contract. The Government was contractually required to perform all testing to investigate and qualify the source

to insure that the source would provide sufficient quality material with reasonable production. The Government completely failed to perform appropriate source testing. The Government was contractually required to perform timely sampling and testing or production material to insure that the Class D aggregate was competent, durable and sound material, as required by the specifications. The Government failed to perform any production testing whatsoever. The Government was required to apply industry standard tolerances in its acceptance inspections. The Government applied no such tolerances, but instead improperly rejected the contractor's crushed material which was within industry tolerances. By refusing to apply industry standard tolerances, the Government breached its contract.

40. The Government breached its duty to cooperate by wrongfully rejecting Aggregate D base material offered by DeAtley in accordance with the contract.

41. The Government breached the covenant of good faith and fair dealing, damaging DeAtley thereby.

42. These breaches caused damage to DeAtley in an amount to be proven at time of trial, plus interest.

**COUNT II**
**(Defective Specifications)**

43. DeAtley realleges paragraphs 1 through 42 as if set forth in their entirety.

44. The Government provided design specifications on the project. These specifications included a gradation specification which did not have a tolerance for the finer material.

45. The Government's specifications were defective. The Government specified an unsuitable source with highly variable, highly weathered rock. The Government specifications contained no criteria which would allow for normal degradation of this material after the crushing operation. DeAtley properly crushed the material which was tested to be in compliance with the specifications. The material naturally degraded outside of the allowable specification range. The Government should have recognized the natural gradation process in the material in question and allowed either a pay factor adjustment or a larger allowable range of gradation.

46. The Government impliedly warranted that such specifications, when followed, would produce a satisfactory result.

47. DeAtley followed the defective specifications and was unable to produce a satisfactory result, which was a breach of the Government's warranty.

48. DeAtley incurred costs as a result of following the defective specifications and the Government failed to pay such costs, damaging DeAtley thereby, in an amount to be proven at time of trial, including interest.

**COUNT III**
**(Differing Site Conditions)**

49. DeAtley realleges paragraphs 1 through 48 as if set forth in their entirety.

50. DeAtley encountered subsurface physical conditions differing materially from those indicated in the contract.

51. The differing site condition could not have been ascertained by a reasonable pre-bid inspection because it was a subsurface physical condition to be determined by a laboratory test.

52. The specifications misrepresented the conditions actually encountered.

53. DeAtley is entitled to an equitable adjustment in contract price under the Changed Conditions Clause of the contract, in an amount to be determined at time of trial, plus interest.

**COUNT IV**
**(Constructive Change)**

54. DeAtley realleges paragraphs 1 through 53 as if set forth in their entirety.

55. The Government constructively changed the contract specifications when the project engineer instructed DeAtley to remove the stockpiled Aggregate D base material and replace it with new material. The contract required application of tolerances for acceptance testing. But, the Government refused to allow application of tolerances, thereby constructively changing the contract scope. The contract required and the Government confirmed that they would perform all durability testing during production. The Government did not. The contractor is contractually entitled to rely upon a Government designated source to consistently make a quality product that will satisfy contract durability requirements. The government adopted an interpretation that the contractor was required to "hunt and peck" for competent rock is a constructive change for which the contractor is entitled to compensation.

56. DeAtley suffered delays, disruptions and additional costs to its planned performance due to the constructive changes and is entitled to equitable adjustments to the contract price under the Changes Clause of the contract.

57. DeAtley notified the Government about the effects of these constructive changes within the appropriate time.

58. DeAtley was damaged by the Government's conduct in an amount to be determined at trial.

**COUNT V**
**(Economic Waste)**

59. DeAtley realleges paragraphs 1 through 58 as if set forth in their entirety.

60. The Government committed economic waste by unreasonably rejecting the delivered material and ordering DeAtley to replace the material. Using a pay factor approach, DeAtley would have been entitled to payment at a 90% rate. Ultimately, the Government rejected the entire material as being out of specification even though its own contract required application of industry standard tolerances. Faced with no viable option to bring the subject material into specification, the contractor was forced to remove the material from the roadway and to move to a new material source and recrush.

61. DeAtley was damaged as a result of this failure in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

1. That this Court enter a judgment in an amount to be determined at trial against Defendant for the amounts owing.

2. Judgment to include the award of prejudgment interest at the rate of twelve percent (12%) per annum on the principle amount owed.

3. Judgment to include the award of Plaintiff's reasonable attorney fees.

4. Such other and further relief as the Court deems just and equitable.

DATED this ____ day of January, 2006.

s/ JOHN C. BLACK
JOHN C. BLACK
10 N. Post Street, Suite 200
Spokane, WA 99201-0653
Telephone: (509) 455-8711
Fax: (509) 455-8734

wpdocs\1742\1806\Amend.Complaint.122205

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the ____ day of January, 2006, a copy of the foregoing *Plaintiff's [Proposed] Amended Complaint* was filed electronically. I understand that notice of this filing will be sent to all parties of record by operation of the Court's electronic filing system. Parties may access this filing through the court's system.

/s/ JOHN C. BLACK
JOHN C. BLACK