# TABLE OF CONTENTS

Page


TABLE OF CONTENTS ........ 1

DEPOSITION OF LINDA PERSOON ........ 2

DEPOSITION OF KERRY COOK ........ 40

DEPOSITION OF RODNEY PRELLWITZ ........ 54

DEPOSITION OF MICHAEL OSBORN ........ 75

PLAINTIFF'S DEPOSITION EXHIBIT 2 ........ 81

PLAINTIFF'S DEPOSITION EXHIBIT 3 ........ 90

PLAINTIFF'S DEPOSITION EXHIBIT 6 ........ 92

PLAINTIFF'S DEPOSITION EXHIBIT 10 ........ 95

PLAINTIFF'S DEPOSITION EXHIBIT 11 ........ 99

PLAINTIFF'S DEPOSITION EXHIBIT 12 ........ 110

PLAINTIFF'S DEPOSITION EXHIBIT 15 ........ 116

PLAINTIFF'S DEPOSITION EXHIBIT 20 ........ 120

PLAINTIFF'S DEPOSITION EXHIBIT 22 ........ 123

PLAINTIFF'S DEPOSITION EXHIBIT 27 ........ 130

PLAINTIFF'S DEPOSITION EXHIBIT 29 ........ 132

PLAINTIFF'S DEPOSITION EXHIBIT 30 ........ 135

PLAINTIFF'S DEPOSITION EXHIBIT 32 ........ 140

PLAINTIFF'S DEPOSITION EXHIBIT 40 ........ 153

DEFENDANT'S DEPOSITION EXHIBIT 8 ........ 155

DEFENDANT'S DEPOSITION EXHIBIT 9 ........ 167

# DEPOSITION OF LINDA PERSOON

2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DEATLEY CONSTRUCTION CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 04-1052C |
| | ) | (Judge Edward J. Damich) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

ORIGINAL

DEPOSITION UPON ORAL EXAMINATION

OF

LINDA PERSOON

DATE TAKEN: August 24, 2005
TIME: 9:00 a.m.
PLACE: 1104 Main Street, Ste. M-110
Vancouver, Washington

COURT REPORTER: Teresa L. Rider, RPR, CSR

APPEARANCES

FOR THE PLAINTIFF: MR. JOHN C. BLACK
Dunn & Black
10 N. Post Street, Ste. 200
Spokane, WA 99201-0653

FOR THE DEFENDANT: MS. LESLIE CAYER OHTA
Department of Justice
1100 L. Street, N.W.
Washington, D.C. 20530

ALSO PRESENT: Messrs. DeAtley and Binder

I N D E X


| Examination | Page |
|---|---|
| By Mr. Black | 5 |


EXHIBITS


| Exhibit No. | Description | Page |
|---|---|---|
| 1 | Defendant's Responses to First set of Interrogatories | 16 |
| 2 | 6-9-99 memo to Peters from Burnett | 34 |
| 3 | Location of borings | 35 |
| 4 | Boring log | 37 |
| 5 | Map | 39 |
| 6 | 10-2-01 Weekly Partnering Agenda | 65 |
| 7 | Table 703-1 and 703-2 | 68 |
| 8 | Table 703-2A | 68 |
| 9 | 5-22-01 project diary | 77 |
| 10 | 2-26-03 letter to Owens from Graybill | 82 |
| 11 | Field Materials Manual - Sampling and Testing Procedures | 83 |
| 12 | 6-5-01 project diary | 93 |
| 13 | 7-7-01 project diary | 93 |
| 14 | 9-5-02 letter to Ruchert from Persoon | 93 |
| 15 | 3-7-03 letter Ruchert from Coe | 124 |

EXHIBITS


| Exhibit No. | Description | Page |
|---|---|---|
| 16 | 10-29-01 project diary | 129 |
| 17 | 12-19-02 project diary | 133 |
| 18 | Photo of windrowed stockpile | 157 |
| 19 | 8-21-02 photo of stockpile | 159 |
| 20 | 8-22-02 project diary | 161 |
| 21 | 8-21-02 photo of stockpile | 164 |
| 22 | 8-25-02 memo to Wasill from Persoon | 167 |
| 23 | 11-4-03 photos of stockpile | 171 |
| 24 | Interim Gradation Test | 177 |
| 25 | 2-14-03 memo of meeting | 182 |
| 26 | 2-14-03 Summary of Sampling and Test Results | 182 |
| 27 | Photo | 189 |
| 28 | 12-10-02 letter to Owens from Persoon | 193 |

LINDA PERSOON,

called as a witness in behalf of the Plaintiff, having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BLACK:

Q. Would you state your full name and address, please.
A. Linda M. Persoon, 104 Birdy Trail, Chewlah, Washington.
Q. Who are you employed with?
A. Federal Highway Administration.
Q. How long have you been employed with the Federal Highway Administration?
A. Since 1989.
Q. Have you ever had your deposition taken before, Linda?
A. Yes.
Q. On how many occasions?
A. I believe just one.
Q. Was that while you were employed with the Federal Highway Administration?
A. Yes.
Q. Are you familiar with the process of a deposition?
A. Yes.
Q. If you need to take a break, let me know, and I have

a tendency to just push forward, so we'll take a break at any time if you need one.

If you don't understand my question, please ask me to rephrase it. I will try and do so and we'll try and work through some of those issues, if we need to. If you go ahead and answer the question, I have to assume you understood it. Is that fair?

A. That's fair.

Q. Tell me about your education. Do you have a college degree?

A. Yes.

Q. From where?

A. North Dakota State University.

Q. In what?

A. Bachelor of science in civil engineering.

Q. When did you get that degree?

A. 1993.

Q. So you were actually employed at Federal Highway while you were going to school.

A. That's correct.

Q. That was a summer job in '89?

A. A cooperative education program, yes.

Q. Had you worked in construction in any manner prior to 1989?

A. Construction general, yes.

Q. Can you give me a brief idea of your construction experience prior to '89.

A. I did my own small business with painting, decorating, some remodeling.

Q. Any experience in road construction or earth work prior to 1989?

A. No.

Q. Do you have any other degrees other than the BS in civil engineering?

A. No.

Q. Can you go through your employment from 1989 with the Federal Highways to the present, in terms of the positions you've held, and if you can, kind of give me an estimate of the dates when you may have changed positions. I know that's difficult.

A. I did the cooperative education program in the summer of '89, '90, '91 and '92.

Q. What is that program?

A. I was sent to construction projects and worked either as in inspection or possibly in the lab, wherever I was needed. One of those years, I believe it was 1991, I spent three months in design, but the other three summers were spent in the field on construction projects.

Q. And were those all road projects?

A. Yes.

Q. In what area, what geographical area?

A. The summer of 1989, I was in the northwest corner of Colorado, project called Hans Peak. And in the summer of -- or excuse me -- 1990, I spent a six month assignment at Twentynine Palms in Southern California. The summer of 2001 I worked in the design office in Lakewood, Colorado. And 1992 I was in Trinity National Forest in northern California.

Q. Continuing on after that cooperative education program, did you become a full-time employee then?

A. That's correct.

Q. And that would have been '93?

A. That's correct.

Q. Can you tell me what your positions were since '93 with the Federal Highways?

A. I've worked as an assistant project engineer and then as a project engineer.

Q. And when did you make that leap to project engineer?

A. I believe it was 1995.

Q. What is the responsibilities of an assistant project engineer?

A. A lot of paperwork. Making sure that -- recording the construction activities that are happening on the project, doing the inspection, helping with overseeing the students that might be out there, the other inspectors.

Q. So there is a position that is an inspector?

A. Yes. There are some people whose sole responsibility is inspecting.
Q. And then you would report to the project engineer, I take it.
A. That's correct.
Q. And then what is your responsibilities, then, as a project engineer?
A. Part of the responsibility is to administer the contract for the contracting officer, so you have direct communication in the field with the contractor.
Q. As project engineer, you are the person in charge of the administration of the project.
A. That's correct.
Q. And you are the person that deals directly with the contractor out in the field.
A. That's correct. I did that as an assistant, also, but it's more responsibility as the project engineer.
Q. Okay.
A. It's part of what we do out there.
Q. The contracting officer delegates you that responsibility on a particular project.
A. That's correct.
Q. Can you tell me your experience in the Chewlah area on projects, northeastern Washington region, if you will?
A. The project we're here to discuss was my first

project in the Chewlah area. I started April of 2001.

Q. To your knowledge, were there prior projects in the Chewlah area for Federal Highways?

A. Yes.

Q. Specifically were there other Flowery Trail projects?

A. Yes.

Q. And you were not involved in those prior?

A. I wasn't there prior.

Q. Subsequent, have you been involved in other Flowery Trail projects?

A. Yes.

Q. How many?

A. Two.

Q. Can you tell me who the general contractors were on those?

A. Delher Industries.

Q. And that was after the --

A. That was the one immediately after the one we're here to discuss.

Q. Just to make it easier on us today, is there a project name that you'd feel comfortable with instead of continually talking about the project that we're here to discuss, like the DeAtley project or -- would that be fine?

A. That would be fine.

Q. So after the DeAtley project, there was the Delher

project. There was quartzite, quite a bit of quartzite. And all of the rock, all of the exposed rock appeared to be in dips.

Q. Dips?

A. Yes.

Q. What do you mean by that?

A. Well, geologically speaking, it had been lifted up so that it was laying in plates that were adverse in that they were -- there wasn't anything real consistent about any of it. You could see some material laying at the dip at an angle and five meters away it would be at a different angle.

Q. So it was highly variable, then.

A. It was highly variable. It was different degrees of fracture.

Q. And prior to the DeAtley project, had you been involved in projects with similar rock formations such as argillite and quartzite?

A. Most of my experience was with decomposing granite of some sort, so northern California I would say it was a lesser quality rock.

Q. Lesser than the DeAtley project?

A. That's correct.

Q. Would that include quartzite and argillite?

A. Well, the projects I had been on in northern California, the rock was more degraded, more weathered than the

A. Yes.
Q. So what is a good range for RQD numbers for a project of this nature?
A. I'm not familiar enough to say.
Q. So you don't consider yourself knowledgeable in terms of design, correct?
A. I do not consider myself knowledgeable in terms of design.
Q. So you really don't know in terms of this project whether the RQD numbers were low or high in terms of the designated source.
A. I don't remember what the RQD numbers were. I think there was a range. I don't remember offhand what they were.
(Deposition Exhibit No. 2 was marked for identification.)
BY MR. BLACK:
Q. Handing you Exhibit No. 2, which is a memo dated June 9th, 1999, from Ron Burnett to Victoria Peters. Have you ever seen this memorandum before?
A. No.
Q. Specifically I just wanted to ask you about the first sentence of the first numbered paragraph where it says, "Kerry Cook shared that material testing confirms this is good quality rock for aggregate base."
A. I don't see that.

Q. You can read the whole thing, but I want you to focus on that first sentence of paragraph 1 because that's really only what my question is going to be about.

It says, "Kerry Cook shared that the material testing confirms this is good quality rock for aggregate base."

