**EXHIBIT 11**

# FIELD MATERIALS MANUAL

# SAMPLING & TESTING PROCEDURES

U.S. Department of Transportation
Federal Highway Administration
Direct Federal Projects

Exhibit 11
Date: 8/24/05
Rider & Associates
800-869-0864

100

# CHAPTER I

## GENERAL INFORMATION AND INTERNAL PROCEDURES


| Topic | Page |
|---|---|
| 1.0 Policy Statement | I;1.0; ;1 |
| 2.0 Responsibility for Sampling and Testing | I;2.0; ;1 |
| 3.0 Policy/Procedural Memorandums | I;3.0; ;1 |
| 4.0 Material Sources | I;4.0; ;1 |
| 5.0 Sampling and Testing | I;5.0;5.1;1 |
| 5.1 Field Laboratory and Testing Equipment | I;5.0;5.1;1 |
| 5.1.1 Laboratory Trailers and Materials Test Kits | I;5.0;5.1;1 |
| 5.1.2 Additional Equipment | I;5.0;5.1;1 |
| 5.1.3 Replacement of Equipment and Supplies | I;5.0;5.1;1 |
| 5.1.4 Installation and Operation of Laboratory Trailers | I;5.0;5.1;1 |
| 5.1.5 Care and Protection of Laboratory Trailers and Testing Equipment | I;5.0;5.1;2 |
| 5.1.6 Moving of Laboratory Trailers | I;5.0;5.1;2 |
| 5.1.7 Field Transfers of Trailers | I;5.0;5.1;3 |
| 5.1.8 Field Storage of Trailers | I;5.0;5.1;3 |
| 5.1.9 Equipment in Materials Laboratory Trailer, T-1501 | I;5.0;5.1;4 |
| 5.1.10 Soils and Aggregate Testing Equipment in Laboratory Trailer, T-1501 | I;5.0;5.1;5 |
| 5.1.11 Sand Equivalent Test Equipment in Laboratory Trailer, T-1501 | I;5.0;5.1;7 |
| 5.1.12 Compaction/T-99 Test Equipment in Laboratory Trailer, T-1501 | I;5.0;5.1;8 |
| 5.1.13 Specific Gravity Kit in Laboratory Trailer, T-1501 | I;5.0;5.1;8 |
| 5.1.14 Housekeeping Equipment in Laboratory Trailer, T-1501 | I;5.0;5.1;9 |
| 5.1.15 Asphalt Vacuum-Extraction Test Equipment in Laboratory Trailer, T-1501 | I;5.0;5.1;10 |
| 5.1.16 Equipment in Materials Test Kits | I;5.0;5.1;12 |
| 5.1.16.1 Aggregate Test Kit, T-1401 (3 Boxes) | I;5.0;5.1;12 |
| 5.1.16.2 Compaction Test Kit, C-1001 (2 Boxes) | I;5.0;5.1;16 |
| 5.1.16.3 Concrete Test Kit, T-1451 | I;5.0;5.1;18 |
| 5.2 Obtaining Representative Samples | I;5.0;5.2;1 |
| 5.2.1 Point of Sampling for Acceptance | I;5.0;5.2;1 |
| 5.2.2 Asphalt Sampling Procedures | I;5.0;5.2;1 |
| 5.2.3 Volume Corrections for Liquid Asphalts and for Emulsified Asphalts | I;5.0;5.2;4 |
| 5.3 Types of Samples and Tests | I;5.0;5.3;1 |
| 5.3.1 Process Control Samples and Tests | I;5.0;5.3;1 |
| 5.3.2 Acceptance Samples and Tests | I;5.0;5.3;1 |
| 5.3.3 Independent Assurance Samples and Tests | I;5.0;5.3;2 |
| 5.3.4 Contractor Verification Samples and Tests | I;5.0;5.3;2 |