A. Yes, I see that sentence.

Q. Was it your understanding that the rock that was designated on this particular project was good quality rock for aggregate base?

A. Yes, it was my understanding.

Q. How did you obtain that understanding?

A. It said so in the special contract requirements.

Q. Said it was good quality rock?

A. It was suitable for aggregate base.

Q. Did you have discussions with Kerry Cook about the quality of the rock prior to construction?

A. Prior to construction, no.

Q. So basically you believed that this was a good quality rock for aggregate base prior to construction.

A. Yes.

(Deposition Exhibit No. 3 was marked for identification.)

BY MR. BLACK:

Q. Handing you what's been marked as Exhibit No. 3, which is a page D7 from the geotech report, is that something

Q. How wide was the designated source? In other words, what points was the cut designated?

A. I think in the contract, I think it was 18 plus 700 to 18 plus 900.

Q. Right. So you had 200 meters of source available to this contractor, correct?

A. At this site, yes.

Q. And there was two logs taken of this site, right?

A. Yes.

Q. And would you agree that it appears that these boring logs were taken roughly from the middle of the site?

A. It appears that way, yes.

Q. Now, going back to Exhibit No. 3, I see that there is a line drawn showing -- from one end to the other showing overburden at -- how deep?

A. 3.5 meters.

Q. And then there's a line, horizontal line going across that shows on one end of the cut argillite and on the other end of the cut quartzite.

A. Yes.

Q. And how deep is that showing?

A. 9 meters.

Q. And then below that line on both sides it says quartzite, correct?

A. Yes.

Q. And you were unable to tell visually whether you were into quartzite or argillite, correct?
A. That's correct.
Q. You testified earlier that this material that you observed was highly variable, correct?
A. Yes.
Q. Is there any information on Exhibit No. 3 which would show that this material was highly variable?
A. Not looking at 4, just looking at 3?
Q. Just looking at 3 now.
A. That snapshot of that location, no, doesn't identify the variability.
Q. Is there anything on Exhibit No. 4 that shows the material is highly variable?
A. Well, when I first saw it, I thought it was because of the range from highly fractured to moderately and then highly fractured again.
Q. And you're looking at the description.
A. That's correct.
Q. But again, that's just in two locations, right --
A. That's correct.
Q. -- on a 200-meter site, correct?
A. Correct.
Q. Now, you couldn't tell visually whether you were going from argillite to quartzite or back to argillite,

correct?
A. I couldn't tell the type of rock, just the amount of fracture.
Q. Just looking at it visually.
A. Yes.
Q. Could you expect the contractor to know the type of rock that he was encountering?
A. By name? No.
Q. In other words, you wouldn't expect him to know whether he was going into argillite in any particular one cut or quartzite.
A. No.
Q. You'd expect him to observe that it was highly fractured, however.
A. Yes.
Q. Now, what was your expectation on this project in terms of the overburden removal before you got to the rock that was competent to crush?
A. What was my expectation?
Q. Yes. When you got to the project site and you observed the geotech report, how much overburden did you expect to remove before you got to competent rock?
A. The boring log suggests to get to competent rock, I'm going to have to go down 14 meters, roughly.
Q. And what log are you looking at?

Is there any testing that can be performed on rock to determine whether it is sufficiently durable to perform Class D aggregate?

A. That's not my expertise. I don't know.

Q. The tests that are listed in 703-05A, such as the sodium sulfate test, Los Angeles abrasion test, are all those tests that are intended to be performed to determine whether particular rock is sufficiently durable for production of Class D aggregate?

A. I'm not sure if all of those tests are a reflection of durability, but definitely some are.

Q. And you're not an expert in those tests?

A. No, I'm not.

Q. You've never performed those tests?

A. No, I haven't performed those tests.

Q. Can those tests be done during production?

A. I'm assuming they can be, yes.

Q. On this project the government was responsible to perform those tests under 703-05, correct?

A. Yes.

Q. And the government did some of those tests prior to production, to your knowledge.

A. That's my understanding.

Q. Are you aware of whether the government did any of those tests during production?

A. I'm not aware that they did.
Q. Do you know if the contractor did any of those tests during production?
A. I'm not aware if they did.
Q. Aside from the visual observation, which you say you're able to tell whether rock is competent or not and performing these tests, is there any other way to tell whether rock is competent sufficiently to prepare Class D aggregate?
Let me break that down. You say that you're able visually to tell whether rock is sufficiently durable to obtain Class D aggregate that will meet the contract requirements; is that right?
A. I can't tell by looking at a rock whether it is durable. I can just tell the extent of its fracture, whether it's one-eighth-inch or an eight-inch rock. I can tell whether it's dirt or whether it's rock. Visually that's all I can tell.
Q. Some rock that is highly fractured can still be crushed and still meet the durability requirements in a contract, right?
A. Yes.
Q. So visually you can't tell -- there's a zone there, if you will, that some rock is sufficiently durable, even though it might appear to be highly fractured, correct?
A. That is true.

Q. So is it accurate, then, that your testimony is that when you're looking at the Exhibit 3, geotechnical information, you're simply saying that rock down in Zone 3 would be better rock than in Zone 2 to obtain durable Class D rock, correct?

A. Yes.

Q. There is some rock, highly fractured or not, in Zone 2 that will clearly obtain or be sufficient to obtain Class D rock, right?

A. There is that possibility, yes.

Q. Is there anything in the contract that tells the contractor do not use rock in Zone 2 to obtain Class D rock?

A. Not that I am aware of.

Q. So you can't necessarily visually observe whether rock, which is highly fractured, would still make competent rock for Class D, right?

A. No, I can't.

Q. The only way to determine in advance whether rock is competent or not to perform Class D rock is by performing the tests set out in 703-05, to your knowledge.

A. That's my understanding.

(Deposition Exhibit No. 6 was marked for identification.)

BY MR. BLACK:

Q. I'm handing you what's been marked as Exhibit No. 6, which are meeting minutes for this particular project. Have

you seen those meeting minutes before?
A. Yes.
Q. Do you recall a weekly partnering meeting of October 2nd, 2001?
A. I don't particularly remember it, but I do see that this document is from that meeting.
Q. And you attended that meeting?
A. Yes.
Q. Did you prepare these meeting minutes?
A. Yes.
Q. At the bottom of the first page, the top of the second, there's discussions concerning quality control in the base material.
A. Okay.
Q. See where it says that?
A. Uh-huh.
Q. It says, "Linda clarified questions raised" and it goes on to talk about aggregate source testing.
A. Yes.
Q. Do you recall that the contractor, DeAtley, asked the government who was going to be doing the testing in terms of the durability of this particular source?
A. I just read that. Could you repeat the question?
Q. Sure. Do you recall that DeAtley, on October 2nd, 2001, asked if they should be the ones testing this material

By that did you intend to mean that the material source designated by the government would yield a consistent product for Class D aggregate?

A. By that I intended to mean that the government is confident that they can produce the base rock quantity they need from this 200 meters.

Q. In other words, the source would provide sufficient material that within reasonable means the contractor could supply material that would meet the contract requirements.

A. Yes.

(Deposition Exhibit No. 10 was marked for identification.)

BY MR. BLACK:

Q. Handing you a document which has been marked as Exhibit No. 10, it's a letter from DeAtley Construction to -- M.A. DeAtley Construction dated February 26, 2003. Have you ever seen this document before

A. May I look at it.

Q. Yes. I realize I don't have the transmittal from you, the government. I apologize for that.

A. I don't remember seeing this document.

Q. I'd like you to look at the second page of that letter where it talks about and it quotes the Federal Highways Administration Field Materials Manual. Is that a manual that you're familiar with?

A. I'm somewhat familiar with the manual.

(Deposition Exhibit No. 11 was marked for identification.)

BY MR. BLACK:

Q. I've handed you Exhibit 10. After reviewing that, does that refresh your recollection of seeing that letter?

A. I don't remember seeing this letter in the past.

Q. Okay. Exhibit No. 11 is a document entitled Field Materials Manual and it has an index. It's not a full manual. It's just excerpts out of that particular manual. Is that a document that you've seen before, at least the excerpts?

A. I'm not all that familiar with the manual. I do use it for reference now and then and mainly use it for students to become familiar with how we sample and test and stuff.

Q. All right. And my first question what is the purpose of the manual?

A. It's not something I drafted so I don't know.

Q. But you do use it as a reference source when you're working with younger people in your office.

A. Well, in particular the contractors usually have a lab that's unfamiliar with maybe a test or something and that's -- or how samples are done.

Q. Okay. Are you aware that there's certain editions of this manual or is there only one manual that you're aware of?

A. I do not know.

quality of the rock that they were discovering under that overburden, true?

A. Yes, in Zone 2.

Q. So that's why you're having a discussion in late May to early June saying maybe there's another source. You don't have to use this source, but if you use that other source, you've got to test it, right?

A. Well, at that point they were just able to reach what was starting to get -- getting some resistance with their bucket.

Q. So, in fact, you did have concerns about the quality of materials in that designated source, correct?

A. In that upper portion of Zone 3, yes.

Q. Well, you hadn't even gotten to Zone 3 at that point in time.

A. No, no.

MR. BLACK: Now is a good time to break.

(Lunch recess taken at 12:00 p.m.)

(Deposition Exhibits No. 12 through 14 were marked for identification.)

BY MR. BLACK:

Q. Right before lunch we were talking about your observations at the site the end of May, first part of June of '01. I'm going to hand you what we've marked as Exhibit 12, which is your memo dated -- it's actually your diary dated June

5, 2001, and signed by you on June 5, 2001, so I assume it was prepared that day.

A. Yes.

Q. Is that your diary for that particular day?

A. Yes.

Q. Apparently on that day, that's the day that DeAtley had dug three test pits in the cut area that's the subject of this case.

A. Okay.

Q. Do you recall this day at all or --

A. Yes.

Q. Were you just passing by this day or were you actually up there to see these test pits, do you recall?

A. No. I was in a plan review on the next -- on another project down the road.

Q. It would be the subsequent project to this. Is that what you mean?

A. Second one after this, the one that's currently --

Q. Apparently you looked at -- it says the first pit you looked at was down 3.8 meters. "This material was showing signs of sloughing into the trench on the vertical sides of the pit."

Do you see where that says that on the third paragraph?

A. Yes, I see that.

Q. Where was this pit located in reference to the bore holes? Can you show me using Exhibit 5?

A. I'm reading the document, trying to find the stationing. I haven't come across it. I need to look here.

Q. I couldn't find the stationing either.

A. It's somewhere in that 200 meters, but I don't recall where it was.

Q. Was it at one end or the other or were they kind of in the middle? I don't think it's that important.

A. No, I don't recall.

Q. "The rock material in the upper 4 to 5 meter is too soft to use for base." That's a statement. Who made that statement?

A. Kerry Cook did.

Q. Did you agree with him?

A. Kerry Cook is the expert. I'm just there to administer the contract. So when it comes to the suitability of the rock, he's the one to ask.

Q. Now, I'm going to ask you, using Exhibit No. 3 again, that four to five meters, is that the four to five meters that we're seeing in Zone 2 below the overburden? Is that what he's saying?