W

CHAPTER I
GENERAL INFORMATION AND INTERNAL PROCEDURES


| Topic | Page |
|---|---|
| 5.4 Statistical Sampling and Testing | I;5.0;5.4;1 |
| 5.4.1 Selecting Random Numbers | I;5.0;5.4;1 |
| 5.4.2 Unrestricted Random Sampling | I;5.0;5.4;1 |
| 5.4.3 Systematic Random Sampling | I;5.0;5.4;2 |
| 5.4.4 Stratified Random Sampling | I;5.0;5.4;2 |
| 5.4.5 Random Number Tables | I;5.0;5.4;2 |
| 5.5 Pay Factor Computations and Applicable Items | I;5.0;5.5;1 |
| 5.5.1 Statistical Evaluation of Materials for Acceptance | I;5.0;5.5;1 |
| 5.5.2 Null Hypothesis Testing for Verification of Contractor's Test Results | I;5.0;5.5;6 |
| 5.5.3 Quality Level - Pay Factor and Null Hypothesis Testing Computer Programs | I;5.0;5.5;7 |
| 5.6 Minimum Recommended Testing Frequency | I;5.0;5.6;1 |
| 5.7 Storage and Stockpiling of Materials | I;5.0;5.7;1 |
| 5.8 Transmittal of Samples to Central Laboratories | I;5.0;5.8;1 |
| 5.8.1 Identification | I;5.0;5.8;1 |
| 5.8.2 Form WDFD-199, Request for Laboratory Tests - for Samples Submitted to the WDFD Materials Laboratory in Vancouver | I;5.0;5.8;1 |
| 5.8.3 Addresses for Testing Laboratories | I;5.0;5.8;1 |
| 5.8.4 Sample Containers | I;5.0;5.8;2 |
| 5.8.5 Method of Shipment | I;5.0;5.8;2 |
| 5.8.6 Minimum Required Sample Size for Submittal | I;5.0;5.8;3 |
| 6.0 Sampling and Testing Small Quantities of Miscellaneous Materials | I;6.0; ;1 |
| 7.0 Safety | I;7.0;7.1;1 |
| 7.1 Hazardous Materials | I;7.0;7.1;1 |
| 7.1.1 Instructions for the Use of Trichloroethylene | I;7.0;7.1;1 |
| 7.1.2 Properties | I;7.0;7.1;1 |
| 7.1.3 Storage | I;7.0;7.1;1 |
| 7.1.4 Handling | I;7.0;7.1;1 |
| 7.1.5 Personal Protective Equipment | I;7.0;7.1;2 |
| 7.1.6 Ventilation | I;7.0;7.1;2 |
| 7.1.7 Fire Hazards | I;7.0;7.1;2 |
| 7.1.8 Symptoms of Poisoning | I;7.0;7.1;2 |
| 7.1.9 First Aid | I;7.0;7.1;3 |
| 7.1.10 Waste Disposal | I;7.0;7.1;3 |




102

CHAPTER I
GENERAL INFORMATION AND INTERNAL PROCEDURES


| Topic | Page |
|---|---|
| 8.0 Nuclear Gauge Administration and Operation Procedures | I;8.0;8.1;1 |
| 8.1 Introduction | I;8.0;8.1;1 |
| 8.1.1 Equipment | I;8.0;8.1;1 |
| 8.1.2 Exposure Badges | I;8.0;8.1;1 |
| 8.1.3 Training | I;8.0;8.1;2 |
| 8.1.4 Special Notice to Female Personnel | I;8.0;8.1;2 |
| 8.1.5 Regulatory Guide Concerning Prenatal Radiation Exposure | I;8.0;8.1;5 |
| 8.1.6 Safety Procedures | I;8.0;8.1;11 |
| 8.1.7 Accidents and Incidents | I;8.0;8.1;11 |
| 8.1.8 Emergency Procedures | I;8.0;8.1;12 |
| 8.1.9 Shipping Procedures | I;8.0;8.1;12 |

# 1.0 POLICY STATEMENT

It is the policy of the Federal Highway Administration to utilize standard uniform sampling and testing procedures which are within the broad scope of those recommended by the American Association of State Highway and Transportation Officials (AASHTO). This manual complements the AASHTO sampling and test methods by providing additional information, instruction, guidance and clarification to the inspector/tester. The sampling and testing methods contained in this manual will be used for all projects awarded under the Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, (FP-85 and later editions), unless otherwise specified in the Special Contract Requirements.

The manual incorporates some procedures designed to reduce testing time. These procedures are consistent with sound engineering and have been shown to have negligible, if any, affect on the final results. Appropriate consideration was given to the precision of the specified sampling and testing methods during establishment of the allowable tolerances and specification limits set forth in the Standard Specifications.

The manual includes some procedures which are not covered by AASHTO. All of the procedures included in the manual which are designated by a "T" are basically AASHTO procedures. Those procedures designated by a "DFT" are procedures not covered by AASHTO. Procedures designated as "DFT" will be referenced to a nationally recognized testing institution when applicable.

When the Specifications and/or Special Contract Requirements conflict with any of the sampling or testing methods, the provisions of the Specifications and/or Special Contract Requirements shall govern.