A. I think at this particular site, looking at the pictures and stuff, we're still -- we're digging through the overburden. As you see in picture here, this is overburden.

And this is reference to four to five meters in the upper four to five meters. So it's too soft through the overburden and then down in this second layer that you see on the first picture (indicating.)

Q. Do you recall that or is that just kind of what you're surmising at this point?

A. I recall that.

Q. So what he's saying is that the first three and a half meters, which is the overburden as shown on Exhibit 3, plus one to one and a half additional is unsuitable, is too soft.

A. It appears at this particular site the topsoil, which I'm going to equate to overburden --

Q. Uh-huh.

A. -- was one meter deep.

Q. Okay.

A. And then below that there's a layer of decomposed rock breaking down into that four- to six-inch size, and that's the material that is sloughing into the trench.

Q. Are you looking at the third paragraph? Is that where you're getting those measurements from?

A. Uh-huh.

Q. Isn't that where it says there were two corings taken, aren't those the B-28, B-29 corings, or is that referring to the test pit you're digging?

A. It's referring to one of the test pits.

Q. The actual test pit as opposed to the coring?

A. That's correct.

Q. So you're saying -- tell me again, then, there was one and a half meters of topsoil or overburden, which would be Zone 1 in Exhibit 3, is that right, at that particular area?

A. The first pit we looked at had one meter of topsoil layer and then a layer of decomposed rock that broke down into the four- to six-inch size.

Q. So if we're using the Zone 1, Zone 2 terminology for that test pit, what was the depth of Zone 1 for that test pit that you were looking at on June 5th, 2001, one meter?

A. The topsoil was one meter, if you're going to equate overburden with topsoil, and I guess in my layman's terms I do, I would call that number -- Zone 1, at this particular location as one meter deep.

Q. Zone 2 would be how deep, then?

A. At this particular place it looks to be 2.8 meters deep.

Q. Where are you getting these measurements from?

A. Well, it says the pit was dug. It was 3.8 meters deep, and at the bottom of the pit, which was the bottom reach of the excavator that was digging the pit, they were getting on top of a harder layer, getting some resistance.

Q. So Zone 2 was how deep, you say?

A. In this particular pit it's 2.8.

Q. And is that 2.8 plus the one meter? In other words, it's 3.8 from the surface?

A. That's correct.

Q. And then how was it determined by Kerry Cook that the rock material in the upper four to five meters is too soft to use for the base if this pit went only down 3.8 meters?

A. I could make the assumption he's going conservative, because the excavator operator is saying he's just starting to get some resistance, so obviously we ought to go a little bit deeper. It's just an estimation.

Q. You said there was two test pits on that particular day.

A. Didn't I read there were three that day or did you say there were three?

Q. I don't know. It says in there the first pit was down 3.8, but I don't know if I see a reference to a second or third pit.

MS. OHTA: It's in the second paragraph says three.

MR. BLACK: Okay.

BY MR. BLACK:

Q. It says three in the second paragraph.

But I don't see any measurements about the other two pits. Do you recall, were the other pits deeper or about the same?

cG1W

N1Tk A. I believe they were the same. I believe that the excavator as able to dig to what apparently was the limitation of that piece of equipment, the 3.8 meters.

Q. Well, take a look at the third page, though. I'm not an expert at math, but this says 28 feet deep. How many meters is that?

G1W A. Six point something, so maybe there was a second piece of equipment up there.

Q. You don't recall?

A. I don't recall.

Q. But on the third page there that picture says, "Test pit 20 feet deep. No material encountered that gave resistance to backhoe," third page. Do you see that?

A. Yes.

Q. And then the fourth page says, "Down 20 feet, still in highly fractured rock."

There's three photographs on this day, page 2, page 3 and page 4. To your knowledge, are those the three test pits that are referred to on page 1 of your diary or are they the same pit?

A. Yeah. They're just -- they're photos of the same pit and they kind of overlap.

Q. Okay. So in this particular pit, you're 20 feet down and there's no material encountered that gave resistance to the backhoe, correct?

A. That's what it appears.
Q. And so when we're talking again in Zone 1 and Zone 2, what was the depths of Zone 2 as shown on Exhibit 3?
A. At these boring sites it showed at, I believe that's 9 meters.
Q. Now, is the rock that you're going through in this test pit in your opinion durable rock capable of meeting the quality requirements for Class D aggregate --
MS. OHTA: Objection.
BY MR. BLACK:
Q. -- from your observation on that particular day?
A. That's why I was glad Kerry was there, and I brought him up there because he was saying this was not competent or not suitable for base rock, could be used for some other materials.
Q. Let me stop you there. I thought you said you could observe rock and tell whether it was competent rock to be used for Class D aggregate. Was I mistaken?
A. I think in the very general terms. Somewhere in this site there was some area where the rock was at the top or a hard knob, and that was not a fractured, like this is. So again, I always have to either -- if I don't have the geotech to look at it, I take pictures and send it to him to get those type of questions answered.
Q. So we're looking at a test pit here on page 3 of

Exhibit 12 showing a 20-foot face.

Do you see what we're looking at there?

A. Yes.

Q. And you're not capable of looking at that material and telling whether it is rock which is competent enough to satisfy the requirements for Class D aggregate?

A. That's not my field of competence.

Q. So the answer is no, you're not?

A. No, I'm not.

Q. How would you tell for sure whether the rock as shown in this 20-foot deep test pit was competent to meet the requirements of Class D aggregate?

A. If I didn't have the geotech on site that day, I would take photos, like I did here, and send them to him and send samples.

Q. And the samples would be for what purpose?

A. For him to study or for him to make the call.

Q. Is the geotech -- is this test of determining whether the rock is competent, like durable, is a visual test, you're saying?

A. It's one that's done by a geotechnical engineer, and so I'm not exactly sure what all goes into making his decision.

Q. But competent and durable rock, to determine that, is done by testing the rock, wouldn't you agree?

A. I would think that is at least a portion of how he

makes that decision, yes.

Q. Do you know if any rock was tested in this particular test pit?

A. I don't know.

Q. How far down in this picture on page 3 of Exhibit 12 does competent rock begin?

A. In terms of the language Kerry was showing us on the geotechnical report, it doesn't begin.

Q. There's no competent rock in this test pit is what Kerry is telling you?

A. In this test hole, that's correct.

Q. How did Kerry know that?

A. You would have to ask Kerry.

Q. If there's no competent rock in this test pit, do you know why Kerry stated, as you say in page 1 of your diary, the rock material in the upper four to five meters is too soft to use for base?

A. Would you repeat that again.

Q. If there's no rock in this test pit, which is 20 feet deep, why is it that Kerry is saying only the upper four to five meters is too soft?

A. I don't know.

Q. Isn't he saying that out of this test pit you can't use the four to five meters?

A. That was my understanding at the time, for base

material.

Q. Okay. And that's what we're talking about, right?

A. Right.

Q. So as you sat there, then, were you able to tell how far down before competent rock was able to be used for base material?

A. If I remember right, the operator or -- was telling me that they were just reaching the hard material.

Q. That's not my question. My question is this. When you were out at the site, were you able to tell where bad rock ended and competent rock started by looking at this 20-foot deep test hole?

A. Nope. I have to rely on Kerry for that answer.

Q. The second bullet point on your Exhibit 12 is, on page 1, says, "We discussed with Cooper that the rock from the beginning of the project to Station 18+800 could well be used for base if quality testing showed compliance with the contract requirements."

Do you see where it says that?

A. Yes.

Q. Is that the -- refers to the testimony earlier where you were saying you could go outside of this designated quarry site? Is that what you're referring to?

A. This site isn't designated by the contract. It just states that it's been proven to have rock capable of producing

A. I see the overburden and the topsoil in the top meter in the picture on page 2.

Q. How far down the 20-foot hole does he need to go in order to start getting competent rock to perform per the contract requirements?

A. For Grade D?

Q. Yes.

A. He's not found it yet.

Q. How do you know that?

A. Because Kerry Cook told us so looking in the hole that this rock is too soft to use for Grade D. You can use it for select borrow, which was his immediate concern.

Q. He did that just by looking at it?

A. Yes.

Q. And that's deeper than is portrayed on Exhibit 3 in terms of where Zone 2 starts?

A. It's deeper than Zone 2 starts, but not to the bottom of Zone 2.

Q. So how was the contractor supposed to, in the Zone 2 material, determine what material was competent to use and what material was not?

A. If I were the contractor, what I would have done?

Q. If you care to answer it that way.

A. I would think that a contractor or a crushing operation would know by looking at the reports, looking at what

you see in this hole, you could tell whether they could produce whatever rock products they needed. I would assume they have had expertise or experience to do that.

Q. Because you don't have that experience, do you? You couldn't tell that by looking at it?

A. No.

Q. So you're saying the contractor should have the experience to tell by looking at it, the material in Zone 2, whether they could use that or not?

A. That would be my -- if I were the contractor, I would be running some tests and deciding what I wanted to do with this material.

Q. What kind of tests would the contractor run, durability tests, take test borings?

A. I don't know how the contractor makes the decision when they do that.

Q. You say they should take some tests. I'm asking you what type of tests. Would they be test borings?

A. Well, I think the first thing -- at this point the contractor did not know about a geotechnical report --

Q. Linda, I appreciate your answer, but let me stick with your statement the contractor should do tests. I'm asking you what tests the contractor should do to determine whether this rock in Zone 2 was competent or not?

A. I really don't know what tests the contractor in a

crushing operation would do to determine when they would start crushing.

Q. In fact, in October it's correct that you told the contractor that the government would perform the durability tests and the contractor didn't need to do it for the source in question, correct?

A. I told them that the government had done it. And on this day I told them here's a picture and showed Cooper here's the picture of what we see. And we saw that we could see these -- the difference between the topsoil and the highly fractured material.

Q. Linda, isn't it a fact that you did say on October 2nd that the contractor did not have to perform the source testing?

A. That's correct.

Q. So basically it's your position that the contractor needed to, in Zone 2 materials, pick and choose which rock was competent rock and which rock they should have discarded, correct?

A. Yes.

Q. Yet you don't know what tests, if any, the contractor could perform to do that selection process, correct?

A. That's not my expertise. I don't know which tests. I don't know how the contractor determines at what point they're going to send material to the crusher.

Q. And there's nothing in the contract documents that tells the contractor he can't use or should not use any of the materials in Zone 2, correct?

A. That's correct.

Q. Now, I'm going to hand you Exhibit No. 13, if I can, which is your daily diary dated July 7th, 2001. Is this one of the diaries you reviewed earlier, prior to your deposition?

A. Yes.

Q. I'd like you to focus on -- you're free to read the whole document, but page 3 of 3 of the document. I just discovered that there's a page 2 missing. Does yours have page 2 missing? We'll have to get that.

But my question is in reference to the first paragraph on page 3 of 3 it says, "I drove to the project and met with Sam about 3:00 p.m. The day crew was finished for the day and Sam agreed to take the excavator up to Station 18+760 to dig an exploratory hole. He dug a hole 2.5 meters from the hinge at Station 18+760 and dug down almost 3 meters. The material to this depth was very loose rock with some clay binder, but mostly rock."