The manual has been divided up into five chapters as follows:

I. GENERAL INFORMATION AND INTERNAL PROCEDURES

II. SAMPLING AND TESTING METHODS

III. SUPPLEMENTARY INFORMATION

IV. SAMPLING AND TESTING FORMS

V. MANUAL REVISION TRANSMITTALS

Each chapter is divided into several sections and the sections may be divided into subsections. In the case of sampling methods, test methods, and forms, the subsection number is the sampling method number, test method number, or form number and they are in numerical chronological order. The page numbering starts over with "1" with each new section or subsection as appropriate.

The following illustrates the page numbering system used:

The first block represents
the: CHAPTER NO.

The third block represents
either the: SUBSECTION NO.
SAMPLING METHOD NO.
TESTING METHOD NO.
FORM NO.
or it may be left blank.

**II;5.0;5.8;1**

The second block represents
the: SECTION NO.

The fourth block represents
the: SEQUENTIAL PAGE NUMBER

The sequence number starts
over with "1" each time the
previous block (block 2 or 3,
as applicable) changes.

## 2.0 RESPONSIBILITY FOR SAMPLING AND TESTING

It is the Project Engineer's responsibility to see that all materials used in the work are inspected and in reasonably close conformity with all quality requirements of the specifications. The Engineer should review all preconstruction data, become familiar with the assumptions made during design, and confirm the pavement structure requirements. The Engineer should review all construction test reports for accuracy and completeness, regardless of whether the tests were performed on the project, by FHWA's Central Materials Laboratory, or another inspection agency.

The standard specifications provide that all materials for which tests are specified will be inspected, tested, and accepted by the Engineer before incorporation into the work. Specific requirements for all materials are stated in the standard specifications, supplemental specifications, special contract requirements, and plans.

Copies of all preliminary engineering materials and subsurface data, such as soil profiles, boring log data, materials sources, borrow area diagrams, options, use permits, and test reports should be on file at the project office.

Materials incorporated into highway work are of two classes: commercially manufactured products such as culvert pipe, reinforcing steel, paint, and asphalt cement which are purchased by the Contractor and transported to the site for incorporation into the work; and materials such as crushed aggregates, bituminous paving mixtures, and concrete which are produced on the site by the Contractor. Testing and inspection of commercial products will generally be conducted off the project. Testing of materials produced at the project site will normally be accomplished on site, although some may be tested at a central laboratory on samples submitted by the Engineer.

The Engineer should have commercially produced products that are shipped to the project physically inspected by the project personnel upon delivery even though they were inspected and/or tested previously and are accompanied by test reports or certifications indicating conformity with the specifications. This will assure that materials which are damaged during shipping are not accepted and incorporated into the work. Any materials which are suspect should be immediately sampled and tested either at the project or at FHWA's Central Laboratory.

The specifications require that the Contractor shall, without charge, replace any material or correct any work failing to conform to the contract requirements, unless in the public interest the Engineer consents to accept such material or work with an appropriate reduction in contract price.

Construction materials will fall into one of the following categories:

- o Those found to be in reasonably close conformity with the specifications.
- o Those not in reasonably close conformity but close enough to be considered as generally serving the intended purpose and warranting only a price reduction.
- o Those which are so far out of specification limits that corrective measures or complete removal are required.

Materials which are not in reasonably close conformity with the specifications should be rejected and the Contractor should be so notified in writing. Acceptance, at a reduced price, for materials which are not in reasonably close conformity with the specifications should be made only after a written request is received from the Contractor and after due consideration has been given to all possibilities of correcting the deficiencies.

It is recognized that in some instances, such as the case of most asphaltic materials, correction after incorporation into the work may not be possible and a price reduction may be the only solution, other than complete removal and replacement or an overlay to strengthen the pavement. Before any consideration is given to acceptance of nonconforming materials at a reduced price, it shall be first determined that the material in question can be accepted and that it will generally serve the intended purpose. Materials deviating from the specifications to the extent that they will not satisfactorily serve the intended purpose shall be removed promptly and replaced with specification material, or brought into compliance, at the Contractor's expense, by such corrective measures as will accomplish the desired purpose.

Unless the amount by which prices are to be reduced for nonconforming material is definitely prescribed in the specifications, a judgment will be required. This will be based on engineering and contractual considerations, past practice, and the particular circumstances of each situation. The Statistical Evaluation of Materials for Acceptance Procedures as outlined in the standard specifications (FP-85 and later editions) may be used as part of the evaluation. See Chapter I; Section 5.5 of this manual for additional information regarding Statistical Evaluation of Materials for Acceptance Procedures.