Do you recall that occurring?

A. Yes.

Q. Was this an area in the designated source or outside the designated source?

A. Inside.

# DEPOSITION OF KERRY COOK

RECEIVED
SEP 1 4 2005
DUNN & BLACK

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| M.A. DeATLEY CONSTRUCTION, INC., Plaintiff, vs. UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF TRANSPORTATION; UNITED STATES FEDERAL HIGHWAY ADMINISTRATION, WESTERN FEDERAL LANDS HIGHWAY DIVISION, Defendants. | ) | No. 041052C |

DEPOSITION UPON ORAL EXAMINATION

OF

KERRY COOK

ORIGINAL

DATE TAKEN: Thursday, August 25, 2005
TIME: 9:00 a.m.
PLACE: Rider & Associates
Vancouver, Washington

COURT REPORTER: KAREN M. SMITH, CSR

APPEARANCES

FOR THE PLAINTIFF: Mr. John C. Black
Dunn & Black
Suite 200, Peyton Building
10 North Post
Spokane, WA 99201

FOR THE DEFENDANTS: Ms. Leslie Cayer Ohta
Department of Justice
Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

ALSO PRESENT: Timothy Binder

# I N D E X



| Examination | Page |
|---|---|
| Examination By Mr. Black | 4 |



## EXHIBITS



| Exhibit No. | Description | Page |
|---|---|---|
| 29 | Geotechnical Report No. 2-99 | 18 |
| 30 | Memo, 4/28/99, Cook to Jacoby | 75 |
| 31 | Field Review Trip Report, June 7-9, 1999 | 79 |
| Aq 32 | E-Mail, 3/2/05, with Chapter 6 - Geotechnical, attached | 93 |

KERRY BRIAN COOK,

called as a witness in behalf of the Plaintiff, having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BLACK:

Q Mr. Cook, will you state your full name and address, please.

A Kerry Brian Cook, 1007 Northwest 51st Street, Vancouver, Washington.

Q Is that your residence address?

A Yes.

Q And you're employed with the Federal Highway Administration?

A That's correct.

Q And your position is?

A Senior geotechnical engineer.

Q When did you first become employed with Federal Highways?

A In July of 1988.

Q Do you have a degree from a university?

A Yes.

Q And what university?

A I've got a bachelor of science in geology from Oregon State University and a master of science in geotechnical engineering from Washington State University.

appropriate for a potential site for aggregate production?

A Depending on the surface exposures you may just sample the outside of the outcrop with grab samples. If it's a significant cut, as this job, you would want to have some borings that would be representative of the rock in the through-cut and test those borings for aggregate quality and combine that information with any other information you can obtain through visual reconnoissance of the surrounding rock.

Q Now, on this particular cut the -- there had been two borings taken at the time the geotech report was prepared, correct?

A That's correct.

Q And they say, "More work is needed to locate and test potential sites," correct?

A That's correct.

Q Did you feel that there was a need to take additional boring logs in the cut that is between 18+700 and 18+900?

A We selected this cut to evaluate for potential material source and in doing so we submitted the core from those two borings to our laboratory for rock quality testing and based on those results the test results showed that aggregate produced from the rock in this cut would meet our aggregate quality specifications.

At that point I went out to the site and collected

samples from the rock cut along the roadside adjacent to this site and also examined the quality of the rock in the rock cuts to assess the type of rock that could be expected to be encountered and they were consistent with the rock that was encountered in the borings, and another sample was submitted to our lab from grab samples picked up along the ditch line for preliminary immersion compression testing.

Q And that was for asphalt production?

A That's for asphalt mix design.

Q Okay. So that one dealt -- that sample dealt with asphalt mix design that you say was submitted?

A That's correct.

Q Okay. So just so I understand, first of all, how did you select or narrow down this particular source as one that you were interested in looking at?

A I reviewed the boring logs and the rock in the boring logs looked to me like it would meet our quality requirements.

Q Okay.

A And I submitted that to our lab for testing and test results showed that it did meet our quality requirements.

Q Did you look at other boring logs also in that process of elimination?

A Yes.

Q So to your -- in your mind the source between

18+700 and 18+900 actually appeared to have the best materials that you saw in all of the boring logs?

A Not necessarily. It was just the largest volume of excavation, largest volume of potential aggregate production.

Q And a lot of rock was needed for this project, right?

A Well, that rock cut contained much more volume of excavation than the aggregate that we needed for the project but it was the obvious largest volume of excavation on the project to look at for material source.

Q Okay.

A And the report also mentioned that similar rock occurred ahead on line here and that we could have evaluated those as well, and the contractor certainly had the option of using any of those, which he ended up doing.

Q Right. But just so I understand, between 18+700 and 18+900, the rock appeared to be acceptable from your review of the bore logs and the size of the cut was such that if that was approvable that it would have enough material to do the whole job, correct?

A As I understand, there was an excess quantity of excavation on this job so the material coming out of that rock cut could potentially have either been wasted or utilized in aggregate production and I understand that there was more than enough volume in that cut to take care of our aggregate needs.

the samplings on or to do the complete suite of testing, rock quality testing. I believe that takes more than one boring, depending on the depth of the boring, so in this case it took both borings to meet the amount of material that they needed for testing and that's commonly done, yes.

Q And that's a reason you did it in this case is because you needed them combined because you didn't have enough material?

A No, I thought that the combined sample would be conservatively representative of the entire cross-section of material that would be excavated from this cut.

Q And again that's something you typically do is combine those samples or direct the materials lab to do that?

A On shorter borings we often combine core samples for material testing, yes.

Q Are you aware of any industry standards or testing literature that says you shouldn't combine the material?

A You know, it's common judgment that you don't combine materials from -- that are significantly different or that you want to test separately but in this case I purposely combined the samples because I wanted a test result that represented the combined material that would be excavated from the cut.

Q Was any material scalped or wasted in these boring logs before they were combined?

A No, I don't.

(Deposition Exhibit No. 30 marked for identification.)

BY MR. BLACK:

Q I'm handing you what's been marked as Exhibit No. 30 which is a memorandum dated April 28th, 1999 that is directed to you from Kenneth Jacoby. Have you seen that document before?

A It's directed to Kenneth Jacoby from myself.

Q Sorry about that.

A Yes, I've seen this document.

Q All right. Now, this is a document that you apparently prepared after receiving the rock quality test that you referred to the materials lab to perform?

A That's correct.

Q All right. Now, who is Kenneth Jacoby?

A He was the head of the Washington design section.

Q Okay. Out of -- and he's located in Vancouver?

A Yes.

Q So he's in the design section?

A Yes.

Q And he was the engineer that was working with you in terms of the road design?

A He's the head of the Washington design section which includes all the Washington projects, and he is the

supervisor of the designer or COTR of the consulting designer who would be working on this project.

Q Okay. I'd like you to focus on the second paragraph of this letter. It says, "Core samples tested are quartzite and argillite from the Belt Series." Is that the samples that are being referred to as the B-28 and B-29?

A Yes, those are the core samples from those two borings.

Q And the Belt Series, is that the name of the geological --

A Yes, that's the formation name for a series of argillites and quartzites surrounding the Idaho baffle area.

Q You go on to say that:

"Based on a review of the Geotechnical Report, this core is similar in rock quality to quartzite and argillite rock found in the cut slopes from 17+475 to approximately 19+700."

What was the point you were trying to make with that sentence?

A That based on visual examination of the rock within that segment of the road that the rock quality represented by the test results on the core samples could potentially be representative of the rock between these stations. And that, you know, that implies that potentially the rock between

A I don't know what their procedures are.
Q Okay. You're kind of out of the loop on that?
A I am.
Q Okay. I apparently only have one copy of this.
(Deposition Exhibit No. 32 marked for identification.)
BY MR. BLACK:
Q I'm going to hand you what's been marked as Exhibit 32. Exhibit 32 is -- appears to be an e-mail from your counsel to our office. It's actually a forward of an e-mail that you sent to her and Tim Binder attaching a PDDM with general guidelines. Can you tell me what the attached document is?
A That's a very lengthy document that provides the guidelines for project design and development.
Q And what you sent was just Chapter 6 of a much larger volume of information?
A That's right.
Q Okay. And the document is entitled what?
A Project Development and Design Manual.
Q Okay. I always have trouble with these acronyms. And is this a document published by the Federal Highway Administration?
A Yes.
Q All right. So this is the Bible, if you will?

A This provides design criteria for the project design and for the various technical groups to perform the functions that they do for development of projects.

Q Okay. And this would include your department, the geotech?

A Yes, geotechnical section is included in Chapter 6 of the PDDM manual.

Q Okay. So your job is governed by Chapter 6 of this much larger manual or are there other chapters too?

A It's not a governing document. It's more of a guideline.

Q Okay. But are there other sections that would be relevant to your scope of work or just Chapter 6?

A There's some small segments of other sections that are relevant to geotechnical engineering but predominantly Chapter 6 covers most of the work that we do.

Q Okay. And is this one of the pieces of information you get when you hire on with Federal Highways?

A I believe most people have a copy of this manual on their shelf, yes.

Q Okay. How often do you -- if at all -- go back and review the information that's in here?

A I look at it several times a year.

Q Okay.

A And right now it's under review and I'm on the

committee to rewrite it.

Q Okay. How often does it get rewritten?

A Not very often. It's been in the same condition since I've been there since 1988 and it has minor revisions that are issued periodically.

Q So since 1988 this same information has been in your office?

A Yes.

Q Okay. I'd like you to turn, if you would, to table 6-4 on page 6-13, and this table is called Guidelines for Geotechnical Drilling Investigations, correct?

A Yes.

Q Okay. And specifically it has a category, Material Sites, borrow sources and quarries. You see where it says that?

A Yes.

Q It says, "Space borings or test pits on a grid pattern every 30 to 45 meters or change of material. See where it says that?

A Yes.

Q Now, your own Federal Highway manual is recommending for material sites that you have boring or test pits on a grid pattern every 30 to 45 meters, correct?