## 4.0 MATERIAL SOURCES

The specifications provide that the Contractors may furnish materials from possible sources shown on the plans and/or described in the special contract requirements or from Contractor furnished sources.

When possible sources of local materials are shown on the plans or described in the special contract requirements, the quality and quantity of materials is inferred as adequate, but the Contractor is obligated to determine for himself the amount of equipment and work required to produce specification materials.

The Contractor will be allowed to obtain material from other than plan sources unless they are mandatory, provided the material meets specification, the Engineer gives prior approval (this usually requires concurrence of the Materials Section), and the Contractor assumes all expense and responsibility in obtaining this material. Case I Borrow, when specified, shall be obtained from the sources shown on the plans and/or described in the special contract requirements.

When the material source is shown on the plans or described in the special contract requirements, the Government assumes responsibility that, with reasonable performance, the Contractor will be able to obtain sufficient acceptable material. This does not mean the Government assumes responsibility for the Contractor's operations in the possible source. The Contractor is responsible for producing a material which meets the quality requirements of the contract. The Government assumes the responsibilities for such characteristics as soundness, abrasion, stripping resistance of the aggregate, and the quantity in the source. The Contractor assumes responsibility for the gradation and sand equivalent. During crushing operations the Project Engineer should submit samples of aggregate to confirm the quality of the material and to make certain that the material still meets the requirements for soundness, abrasion, stripping, etc.

If a designated source does not contain a sufficient quantity of quality material, the Government is responsible for providing another source.

The Contractor will be compensated for increased costs incurred in producing material from a new source upon failure of the designated source. This additional compensation may include the cost of equipment moves and setups, additional haul, and additional costs, if any, of producing the material. The change in source and any additional cost involved shall be covered by a Contract Modification.

Extreme care should be taken to insure that all available suitable material is obtained from a source before the Contractor is authorized to move to a new source. Changes in formations in the source and other factors affecting production should not be used as a reason for abandoning the source when acceptable material can be produced within the original concept of the item as bid upon. If an area has been shown as a source of more than one type of material, conditions may be encountered where part of the area is suitable as a source of one material, but not as a source for another. The Project Engineer should direct the Contractor to conduct his operations in such a manner to insure that the material best suited for a particular purpose be

used for that purpose. If the Contractor disregards such instructions and exhausts the better material for purposes other than those intended, the Government will not be responsible for any additional costs that may result from such improper usage of the material.

In the event the Contractor elects to use a source not indicated on the plans or described in the special contract requirements, the sampling and development plan of the source shall be performed under the direction of the Engineer. Other details concerning sources proposed by the Contractor are noted in the specifications and special contract requirements.

The WDFD Geotechnical Section maintains a record of various material sources. A search of these records could possibly indicate the proposed source has been tested and has a history of producing suitable material and could be approved without additional testing.

The Contractor must coordinate the use of his proposed source if it involves Government property with the agency involved.

The Contractor shall be notified of source acceptance by letter which will contain any restrictions or requirements for use of the source.

During crushing operations the Project Engineer should submit samples of aggregate to confirm the quality of the material and to make certain that the material still meets the requirements for soundness, abrasion, stripping, etc.

The Aggregate Source Report, Form WDFD-98, is to be submitted to the Materials Section for each source used as soon as production operations have been completed.

# EXHIBIT 12

110

Date: Tuesday, June 5, 2001
Weather: Cool and drizzle off and on

**Work of Inspectors:** John Foster to serve as assistant project engineer on site – coordinating with contractor's superintendent, Sam Stamper. Thomas Siniscal watched the construction clearing operations and video taped the processor / skidder working on decking logs for Vaaugen Brothers.

About 9:45 am John Foster came down to the (5) project where I was in a plan review with the designers and Kerry Cook. Foster noted that John Cooper had dug three test pits in the area of the big thru cut at Sta 18+800 and wasn't able to find rock. Kerry Cook and myself drove to the site with a copy of the geotech report.