A It's not necessarily a recommendation. These are general guidance to be used if you have no other information

# DEPOSITION OF RODNEY PRELLWITZ

RECEIVED

SEP 29 2005

DUNN & BLACK

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

M.A. DeATLEY CONSTRUCTION, INC.,)
)
Plaintiff, )
)
vs. ) Case No. 041052C
)
UNITED STATES OF AMERICA; )
UNITED STATES DEPARTMENT OF )
TRANSPORTATION; UNITED STATES )
FEDERAL HIGHWAY ADMINISTRATION, )
WESTERN FEDERAL LANDS )
HIGHWAY DIVISION, )
)
Defendants. )

COPY

DEPOSITION UPON ORAL EXAMINATION

OF

RODNEY PRELLWITZ

DATE TAKEN: Thursday, September 15, 2005
TIME: 10:01 a.m.
PLACE: 1104 Main Street, Suite M110
Vancouver, Washington

COURT REPORTER: Jeannice Middaugh, RDR, CRR

APPEARANCES

| | |
|---|---|
| FOR THE PLAINTIFF: | DUNN & BLACK<br>BY: JOHN C. BLACK, ESQ.<br>10 North Post, Suite 200<br>Spokane, WA 99201 |
| FOR THE DEFENDANTS: | DEPARTMENT OF JUSTICE<br>BY: LESLIE CAYER OHTA<br>Attorney at Law<br>1100 L Street, N.W.<br>Washington, D.C. 20530 |
| ALSO PRESENT: | TIMOTHY J. BINDER |

# I N D E X


| Examination | Page |
|---|---|
| By Mr. Black | 4 |


## EXHIBITS


| Exhibit No. | Description | Page |
|---|---|---|
| 3 | Diagram | 22* |
| 4 | Boring Logs | 20* |
| 5 | Plan Sheet | 18* |
| 27 | Photograph | 42* |
| 29 | Geotechnical Report No. 2-99 | 10* |
| 32 | PDDM - Chapter 6 | 45* |
| 40 | Photograph | 42* |


* Marked at prior depositions by other court reporters

RODNEY PRELLWITZ,

called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BLACK:

Q. Mr. Prellwitz, will you state your address, please.

A. 414 Sharrott Hill -- S-h-a-r-r-o-t-t -- Sharrott Hill Loop -- Stevensville, Montana -- with a "v," Stevensville.

Q. And by whom are you employed?

A. Currently I'm self-employed and semi-retired.

Q. And when did you leave the employ of --

A. GMT Consultants?

Q. Yes. Thank you.

A. I worked with them on the five-year open-ended contract with Federal Highways. So when I worked on projects for Federal Highways and a few other projects, I worked with GMT. Other than that, I wasn't one of their permanent employees.

Q. Okay. So you've never been a permanent employee of GMT then?

A. Not completely, no. We just did certain project works where they wanted my expertise, and I wasn't -- at that time I was on their payroll as one of their engineers.

Q. Would that be considered a contract employee then or

A. That's true.

Q. -- with Federal Highways?

A. After -- after '93 -- after I retired from the forest service.

Q. And that would be with Federal Highways; right?

A. With Federal Highways, yes.

Q. What did you understand your scope of work to be for the phase two geotechnical investigation?

A. I was assigned as the senior technical engineer on the project. And as part of our proposal, we were given certain tasks to perform. And in those tasks we were given specific things which we had to investigate and which we had to report in to -- report to the Federal Highways and to make delivery of certain samples.

Q. Do you recall what those tasks were?

A. Yes, I do.

Q. Okay.

A. They're documented in the report and -- they're summarized in there, I should say.

Q. Let me --

A. If -- would you like me to read them?

Q. Yes, or show me where they are.

A. Right. Exactly.

MS. OHTA: And you handed him Exhibit --

MR. BLACK: This is Exhibit 29. But this is actually

my copy. I think what we did just for -- we can go off the record.

(Discussion held off the record.)

MR. BLACK: Let's go back on the record.

THE WITNESS: Actually, looking at the table of contents, the very first section is an introduction and scope of work, and that starts on page 1.

BY MR. BLACK:

Q. Okay.

A. And on page 1 then it begins with the field work and the office work that we were assigned and my tasks particularly.

Q. I'll have to look over your shoulder here just so I -- I only have one copy to look at.

A. How much of this do you want me to read?

Q. Back to the -- what was it that you were specifically assigned?

A. What I was specifically assigned to do had to do with my expertise in slope stability and slope design and primarily -- for instance, we had to deal with the cuts -- the type of road cuts that would be made in this section of road.

MS. OHTA: We have an extra copy, so if you want to take this back and --

MR. BLACK: Thank you. That would be great.

MS. OHTA: Have a look at this.

Q. Well, there was -- in this particular area -- let's see if I can -- I can probably get -- point you to the -- why don't we just go to page 20 of the report --
A. Okay.
Q. -- your geotech report, which is Exhibit 29.
A. Okay.
Q. Page 20, there's a category, "Material Sources."
A. Mm-hmm.
Q. See where it says that?
A. I see it.
Q. Now, the material source section -- was that part of the request for proposal?
A. It wasn't specifically. What it was -- the request for proposal -- we were required to, as the centerline reconnaissance, determine the material that was there --
Q. Right.
A. -- and to segment the road based on those materials.
So as part of that requirement to give a general description, we determined that in both sections C, D and E there was suitable material that could probably be used as material source, not specific locations but somewhere in those segments. If you wanted a materials engineer who was going to look for a material source, that would be the place to look.
Q. Okay. And was that something you were specifically asked to find out?

A. As part of the reconnaissance, just in a general sense.

Q. And the sections were C, D and E?

A. C, D and E.

Q. How big were each of those sections in terms of length or distance?

Does this -- if you look at Exhibit 5, does that help you?

A. No. That notes only one of them. It would be -- hold on a second.

Q. Would a set of plans help you?

A. On page 3 -- again, now we're talking -- what exhibit is this?

Q. 29.

A. Okay. On page 3 and 4 the stationing on the segments is documented.

Segment C runs from 17+475 to 18+490.

Segment D runs from 18+490 to 19+210.

Segment E runs from 19+210 to 20+370.

Q. And these are meters?

A. Those are meters.

Q. So basically you were asked to give a general overview during your other specific chores to see -- to say whether in any one of these sections there may be sufficient material or quality material?

A. That's true.
Q. Okay. So when you said there may be, you basically were saying over the segments of C, D and E, which are many meters in length, there could be some good material?
A. That's true.
Q. Okay.
A. That's the general statement that's made.
Q. Okay. These statements under "Material Sources," such as "thin-bedded argillites and schists may be of lesser quality" -- do you see where it says that? I'm going back to page 20. Why don't you --
A. 20?
Q. Yeah. Are you there?
A. I see it.
Q. Okay. Halfway into the paragraph under "Material Sources" it says: "The thin-bedded argillites and schists may be of lesser quality, and extensive outcrops of these rock types should be avoided as material sources."
Do you see where it says that?
A. That's true.
Q. Is that something you wrote or is that Mr. Crawford?
A. No, that's something I wrote.
Q. Okay. That's just a general statement?
A. General statement.
Q. Okay. Did you observe areas of thin-bedded

argillites and schists on this particular project?

A. Oh, yes.

Q. Okay. Was there that condition, to your knowledge, within this cut, which is B-28 and B-29?

A. Not to my knowledge.

Q. Okay. You didn't observe it?

A. No.

Q. Is it possible that within zone two between those 25 meters, between B-28 and B-29, there was such conditions?

A. I have no knowledge of that.

Q. You'd have to do more test borings to determine that?

A. It wasn't our responsibility, so I'm not about to comment on that.

Q. Okay. But as an expert in geology, I should say, the only way you'd be able to tell that is if you did more borings; is that correct?

A. That's true.

Q. Going back again to page 20 of Exhibit 29, it says there -- excuse me -- it says: "Rock quality tests are required to verify the suitability of all these materials for crushed aggregate."

Is that your statement?

A. That's true.

Q. And what rock quality tests did you have in mind?

A. That wouldn't be for me to determine. That would be

for a materials engineer.

Q. You're basically fulfilling your obligation to say: "Hey, there may be some good rock out here" --

A. Exactly. Right.

Q. -- "so you need to do your own tests, Federal Highways"?

A. That's true.

You left out one very important thing. There also is that we did not recover samples for rock quality testing for material sources, which is also in that paragraph. It should be documented.

Q. Okay. Where -- where are you referring to?

A. (Indicating.)

Q. So, in other words, you did not recover --

A. No.

Q. Would you say again --

A. I'm sorry. I guess I didn't put it in there.

Q. Okay.

A. We did not --

Q. So tell me again what --

A. We did not recover any samples to be used as rock quality tests.

Q. And you weren't asked to do that?

A. No.

Q. And so it was -- when you said "Rock quality tests

are required to verify the suitability of all the materials for crushed aggregate," you had in mind that the government should go get additional samples of material and actually run additional tests?

A. That they would have to definitely do their own sampling.

Q. And testing?

A. For that purpose, yes.

Q. And that would include testing?

A. (No audible response.)

Q. "Yes"?

A. Excuse me. I did state -- here -- the second sentence in there says: "No samples were taken for laboratory analysis, but the quartzite and diorite should be hard and durable."

Q. Okay.

A. So we didn't require -- we didn't plan to take samples for that purpose as documented.

Q. So you specifically told the government that, if they wanted to look at material for purposes of quality for designating it as a source, that they'd have to do their own sampling and testing?

A. That's true.

MS. OHTA: Now --

THE WITNESS: Sorry.

opinions concerning whether a source was a proper material source?

A. I have no knowledge of that.

Q. Okay. I'm going to hand you what has previously been marked as Exhibit 29 and -- or excuse me -- 27 and Exhibit 40. Do you recognize these cuts that are shown in these photographs as cuts that are from the Flowery Trail project?

A. They might possibly be but not in this particular area that we're talking about. The rock was much harder.

Q. Okay. So when you say "not in this particular area," you're saying in the cut that is between B-28 and B-29 the rock is much harder?

A. True.

Q. Okay. And how do you know that?

A. By looking at the cores.

Q. Okay. So by looking at the rock which -- or excuse me -- looking at the cores, which are B-28 and B-29, Exhibit 4 --

A. True.

Q. -- the rock would be much harder than as shown on the photographs, Exhibit 27 and Exhibit 40?

A. True.

Q. What do you see in these photographs in terms of the quality and competency of the rock?

A. For what purpose?

Q. For designation as a potential quarry site.
MS. OHTA: Objection. Competency.
THE WITNESS: I am not a qualified materials engineer.
BY MR. BLACK:
Q. Okay. What do you see in terms of these photographs for the quality and competency of the rock in general?
A. If I was going to put a cutslope in there, it would be flattened one to one.
Q. So in layman's terms, then, you would see in both Exhibit 27 and Exhibit 40 rock which would require a one-to-one slope?
A. Exactly.
Q. Okay. And if we look at Exhibit No. 3, that would be, in other words, zone one material?
A. At least, yes. Maybe not as good as zone one material.
Q. Okay. So the material that you're seeing in Exhibit No. 27 would be potentially equal to or maybe even worse in terms of stability for Exhibit No. 1 --
A. True.
Q. -- for zone number one. Excuse me.
A. Zone number one.
Q. The same with Exhibit 40?
A. True.

Q. And so when you're -- can you describe for me, using the bore log terminology, Exhibit 4, what type of material you're visually seeing in Exhibit 27 and Exhibit 40?

A. It doesn't even exist on this one.

Q. Oh, it doesn't?

A. No. It wasn't -- it never got to that point of weathering.

Q. How would you describe this type of material?

A. Highly weathered, very thin-bedded.

Q. Okay. Highly weathered. What type of material is it?

A. I'm not sure, looking at it. It could be decomposed granite from this appearance or some other type of intrusive rock.

Q. "Intrusive rock" being what?

A. Igneous.

Q. Igneous. Okay. Is there -- is it possible that there's -- strike that.

Are you able to see any schists or intrusions in these photographs, Exhibit 27 and 40?