The first pit we looked at was down 3.8 m. There was a 1 meter topsoil layer and then a layer of decomposed rock, breaking into 100 to 150 mm size. This material was showing signs of sloughing into the trench on the vertical sides of the pit. At 3.8 meter (the bottom reach of the excavator) was the top of a harder layer. Cook noted this matches what is seen in the corings. There were two corings taken at Sta 18+850 showing: a silt, sandy, dry, tan material down to 1.5 m; an argillite (highly fractured, brownish gray) from 1.5 m to 3.6 m; an argillite (moderately fractured and weathered, brownish gray) from 3.6 m to 6.61 m; an argillite ( with clay alteration in fractures, brown to gray with Fe stains) from 6.61 m to 8.53; and a quartzite (fractured and weathered, gray) from 8.83 m to 16.1 m. The second coring has a similar description except it called the highly fractured zone a guartzite. In both cores the RQD % was 0 to 8 down thru the highly fractured area, but then going to 32 – 90% recovery of 4"+ rock to the bottom of the cores in the moderate / slightly / competent / very hard quartzite below. From our witnessing the test pits and reviewing the geotech report we discussed the following:

- The rock material in the upper 4 to 5 meter is too soft to use for base. Kerry Cook agreed it could be used in subexcavations provided it was clean enough. It also could be used on the slope armors.
- We discussed with Cooper that the rock from the beginning of the project to Sta 18+700 could well be used for base if quality testing showed compliance with contract requirements. The only reason the area from 18+700 to 18+900 was listed as having base material is because samples from this area have passed quality testing.
- Cooper noted this changes their plans. They expected to remove 1-2 meters of topsoil and then have competent base rock. He stated he would have to reconsider when to bring in his crusher and where to locate it.
- We discussed the stability of the zone of highly fractured rock 1.5 to 4 or 5 meters deep. The cross sections show us having this material at a 2:1 (metric) slope as is the competent material below it. We looked at options for laying back this portion of the cut slope. But there isn't enough ROW to do this. This is private property and would take considerable time to get additional ROW. Cook agreed the material could be built per plan, but this upper slope will slough material into the ditch. The ditch has been designed in this area to handle the expected sloughing rock.

Exhibit 12
Date: 8/24/05
Rider & Associates
800-869-0864

111

- We questioned why the ROW wasn't obtained between the new alignment and the old road in this area of rock. We are making this deep through cut and leaving a somewhat unsightly bank of rock.

Both John Cooper and Sam Stamper seem unfamiliar with the geotech report. A couple of weeks ago I asked Scott Palmer, M.A. DeAtley's engineer/estimator if he had a copy of the geotech report. Scott noted he did have a copy and he had used the report in conjunction with the cross sections to develop the takeoffs for rock materials when bidding the project.



One meter of topsoil; 0.6 meters of soil; then highly fractured rock



Test Pit 20' deep. No material encounter that gave resistance to backhoe.



Down 20'; Still In Highly Fractured Rock

**Conversation with Stevens County Representatives:**
About 11:00 am Jason Hart and a ROW person from the county office were on site. Jason noted the vast progress on the clearing of the Stimson property. He asked me if I knew how many loads of logs had been taken. I noted we don't have a count, since the self loaders are here before we start in the morning and after we leave some days. I stated I was hoping he could provide me with a count. I would like to know

the quantity and dollar value so we can have some data for the next project engineer's estimate.

I asked Jason and the ROW person why the county didn't purchase the small sliver of land between the roads. They were both surprised that this hadn't been done and stated it looks like an oversight. They noted that it would look odd to leave the chunk of rock standing there between the new road and the obliteration. Jason agreed to look into it. They also discussed how difficult it would be to negotiate with Stimson. Jason asked me what we could give Stimson. I noted I don't know what more we can do. We are already building them 5 approaches, 3 more than existing.

**Conversation with Forest Service Representative:**
Late in the afternoon Bruce Bailey called and we discussed:

- There is a fishery crew that will involved in a month long study and he asked when it work in the contractor's schedule to have them on the project. We discussed having them start next week; report to the flagger at 7:00 am Monday morning and discuss where to park. They should wear vest and hard hats. They will start on the east end of the project and slowly work west. They are counting ponds, etc in the steams and creeks
- Bruce questioned if I had heard from my supervisors about the FS issuing the use permit to FHWA for the Kings Lake Pit. I noted we had spoken with the environmental section and they were all right with environmental reviews having been complete. So it will work to issue us the permit.
- I questioned Bruce if he knew if the Kings Lake Pit had been cored by WFL for quality. Bruce recalled that Marion thought the pit was unacceptable, but he thought she learned it to be all right "just before she left".
- We will meet tomorrow morning as part of the line and grade review on the (3) job with the designers.
- I would like to have Bruce visit an area near Sta 22+200 where the contractor would like to stage his equipment trailer temporarily.

Linda M. Persoon
6/5/01

115