A. Highly-weathered schists might have this appearance.

Q. You're pointing to Exhibit 40?

A. Exhibit 40.

Q. Okay. How about Exhibit 27?

A. It's too broken up. I couldn't tell.

Q. Okay. Are schists different than intrusions?

A. Yes. They're meta- -- highly metamorphosed.

Q. Do you see any schists in Exhibit 27 or 40?

A. Possibly 40.

Q. Okay. All right. For purposes of -- strike that.

Would the -- strike that as well.

Would you characterize this rock in this cut as highly variable?

A. In terms of the discontinuities, the bedding planes, and joint sets, yes.

Q. Are you able to determine whether the rock is competent in nature?

MS. OHTA: Objection. Rel- -- objection. Competency.

THE WITNESS: What exactly are you meaning in terms of "competent"?

BY MR. BLACK:

Q. Well, okay. That's a fair question. Let's see if I can -- I'm going to hand you what's been marked previously as Exhibit 32. Let see if we can --

MS. OHTA: There's no question pending with this.

MR. BLACK: Well, Counsel --

MS. OHTA: Okay. Oh, that's yours.

MR. BLACK: -- I know you're trying to be helpful, but just -- let's set this there for a second.

MS. OHTA: All right. It's just our copy.

MR. BLACK: I understand that. I'm not going to take it. Let me get to the sampling here. Okay. Let me keep this together.

Q. I'm going to hand you Exhibit No. 32 and --

MS. OHTA: It's important that you put it between us so I can also look at it.

BY MR. BLACK:

Q. What I'm going to do is turn to the second page. And what this document is -- it's a manual that comes from Federal Highways.

Have you ever seen any Federal Highways manuals?

A. No.

Q. Okay. And it's chapter 6, the geotechnical section. Okay. And what I'd like you to do is turn to -- and I'll help you here -- a table in here, Exhibit 6.5, and ask you to take a look at that.

A. Mm-hmm.

Q. It's a table entitled "Field Classifications for Soil and Rock."

Have you ever seen a table similar to this in any of the information you use in your occupation?

A. Yes.

MS. OHTA: Okay. Please allow me time to --

THE WITNESS: Sorry.

MS. OHTA: -- interpose an objection if I think it's appropriate.

I object on the same grounds previously stated: That he is here as a fact witness to testify about his role in generating the geotechnical report in connection with this contract, and he is not here as a retained expert to testify about other matters.

So I just think that it is inappropriate for you to be drawing on his expertise in areas that he did not cover in his report.

MR. BLACK: Thank you.

Q. You said that you've seen charts similar to this in other publications. Is this -- is this information something that you utilize in performing your tasks?

A. To some degree, especially in the soils end of it, yes.

Q. Okay. Is this a -- is the organization of this table something that's very common in the geotechnical area?

A. It's not unusual.

Q. Now, can you describe for me, using the photographs of Exhibit 27 and 40, what is the nature of the material that you visually observe from those photographs?

MS. OHTA: Objection. Competency.

BY MR. BLACK:

Q. And I guess if it's any better for you, let's talk

about the rock hardness section.

A. I'll have to speak in terms of slope stability.

Q. That's fine.

A. And what I would do -- in both of these cases I would treat those as residual soil. I wouldn't even call them competent enough to be called rock.

Q. Okay.

A. I would treat those as very dense, residual soils and design the slope accordingly.

Q. Okay. And is there -- would you characterize the rock shown in photographs 27 and 40 as very soft rock or even something less than that?

A. I would call it a granular soil. And then depending on the -- if we ran a standard penetration test, we would determine the relative density. And that's the resistance SPT you're seeing there. We could use that in the classification.

Q. Okay. But in terms -- can you use the -- can you characterize using the language in the hardness section?

A. (No audible response.)

Q. "No"?

A. It's not a rock when you call it a soil. It's not a rock anymore.

Q. So the material in these two cuts, Exhibit 27 and 40, wouldn't even be characterized as rock? Is that what you're saying?

A. That's true.
Q. And so the table which is Exhibit 6.5 is a classification that's intended for rock?
A. Oh, no. It's soil and rock.
Q. Soil and rock.
A. Exactly. Cohesive soil, granular soil, and rock hardness. They're all there.
Q. Okay. So I understand what you're saying. So you can't even use the rock hardness column?
A. No.
Q. Okay. Are you familiar with any publications that are industry-wide in the geotechnical area that would detail the process of investigating and qualifying a source for material?
MS. OHTA: Yes, same objection as previously stated. This is far beyond what Mr. Prellwitz is here for. He is a fact witness. We're not required to subpoena him because he came voluntarily. But pursuant to a subpoena, he would only be required to answer questions that he was a percipient witness of -- that is, the observations and the work he did in preparing the geotechnical report which is at issue in this case.
BY MR. BLACK:
Q. You can go ahead and answer.
MS. OHTA: If you choose to answer it.

# DEPOSITION OF MICHAEL OSBORN

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DEATLEY CONSTRUCTION CO.,

Plaintiff,

vs. No. 04-1052C
(Judge Edward J. Damich)

THE UNITED STATES,

Defendant.

DEPOSITION OF MICHAEL OSBORN

Deposition upon oral examination of Michael Osborn, taken at the request of the Defendant, before Paul D. Sublette, a Notary Public, at the offices of the U.S. Attorney, 920 West Riverside Avenue, 3rd Floor, Spokane, Washington, commencing at or about 8:02 a.m., on Friday, September 30, 2005, pursuant to the Rules of the United States Court of Federal Claims.

COPY

APPEARANCES:

FOR THE PLAINTIFF: DUNN and BLACK
By: Michael S. Bissell
Attorney at Law
10 North Post Street, Suite 200
Spokane, Washington 99201-0705

FOR THE DEFENDANT: DEPARTMENT OF JUSTICE
Commercial Litigation Branch
Civil Division
By: Leslie Cayer Ohta
Attorney at Law
ATTN: Classification Unit,
8th Floor
1100 "L" Street, N.W.
Washington, D.C. 20530

Also Present: Brent Coe
Rayann Speakman

I N D E X


| EXHIBITS: | | | PAGE |
|---|---|---|---|
| No. | 1 | FHWA Geotechnical Report No. 2-99, March 1999 by Rodney W. Prellwitz (191 pages) | 4 |
| No. | 5 | Summary of Physical Data Available, Part A and Physical Data Transmitted to or Reviewed in this Office, Part B by Marili Reilly (1 page) | 4 |
| No. | 8 | Contract awarded 2/9/01 (67 pages) | 4 |
| No. | 9 | Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, FP-96, 1996 (53 pages) | 4 |
| No. | 12 | Subcontract Form, 1995 Edition, 4/5/01, and Subcontract General Conditions (9 pages) | 4 |

| | | |
|---|---|---|
| No. 92A | Memorandum dated 11/12/01 to Kyle Huffman from Robert Lantz (1 page) | 4 |
| No. 118 | Daily note, 8/26/02 signed by Kris Parkins (1 page) | 4 |
| No. 127 | Letter dated 8/28/02 to M.A. DeAtley Construction from DeAtley Crushing (1 page) | 4 |
| No. 130 | Daily report dated 8/29/02 signed by Kris Parkins (1 page) | 4 |
| No. 144 | Letter dated 9/3/02 to M.A. DeAtley Construction from DeAtley Crushing (2 pages) | 4 |
| No. 163 | Letter dated 10/4/02 to M.A. DeAtley Construction from DeAtley Crushing (2 pages) | 4 |
| No. 166 | Letter dated 11/11/02 to Linda Persoon from Greg Graybill (2 pages) | 4 |
| No. 175 | Letter dated 12/23/02 to M.A. DeAtley Construction from DeAtley Crushing (1 page) | 4 |
| No. 178 | Letter dated 1/29/03 to Brian Wilsey from Craig Owens (1 page); letter dated 1/29/03 to Craig Owens from Greg Graybill (3 pages) | 4 |
| No. 189 | Request of CO Decision, 9/18/03 and attached documents (184 pages) | 4 |
| No. 206 | Color photos (43 pages) | 4 |

| EXAMINATION | PAGE |
|---|---|
| By Ms. Ohta | 4 |
| By Mr. Bissell | 121 |
| By Ms. Ohta | 122 |

A. Nope.
Q. Did you also look at the solicitation package?
A. Correct.
Q. And did you obtain any of the materials that were made available, such as a geotechnical report?
A. I did look at the geotechnical report to see where the site was offered up at.
Q. And how did you get the geotechnical report?
A. I looked at the copy of M.A. DeAtley's.
Q. Okay. And where and when was that?
A. Previous to the job being bid, probably by a week or two.
Q. All right. I'll hand you Exhibit 1. You've been handed Exhibit 1, which is a geotechnical report dated March of 1999. Is that the report that you said you looked at in the --
A. I believe so.
Q. -- weeks prior to submitting the bid?
A. I believe so.
Q. Okay. And could you tell me what in that report was important to you in estimating the bid?
A. Are we going to take the time to look through this? Because I cannot remember. I mean, I look at hundreds of these a year.
Q. Okay. If you just tell me the type of information

that you would --
A. I would be only interested in the sections pertaining towards the quarry sites offered up, what they looked like, what information was there. And then from there I would make my decision on what I would put into a quote. Most of the times, and on this one, I know that we would have left out all source qualifying tests. Those would have been excluded from us because we would have assumed it was either taken care of here or by the prime contractor.
Q. Okay. So if you are using a designated source, no testing would be required; is that correct?
A. On my side, yes.
Q. Okay. But even if M.A. DeAtley had chosen a non-Government designated source, DeAtley Crushing would not have assumed the responsibility for testing that particular source?
A. Correct.
Q. So you're basically going to crush where M.A. DeAtley tells you to crush?
A. Where we're directed to, correct.
Q. Okay. If you'd look at, I believe it's -- first look at D7.
A. (Witness complies.) Yes.

**EXHIBIT 2**

Exhibit 2
Date: 8/24/05 Persson
Rider & Associates
800-869-0864

Victoria

# Memorandum

U.S. Department
of Transportation

Federal Highway
Administration

WESTERN FEDERAL LANDS HIGHWAY DIVISION
610 EAST FIFTH STREET
VANCOUVER, WA 98661-3893

Subject: Field Review and Discussion
Flowery Trail Road, Phase II
WA PFH 158-1(2)

Date: June 9, 1999

From: Ron Burnett
A/E Project Manager

Reply to
Attn to:

To: Victoria Peters, A/E Design Operations Engineer

This trip was scheduled to orient Ron Burnett to the project and identify any unresolved design issues needing resolution prior to Intermediate Design submittal. Attendees included Dave Hilgendorf, Lead Designer, Kerry Cook, Geotechnical Engineer, Brian Wacker, Project Manager from Robert Peccia & Associates, Art Lemke, Environmental Specialist, Bruce Baily, Forest Service Engineer, and Ron Burnett, A/E Project Manager. John Eminger, ski area owner and manager, participated in a short discussion in the ski area parking lot.

*Meeting prior to field review:*

Discussed the following:

1. Use of thru-cut near station 18 + 800 as an aggregate source - Kerry Cook shared that materials testing confirms this is good quality rock for aggregate base. Not appropriate for Asphalt due to cationic reaction. Brian Wacker will determine the quantity available in this area based on current earthwork runs & overburden. Bruce Baily talked with Stimson Lumber and discussed the possibility of staging a crushing operation on Stimson Lumber land adjacent to the large cut. Stimson is not interested in utilizing the area for staging unless there are no other options. The field review will look at a county owned site off the project and any other sites that may be viable for a crushing operation.

2. Project earthwork balance - Currently there are 80,000 cubic meters of excess excavation on the project, which includes the amount of aggregate in the large thru cut. The parking areas at 49 degrees north will be able to accommodate all excess excavation generated on this project.

3. Fish Passage Culverts - Brian Wacker discussed each of the fish passage culverts that had been reviewed in the field in October, 1998 with FS and Fish & Wildlife personnel. Brian has proposed culvert sizes for all of the fish passage culverts based on that field review. Dave Hilgendorf, Art Lemke, and Bruce Baily agreed that the information presented by Brian was what was discussed at the field review and the sizes and bury depths specified are appropriate obtaining permit approval. One of the fish passage culverts (near 22 + 579) was not resolved at the field review. The culvert is currently laying at a proposed 8.6% grade and will be difficult to get permit approval. Field review will attempt to determine if there is a way to flatten the pipe grade

82

and avoid the stair stepping falls that are causing the steeper grade.

4. Ski Area Alternate Access Road - The ski area will lose it's existing access due to the realignment of the road in this area. A new access is being provided as part of this project. The new access will be almost ½ mile long, compared to the existing access of less than 1/4 mile. There is also an existing alternate access route that goes out the back side of the parking areas and the ski area has requested continuing to have an alternate access route for emergencies. This request for an alternate access to the area could be viewed as a replacement in kind of the existing facilities. The Forest Service and the County will need to discuss this in conjunction with WFLHD. The Forest Service needs to get a master plan from the permitee, and that document should define access and ultimate levels of development within the area.

*Field Review*

1. Abandoned County Pit site - the pit is located approx. 6 miles from the beginning of the project. There is a residence on a hill above the site. Because of the residence, noise, dust, and hours of operation will be issues that will have to be addressed prior to using this site. When the haul distance is taken into consideration, this site becomes relatively unattractive for a crushing and stockpiling area.

2. Ski Area Parking lot as potential crushing/stockpiling excess excavation area - The main ski area parking lot has ample room for a crushing and stockpiling operation. The lower edge of the lot has a bench that could accommodate excess excavation. John Eminger, owner of the 49 Degrees North development was on site and indicated high interest in accommodating the excess excavation. Crushing and stockpiling is acceptable as long as it doesn't interfere with ski area operations. The stockpiled material could be placed and ramped to allow vehicle parking. Brian Wacker will review the excess excavation amounts and see how much the lot could be expanded. The EA does allow additional clearing around the perimeter of the ski area parking lots. There are two additional parking areas behind the main lot that lend themselves to regrading. These areas could also accommodate large quantities of excess excavation.

3. Fish Passage culvert at Ski Area access - This culvert will be difficult to provide fish passage due to existing grade and length. If we do not impact the existing installation, we will not be required to mitigate for fish passage. Brian Wacker will look at the option of a small wall on the downstream side so that the road can be widened without impact to the existing installation.

4. Thru cut near Station 18 + 800 - Reviewed this section of road; looked at cross sections. Kerry Cook did a rough calculation of quantity and estimated approximately 50,000 cubic meters of material available. Brian Wacker will get the latest earthwork runs to refine the quantity. There are 24,000 cubic meters of aggregate base and 25,000 cubic meters of select topping required for the project, so this one cut may provide enough material. Discussed designating this as a mandatory source for the project since the quantity and quality of the aggregate is so high. Kerry Cook agreed that this source could be designated as mandatory. Discussed the potential for aggregate for future sections of the project to come from this same source. After review of this area, Ron Burnett and Brian Wacker separated from the rest of the group and reviewed the entire Phase II project. The rest of the people left to review other sections of the job and the existing construction project.

5. Fish Passage at Station 22 + 579 - The proposed layout has an 8.6% grade which may be hard to get approval from State F&WL folks. The reason for the steepness is a step feature. Measuring from centerline stakes show the feature to be 8 meters from centerline. The toe of the fill on that side is 14 meters from centerline, and that is why the culvert is laying at a steeper grade. Discussed flattening the curve in this area to pull the toe of fill and inlet away from the step feature. The R-O-W is wide enough in this area to accommodate the shift and the tangent lengths on both ends of the curve are long enough to accept a larger radius curve. Brian Wacker will revise the alignment in this area to pull the fill away from the step feature.

6. Fish Passage at Donaldson Cr. - Ok with proposed size and bury depth, as it complies with F&WL recommendations.

7. Fish Passage at Palmer Cr. - Because of difficulty in providing passage for a longer culvert, the current recommendation is to leave the existing installation in place and use a steepened riprap slope or short wall to allow road width for new roadway.

8. Fish Passage at 10 Mile Cr. - Ok with proposed size and bury depth, as it complies with F&WL recommendations. Crossing was 'squared up' and skew angle reduced in proposed layout per field discussions.

9. Fish Passage at Little Calispell Cr. - Ok with proposed size and bury depth, as it complies with F&WL recommendations.

10. Utilities along roadway from housing development. - Station 16 + 095 - There is a water line running parallel to the road after the road reaches the summit where the housing development is. The line crosses the road and goes up the hill to the ski area at approx. Sta 16 + 095. The line will be covered by the fill of the new construction. The current task order does not identify any utilities coordination. The A/E firm is showing all utilities locations on the drawings, but is not tasked with coordination of any relocation work. The original intent was to have WFLHD Utilities personnel coordinate the utilities work. This issue will have to be addressed and resolved by the A/E Team and AK/WA team.

11. Closeout and Field Trip De-Brief - Ron Burnett and Brian Wacker discussed the following in conjunction with the field trip:

A. Project Schedule - Brian is proposing to move the Internal Intermediate Design submittal out by two weeks; revised submittal date 7/16/99. Other Intermediate Design dates also shift accordingly. Brian gave Ron B. an overall schedule. Final delivery dates are the same except for the Design Data to construction. PRMS shows a 5/22/00 completion and the proposed schedule shows 6/2/00 completion. Ron B. will review with Victoria Peters and finalize the revised schedule and prepare the task order modification with the revised dates.

B. Pending Issues -

*Alternate Access into the ski area* - although not critical at this point, this determination needs to be made at the time of or shortly after Intermediate submittal. Ron Burnett will discuss with Bruce Baily of the Forest Service to determine the schedule of resolving this issue.

*Typical section for Access Roads* - discussion to this point has been to use County stds. Until Brian hears differently, they will continue to use this std.

*Confirmation of excess excavation quantities* - Brian will get earthwork re-run completed and develop the design based on utilizing the large thru cut for aggregate base. Remainder of 80,000 cubic meters of excess excavation will be shown being placed in the ski area parking lot.

C. Brian will prepare a trip report that identifies decisions made at the field trip and any pending issues that were not completely resolved.

Enclosure:
Trip Report from Brian Wacker

*Field Review Trip Report (June 7-9, 1999)*

# FHWA IDIQ Contract DTFH70-97-D-00002
# Task Order Number 99-RP010
# Flowery Trail Road
# 158-1(2)

*Prepared For:*

U.S. Department of Transportation
Federal Highway Administration
Western Federal Lands Highway Division
Vancouver, Washington
and Cooperating Partnering Agencies

Submitted By:
Robert Peccia & Associates, Helena, Montana

**June 7, 1999**

Brian Wacker of Robert Peccia and Associates (RPA) traveled from Helena, MT to Spokane, WA.

**June 8, 1999**

The following people convened in Chewelah:

| | |
|---|---|
| Bruce Bailey, Colville National Forest | 509-684-7220 |
| Ron Burnett, FHWA, Western Federal Lands Highway Division | 360-696-7759 |
| Kerry Cook, FHWA, Western Federal Lands Highway Division | 360-696-7738 |
| David Hilgendorf, FHWA, Western Federal Lands Highway Division | 360-696-7620 |
| Art Lemke, FHWA, Western Federal Lands Highway Division | 360-696-7952 |
| Brian Wacker, Robert Peccia and Associates | 406-447-5000 |

Meeting began with discussions of FHWA's change in organization and project responsibilities. Ron Burnett, of the newly formed A&E team, has replaced David Hilgendorf as the COTR for the project.

There were several items discussed. The following is a summary of the conclusions:

- Material Source.
  - The Gletty pit will be used only for surfacing aggregate.
  - Aggregate base material will come from a cut at approximate stations 18+700 to 18+900. This will be designated the mandatory source for this material. RPA will determine how much rock will come from this cut and let FHWA know.
  - Select topping will be taken from other rock cuts on the job. This will be considered an optional source.
  - There was some discussion of stockpiling aggregate for the next Flowery jobs. FHWA will consider this once the quantity of rock is determined. If material is not produced for the next jobs, the above-mentioned cut may be left in a manner that will facilitate using it as a material source in the future.
  - Several possible staging/stockpile/crushing areas were discussed. Bruce said that the owners of possible site right of about station 18+300 were reluctant to allow use of the area for the project. This site, an old county pit, and the ski area will be looked at in the field.
- Jerry Bryant is no longer with Stevens County. Replacement for him is unknown at this time.

- Fish Passages.
  - FHWA was originally going to lay out the fish passage culverts. RPA will now complete this work. Brian gave Ron a copy of all preliminary layouts. Ron will have Mark Browning look at to make sure this is what he is looking for.
  - Riprap will be placed on top of fill slopes instead of in them. This will lengthen pipe slightly.
  - Bury depth shouldn't exceed 40% of culvert size.
  - Fish passage sizes were discussed as follows:
    - Station 15+810 (ten mile creek), a 6150 mm culvert will be used. It will be buried 2.5 meters at the inlet and 1.0 meter at the outlet. Concrete collars will be used with riprap around them. Pipe will be full length of fill with no endwalls.
    - Station 16+164 (little calispell creek), a 3050 mm culvert will be used. It will match the gradient of the stream with 1 meter of embedment.
    - Station 17+442 (ten mile creek), a 4600 mm culvert will be used. Concrete collars will be used with riprap around them. Pipe will be placed flat and full length of fill with no endwalls.
    - Station 19+172 (palmer creek), the existing pipe will be left in place if at all possible. Dave said that we cannot put a longer pipe in. We may have to use walls or something to keep the existing pipe.
    - 20+095 (donaldson creek), a 3050 mm culvert will be used. It will match the gradient of the stream with 1 meter of embedment.
    - 22+579 (tributary to ten mile creek), there is still some question as to the profile grade of the stream. The several steps in the stream make it difficult to reduce the gradient. Will look at in the field & possibly get the stream profiled. Preferred preliminary design is a 2120 mm culvert buried 0.6 meters.
  - RPA will develop plans for intermediate review and present to Department of Fish and Wildlife at review for comments.
- The snowmobile pullout between 14+900 and 15+300 has been eliminated. The pullout near nine bark road will remain. It will be coordinated with the approach intersection and will accommodate four (4) pickups.
- Ski area hasn't developed a plan yet. For now there will only be one access.
- If possible roadway obliteration plans will be shown on the plan & profile sheets. Bruce said he believes there will mostly be shoulder pull option. RPA will develop plans and will determine types of obliteration at the Intermediate review.

The group then traveled to the field. The following were items discussed and decisions made:

- The group stopped at an old county source along the way to the project. Area not too large, but may be possible for use. Measured approximately 50 meters by 40 meters. If used will have to determine impacts to trailer house that overlooks site.
- The group stopped at the main ski area parking lot. There was discussion about using it as a staging/stockpile/crushing area. It appears that there would be adequate room to do so. Kerry said there would be no trouble with stockpiling the material and driving on it. This would allow ski area to use during winter months. Bruce said this was ok with FS. John Eminger of the ski area showed up and did not have any problem with this. It was decided that this would be provided as staging/stockpile/crushing area. RPA will work with FS and ski area to assure stipulations in plans meet needs. The group discussed expanding ski area and decided if excess material is available it would be possible to expand boundaries.
- The group stopped at the fish passage on the proposed ski area access road. Ron will check to see if pipe is considered a fish block. If it is, it will be replaced with 2120 mm culvert. If not considered a fish block, attempts will be made to use the existing pipe, with extensions if necessary.
- The group then traveled to possible staging area at about station 18+300. Decided not to use the site because landowner was hesitant.
- The group stopped at cut site at approximate station 18+700. Decided to wait until rock volumes were determined before discussing use of rock for future jobs.

The group split and looked at different portions of project on their own. Ron and Brian reviewed all fish passages and did a general review of the project.

Spent time at the 22+579 fish passage and determined that there is a big step approximately 8 meters left of the staked centerline. May prove beneficial to adjust the alignment to the right to drop below this step with inlet. Also, may be beneficial to profile the stream.

Brian provided Ron with a proposed schedule. Ron will be preparing an amendment to adjust this, provide for RPA to lay out fish passages, provide for RPA to attend this trip, and other items that may need addressed. Both Ron and Brian will look at scope to make sure no other adjustments are necessary.

Ron departed and Brian drove through (1) under construction. Stopped by New Port to visit with Marion Barber but she was unavailable. En route to Helena, MT.

**June 9, 1999**

Brian Wacker returned to RPA office in Helena, Mt.

**EXHIBIT 3**

Exhibit 5
Date: 8/24/05 Persoon
Rider & Associates
800-869-0864

-D7-




All color markings placed by Kerry Cook

C:\CADD\DGN\FLOWERY\FLOWRSEC.DGN 3/1/99

NOTE: Alignment and cut slopes shown are the preliminary line dated 9/98. Final line stations and cutslopes will vary from that shown.

0 5
Scale (m)

FLOWERY TRAIL ROAD

**EXHIBIT 6**

# Weekly Partnering Agenda
## Tuesday, October 2, 2001

Today's meeting was held at Sta 18+600.

Attending: M.A. DeAtley — John Cooper, Mark DeAtley, Jack (new comtroller), Dusty Forsman

FHWA — Linda Persoon, John Foster

Contract Modification Status:

| Number | Description | Status (Next Step) - Responsibility |
|---|---|---|
| 002 | Added Clearing | CM complete. Waiting on Vaagen Bros for pick up of last partial load. Linda should know within 24 hrs if the county is going to pickup. If not, the Senior class at Chewelah would take donated timber for their fund raiser. |
| 003 | 4500 mm pipe, Sta 18+300 | CM complete. John stated the pipe is ready and they might get it in this year if the approach isn't used for a stockpile site. |
| 004 | Stimpson/Stevens Co. timber | Linda hands John Cooper CM. $46,325.91 plus 15 days |
| 007 | Stockpile 100 logs w/ stumps | CM complete. 54 trees stockpiled to date. Dusty noted they are ready to haul some more. Linda noted they might have a few in the added clearing to be done at Sta 18+340 LF where the slope is going to be laid back. |
| 008 | Pipe at Sta 19+200 | Agreement reached. Waiting on next fiscal year appropriations to process. |
| 009 | Time extension | Linda needs to process |
| 0010 | Hour survey item. | Linda needs to process |

**Environmental Concerns** – prepare for winter shutdown. John noted they are working on silt fence. We discussed the main concern is getting base on the grade before weather hits.

**Quality Control on the base material** – Linda clarified questions raised:

- Aggregate source testing (Los Angeles abrasion, durability index, sodium sulfate soundness, accelerated weathering) are not required for government identified source between Sta 18+700 and Sta 18+900. If base material is

Exhibit 6
Date: 9/24/05
Rider & Associates
800-869-0864

produced beyond these limits, it will be necessary to run the quality tests, however.

- SCR 105.05…"Rock material between stations 18+700 and 18+900 has been found to meet the quality requirements for aggregates under Sections 301 and 309."
- SCR, pg F-27, Table 301-1 – remarks column under Aggregate Source: "Not required when using Government provided sources".

- While the contract allows 15 days to run Humphres test because of the reduced workload this time of year this could be accomplished is a matter of days.
  - The contractor can speed the approval process by making sure that when sending in the Target Values they include all sieve values shown on Table 703-2A plus the 2.00 mm or the 2.36 mm. These are necessary to run the Humphres Curve.
  - The Humphres test is required prior to incorporating base into the work. Table 301-1 (SCR F-27, 28).

**Crushing Status**
Mark DeAtley noted they would be meeting with the subcontractor Brian DeAtley tomorrow morning on site. Mark noted it looks like they won't be ready for the crusher by next week. They plan on the first blast at the rock source tomorrow noon.

**Alternative waste site/s – discuss**
John noted there will be excess material on the west end that needs a place soon. Linda is looking at options off the west end of the project with a shorter haul than going 9 kilometers into Gletty Pit.

# EXHIBIT 10

Exhibit 18
Date: 8/24/05
Rider & Associates
800-869-0864

# DeAtley Crushing Company

4307 Snake River Avenue • P.O. Box 759 • Lewiston, Idaho 83501 • 208-743-6550 • Fax 208-743-6474

RECEIVED
FEB 28 2003

February 26, 2003

M. A. DeAtley Construction Company
Attn: Mr. Craig T. Owens
P O Box 490
Clarkston, Wa. 99403

**RE: Flowery Trail / Project #DTFH70-01-C-00011**
**Agg Base "D" / WFLHD Source**

Dear Craig:

After our joint meeting with WFLHD on in Chewelah on the 14th, we would offer some follow up comments. We'd like to thank M.A. DeAtley Construction for setting up the meeting and allowing both M.A. DeAtley Construction and DeAtley Crushing Company the opportunity to show WFLHD the evidence regarding the source face to face. Sadly, we are not surprised at the outcome of this meeting. It has become apparent that the WFLHD staff operates under the guise that they can use as they see fit, or ignore when it's to their benefit, the contract guidelines and clear Special Contract Requirements, as well as the Federal Highway Administration Field Materials Manual. Mr. Coe flatly refused to answer direct questions put to him on numerous occasions. As was stated previously by DeAtley Crushing Company, we do not believe that WFLHD will acknowledge the truth or treat the contractor fairly unless forced to do so through a claim by M.A. DeAtley Construction.

We would like to recap the meeting points that we see as all important. All parties are in agreement that the stockpiled materials have broken down since being produced and stockpiled. Quite simply, the gradation has changed throughout the sieve ranges. This is evidenced by the comparison of the gradation verification tests done during or shortly after production, and the battery of tests performed on the same materials a year later. While Brent Coe did not appear to want to hear the proof, he admitted himself at the meeting that the aggregates in pile had broken down. This was heard by all in attendance. WFLHD was provided with the reasons why testing finished products by use of the Sulfate Soundness test method as a way to determine if the source meets contract requirements is not reliable or proper procedure, not the least important of which would be the fact

that the Special Contract Requirements clearly identify that the material is to be taken from the source and NOT from stockpiles of finished product. A representative from Buddinger and Associates, an independent laboratory, provided a clear analogy of the differences between "source testing" and testing of finished products.

After the discussion about what materials were to be used, and where the materials should be retrieved from, to ensure proper source testing, WFLHD then changed its position somewhat. At that point, Linda and Brent stated that WFLHD was "hanging its hat on the test results from the two test borings of the source". These test results apparently sufficiently indicated to WFLHD that the materials did meet, and would continue to meet, all contract source compliance requirements. After WFLHD said they were hanging their hat on the previous boring results, Brent was asked directly if WFLHD is absolutely responsible for making sure that the source met all contract requirements all the way through production of aggregates. Mr. Coe then correctly replied that "yes, WFLHD is responsible for the entire source". One fact has not changed since this debate started. The Source failed the Sodium Sulfate Soundness test.

We would like to offer M.A. DeAtley the following information derived from and quoted exactly as stated in the Federal Highway Administration Field Materials Manual.

*"1.0 POLICY STATEMENT*

***.......The sampling and testing methods contained in this manual will be used for all projects awarded under the Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, (FP-85 and later editions), unless otherwise specified in the Special Contract Requirements."***

*"4.0 MATERIAL SOURCES*

***.......When the material source is shown on the plans or described in the special contract requirements, the Government assumes responsibility that, with reasonable performance, the Contractor will be able to obtain sufficient acceptable material.....***

***.......The Government assumes the responsibilities for such characteristics as soundness, abrasion, stripping resistance of the aggregate and the quantity of the source.....***

***.......During crushing operations the Project Engineer should submit samples of aggregate to confirm the quality of the material and to make certain that the material still meets the requirements for soundness, abrasion, stripping, etc.....***

***.......If a designated source does not contain a sufficient quantity of quality material, the Government is responsible for providing another source.....***

***......The Contractor will be compensated for increased costs incurred in producing material from a new source upon failure of the designated source. This additional compensation may include the cost of equipment moves and setups, additional haul, and additional costs, if any, producing the material.....***

As you know, WFLHD's engineers did not retrieve and test any source materials during crushing operations as is required to ensure that the source provides quality material throughout. What is more alarming is the fact that WFLHD didn't follow through with its own self imposed obligation to ensure availability of quality source material even after it was reported to them that the source had failed a source compliance test. The situation degrades from alarming to unbelievable when a person understands that after being notified that the source failed, and then being requested, in writing, to jointly sample the source on numerous occasions, WFLHD has refused to do just that for over six months.

It is clear that WFLHD is not operating within its own rules, guidelines, or contract requirements. We see no reason to believe that WFLHD will willingly change its course in this instance; therefore we believe the only way that the contractors will be fairly compensated will be through the filing of a claim by M.A. DeAtley.

You can reach me at our Lewiston office should you have any questions.

Sincerely,
DeAtley Crushing Company

Greg Graybill
Administrator