IN THE UNITED STATES COURT OF FEDERAL CLAIMS

M.A. DeATLEY CONSTRUCTION, INC.,

Plaintiff,

vs.

UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF TRANSPORTATION; UNITED STATES FEDERAL HIGHWAY ADMINISTRATION, WESTERN FEDERAL LANDS HIGHWAY DIVISION,

Defendant.

Case No.: 041052C
(Judge Edward J. Damich)

**MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE TO DEFENDANT UNITED STATES' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... iii

I. INTRODUCTION ..... 1

II. STATEMENT OF THE CASE ..... 2

III. THE COMPLAINT ..... 15

IV. ARGUMENT ..... 19

A. Standard Of Review For Subject Matter Jurisdiction Issues. ..... 19

B. Standard For Review For Failure To State A Claim Issues. ..... 20

C. This Court Possesses Jurisdiction For M.A. DeAtley's Claim For Interest And Attorneys Fees. ..... 20

D. M.A. DeAtley's Breach Of Contract Claim Should Not Be Dismissed. ..... 21

E. M.A. DeAtley's Defective Specifications Cause Of Action States A Claim Upon Which Relief Can Be Granted. ..... 24

F. M.A. DeAtley's Cause Of Action For Constructive Change Should Not Be Dismissed. ..... 25

G. M.A. DeAtley's Claim For Failure To Mitigate Damages Should Not Be Dismissed. ..... 27

V. CONCLUSION ..... 29

# TABLE OF AUTHORITIES

**Page**

**Statutes**

28 U.S.C. § 1491 (2005) ........ 19

41 U.S.C. § 611 (2005) ........ 20

**Cases**

Allenfield Assoc. v. United States, 40 Fed.Cl. 471, 479 (1998) ........ 27

Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002) ........ 24

Conley v. Gibson, 355 U.S. 41, 45-46 (1957) ........ 20

Demarco Durzo Development Co. v. United States, 60 Fed.Cl. 632, 636 (2004) ........ 21

Flink/Vulcan v. United States, 63 Fed.Cl. 292, 303 (2004) ........ 26

Granite Constr. Co. v. United States, 962 F.2d 998 (1992) ........ 19, 28

PCL Constr. Services, Inc. v. United States, 47 Fed. Cl. 745, 752 (2000) ........ 23

Puget Sound Power & Light, Co. v. United States, 23 Ct.Cl. 46, 65 (1991) ........ 27

Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ........ 20

Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001) ........ 20

Spearin v. United States, 248 U.S. 132, 136-37 (1918) ........ 24

# I. INTRODUCTION

The United States seeks to dismiss M.A. DeAtley Construction, Inc.'s ("M.A. DeAtley") causes of action for breach of contract, defective specifications, constructive change, and failure to mitigate damages, quantum meruit/unjust enrichment[1], interest and attorney fees and costs. The United States attempts to unilaterally characterize M.A. DeAtley's claim as solely one for differing site conditions. The Government's argument, however, is completely without merit. As this Court is aware, M.A. DeAtley need only show that there is a possible set of facts that would entitle it to relief in order to survive a RCFC 12(b)(6) Motion to Dismiss.

Here, the facts alleged within the four corners of the Complaint sufficiently state claims upon which relief can be granted. Therefore, the United States' Motion to Dismiss should be denied.

Moreover, discovery which has recently been completed has revealed additional facts which were unknown by DeAtley as of the date the Complaint was filed. Therefore, to address the Government's arguments, DeAtley seeks to amend its Complaint to assert these additional facts. While not technically required to

---

[1] This Court has jurisdiction over a quatum meruit claim arising from an implied in fact contract. See Cities Service Gas Co. v. United States, 205 Ct.Cl. 16, 500 F.2d 448, 451-52 (1974). However, M.A. DeAtley recognizes that its claim for unjust enrichment/quantum meruit is a claim that arises out of a contract implied in law, and therefore withdraws this claim.

defeat the Government's Motion, DeAtley requests that it be granted leave to file the Amended Complaint based upon this recent discovery.

Finally, the United States seeks to dismiss M.A. DeAtley's claims for interest and attorney fees and costs based upon an unreasonable position that the Court lacks subject matter over these claims. As discussed below, this Court has jurisdiction over these claims. Therefore, the United States' Motion to Dismiss should be denied.

## II. STATEMENT OF THE CASE

1. On February 9, 2001, M.A. DeAtley was awarded Contract No. DTFH70-01-C-00011 to reconstruct a portion of Flowery Trail Road in Washington State. The Contract required crushing of 21,500 metric tons of Aggregate D base for the Project. To perform this crushing, M.A. DeAtley entered into a subcontract with DeAtley Crushing Company ("DeAtley Crushing"). (*Complaint, ¶¶ 4-5*). The project schedule called for construction over a two year period starting in 2001 and completing in 2002. (*§ 108, Special Contract Requirements; Defendant's deposition Exhibit 8*).

2. The Class D aggregate source was selected by the Government and it was designated in the contract as an optional source for the contractors to use.

(*§ 105.05; Special Contract Requirements, Defendant's deposition Exhibit 8*).[2] The designated source was 200 meters wide. *(Dep. of Persoon, p. 40).*

3. For Government designated sources, the contract requires the Government to perform testing on the material to determine the quality and durability of the rock. The tests include the Los Angeles abrasion test, the sodium sulfate soundness test, accelerated weathering, and durability index. (*§ 703.05 Standard Specifications, FP 96; Defendant's deposition Exhibit 9*).

4. The Federal Highways Field Materials Manual directs the Government on the timing and frequency of such testing. (*Exhibit 11, Dep. of Persoon*). That manual also summarizes the Government's obligations when a Government-designated source is involved. The Manual states:

> When the material source is shown on the plans or described in the special contract requirements, the Government assumes responsibility that, with reasonable performance, the Contractor will be able to obtain sufficient acceptable material. This does not mean the Government assumes responsibility for the Contractor's operations in the possible source. The Government is responsible for producing a material which meets the quality requirements of characteristics as soundness, abrasion, stripping resistance of the aggregate, and the quantity in the source. The Contractor assumes responsibility for the gradation and sand equivalent. During crushing operations the Project Engineer should submit samples of aggregate to confirm the quality of the material and to make certain that the material still meets the requirements for soundness, abrasion, stripping, etc.

[2] All references to transcripts and deposition exhibits are filed as attachments to the Affidavit of John C. Black filed herewith.

(*Exhibit 11, Dep. of Persoon); (emphasis added).*

5. The contract further contains a Government-provided design for aggregate size and gradation. (*§ 703-5, Table 703-2, Special Contract Requirements*). The Standard Specifications contain a mix design range for each sieve size of aggregate. The Standard Specifications further contain tolerances outside of each sieve range. These tolerances provide that the material will still be accepted based upon statistical deviation calculations, although the contractor's payment would be reduced. (*§ 106.5 Standard Specifications, FP-96, Defendant's deposition Exhibit 9*).

6. The Government revised the Standard Specification for the Flowery Trail Project. With respect to the fine material (i.e., the #200/75 micron sieve), the Government deleted the typical design range. Instead, the Government provided that the allowable amount of fine material would be capped at 10% maximum. There were no tolerances specifically stated for this specification requirement. (*Table 703-2A; Special Contract Requirements, Defendant's deposition Exhibit 8*).

7. The contract addresses the situation where no tolerances are provided. The contract states:

> When no tolerance values are identified in the contract, the work will be accepted based on customary manufacturing and construction tolerances.

(*§ 106-04 Standard Specifications, FP 96; Defendant's deposition Exhibit 9*).

8. In March 1999, the Government retained a geotechnical consultant to travel to the site for purposes of designing cut slopes for the roadway. The Government asked the geotechnical consultant if he could visually observe whether there "may" be any locations within the existing project boundaries which could possibly serve as a quarry source for crushed aggregate material. (*Dep. of Prellwitz, p. 30, 31*).

9. In March 1999, the geotechnical consultant prepared a report which recorded his observations. The consultant performed no tests, nor did he take any borings for purposes of material source qualification. *(Dep. of Prellwitz, p. 34).*

10. The geotech report stated:

> *No samples were taken for laboratory analysis, but the thin-bedded argillites and schist may be of lesser quality and extensive outcrops of these rock types should be avoided as material sources. These can be identified in the existing rock cuts by their thin-bedded and micaceous nature.* ***Rock quality tests are required to verify the suitability of all these materials for crushed aggregate.***

(*Exhibit 29, Dep. of Prellwitz). (emphasis added).*

11. Concerning the statement in his report, Mr. Prellwitz testified in his deposition:

> *Q. So you specifically told the Government that, if they wanted to look at the material for purposes of quality for designating it as a source, that they'd have to do their own sampling and testing?*

*A. That's true.*

*(Dep. of Prellwitz, p. 35).*

12. The Federal Highways Administration also maintains a Materials Manual that contains directions on how the Government should proceed with investigating, testing and qualifying a materials source. *(Exhibit 32, Dep. of Cook).* The Manual states that borings or test pits should be spaced on a grid pattern every 30 to 45 meters or less if material changed. *(P. 6-13, Exhibit 32, Dep. of Cook).* For typical federal highway projects, four to six have holes and two to four complete sets of aggregate quality tests are required. *(P. 6-9, Exhibit 32, Dep. of Cook).* The Manual further explains the information that such an investigation is supposed to reveal to the Government and the Contractor:

*A material source investigation should provide the following minimal information:*

- ***Expected quality of processed materials and procedures necessary to obtain that quality;***
- *The boundary limits of proven materials and limits of previously used access;*
- *Specific areas and elevation of nonusable materials;*
- *Previous uses of material from the source;*
- ***Recommendations or uses and limitations for processed materials;*** *and*
- ***Listing of potential development, processing and handling problems that may occur during construction.***

(*pp. 6-6, 6-9, Exhibit 32, Dep. of Cook*). *(emphasis added).*

13. As it turns out, the Government followed <u>none</u> of their own guidelines. Nor did the Government heed the warnings of its consultant who told the Government that additional investigation, sampling and testing would be required to select and qualify a source. Instead, Mr. Kerry Cook, employed by Federal Highways Administration as an in-house geotech, selected the site because it contained "the largest volume of potential aggregate production." *(Dep. of Cook, p. 38).* Ignoring the advice of its independent geotech consultant, the Government took no more bore holes of the source in question. *(Dep. of Cook, p. 36).*

14. Instead, the Government simply combined material for testing from two bore logs that were previously taken for the purposes of testing slope stability. As explained by Cook, he felt that mixing the material from two cores would be an appropriate method of averaging out the results. Yet he acknowledged that it is "common judgment" that you don't combine materials that are significantly different. *(Dep. of Cook, p. 68).* In actuality, the designated material source contained highly variable material. According to Cook's own words, the material should not have been combined for a testing of rock quality. *(Dep. of Persoon, p. 31*).

15. The actual condition of the source material was so poor that the

Government's independent geotech would not even characterize the material as rock. When shown photographs of the native material at the designated source, the Government's own geotechnical consultant testified as follows:

> Q. … can you describe for me, using bore log terminology, Exhibit 4, what type of material you're visually seeing in Exhibit 27 and Exhibit 40?
>
> A. It doesn't even exist on this one.
>
> Q. Oh, it doesn't?
>
> A. No. It wasn't – it never got to that point of weathering.
>
> Q. How would you describe this type of material?
>
> A. **Highly weathered, very thin-bedded.**
>
> * * *
>
> Q. Okay. And is there – would you characterize this rock shown in photograph 27 and 40 as very soft rock or even something less than that?
>
> A. **I would call it a granular soil.** And then depending on the – if we ran a standard penetration test, we would determine the relative density. And that's the resistance SPT you're seeing there. We could use that in the classification.
>
> Q. Okay. But in terms – can you use the – can you characterize using the language in the hardness section?
>
> A. (No audible response.)
>
> Q. No?
>
> A. It's not a rock when you call it a soil. It's not a rock anymore.
>
> **Q. So the material in these two cuts, Exhibit 27 and 40, wouldn't even be characterized as rock? Is that what**

**you're saying?**

A. **That's true.**

*(Dep. of Prellwitz, pp. 44, 48-49; see also Exhibit 27 and 40). (emphasis added).*

16. Mr. Cook, however, felt the material source contained good quality rock. (*Exhibit 2, Dep. of Persoon*). On April 28, 1999, the Government's test results were returned with yet another warning to Mr. Cook the he should not rely on the test results where the rock is highly weathered. *(Exhibit 30, Dep. of Cook).* Mr. Cook ignored those warnings as well.

17. Incredibly, the Government approved the source and certified that the source "has been found to meet the materials requirements under Sections 301 and 309". (*§105.05 Special Contract Requirements, Defendant's deposition Exhibit 8*). The contract also included a drawing which depicted a cross section of the source showing an overburden depth (i.e. unusable material) of only 3.5 meters. *(Exhibit 3, Dep. of Persoon).*

18. M.A. DeAtley relied upon the Government's representations and bid the project fully intending to use this Government-designated material source. *(Dep. of Osborn, pp. 13-14).*

19. On October 2, 2001, Federal Highways and M.A. DeAtley attended a pre-construction meeting. M.A. DeAtley asked the Government Contracting Office Representative, Ms. Persoon, whether it was the Contractor or the

Government that would be responsible for the appropriate aggregate testing to insure that the rock in question was competent and durable as aggregate. Ms. Persoon responded that aggregate testing such as the Los Angeles abrasion test, durability index, sodium sulfate soundness test, and accelerated weathering were not required for Government-designated sources. The Government would perform those tasks. *(Exhibit 6, Dep. of Persoon).*

20. In October 2001, the contractor began crushing operations. Test holes were dug at the site. Immediately the contractor became concerned that the material source was not as represented. The contractor's test pits were 20' deep and no material had been encountered that gave resistance to the backhoe. The pits revealed highly fractured rock throughout the entire excavation. *(Exhibit 12, Dep. of Persoon).* Mr. Cook, the Federal Highways geotechnical engineer, was called to observe the condition. He noted that the rock material in the upper four to five meters was too soft to use as base. *(Exhibit 12, Dep. of Persoon).*

21. Yet the Contracting Officer's Technical Representative, Linda Persoon, noted something much different. She observed that there was no competent rock in the 20' deep test pit. *(Dep. of Persoon, p. 102).* She felt that the material was highly variable. She observed that the material ranged from highly fractured to moderate and then back to highly fractured again. *(Dep. Of Persoon, p. 41).* Not being the expert, she chose to stay silent and rely upon Mr.

Cook that there was competent rock. *(Dep. of Persoon, p. 103).* No additional tests for rock competency or durability were taken by the Government that day or at any time during production. *(Dep. of Persoon, pp. 63-64).*

22. Despite its own Field Manual, which mandates that a Government supplied source must yield competent material, Ms. Persoon testified that she felt it was the contractor's responsibility to hunt and peck for competent rock in the source. Ms. Persoon testified as follows:

> Q. Linda, isn't it a fact that you did say on October 2nd that the contractors did not have to perform the source testing?
>
> A. That's correct.
>
> **Q. So its basically your position that the contractor needed to, in Zone 2 materials,[3] pick and choose which rock was competent rock and which rock they should have discarded, correct?**
>
> **A. Yes.**

*(Dep. of Persoon, p. 118). (emphasis added).*

23. When asked how the contractor would undertake such a process, Ms. Persoon testified as follows:

> Q. So how was the contractor supposed to, in the Zone 2 material, determine what material was competent to use and what material was not?
>
> A. If I were a contractor, what I would have done?

---

[3] Zone 2 materials are those materials that were noted by Ms. Persoon to be highly variable and weathered. See Exhibit 3, Dep. of Persoon.

Q. If you care to answer it that way.

A. I would think that a contractor or a crushing operation would know by looking at the reports, looking at what you see in this hole, you could tell whether they cold produce whatever rock products they needed. I would assume they have had expertise or experience to do that.

Q. Because you don't have that experience, do you? You couldn't tell that by looking at it?

A. No.

Q. So you're saying the contractor should have the experience to tell by looking at it, the material in Zone 2, whether they could use that or not?

**A. That would be my – if I were the contractor, I would be running some tests and deciding what I wanted to do with this material.**

**Q. What kind of testes would the contractor run, durability tests, take test borings?**

**A. I don't know how the contractor makes the decision when they do that.**

*(Dep. of Persoon, pp. 116, 117). (emphasis added).*

24. Apparently, Ms. Persoon did not understand that it was the Government that was required to perform these tests, not the Contractor. (*Exhibit 6, Dep. of Persoon).*

25. In reliance upon Mr. Cook's observations and the assumption that the Government had performed the proper tests, M.A. DeAtley proceeded to crush over 20,000 tons of Class D aggregate material from the designated source. During crushing, the material was sampled and tested by an independent

laboratory, which confirmed that the crushed sample met the contract gradation requirements. The material was placed in stockpiles for placement the following spring. *(Complaint, ¶ 7).*

26. Unfortunately, when the contractor returned to the project the following year, the contractor discovered that the material had degraded. When DeAtley began placing the material on the roadway, test results revealed that the material gradations had changed. The percentage of material in all sieve sizes, except the largest sieve had increased. The material had simply degraded to the point that the #200 sieve material was greater than the 10% maximum requirement. *(Complaint, ¶ 8-10; Exhibit 10, Dep. of Persoon).*

27. Subsequently, DeAtley commissioned independent testing on the material source. The test result, which showed a failing sodium sulfate soundness test, indicated that the source material was not durable and was of poor quality. *(Complaint ¶ 12).*

28. DeAtley Crushing summarized the situation as follows:

> *We would like to recap the meeting points that we see as all important. All parties are in agreement that the stockpiled materials have broken down since being produced and stockpiled. Quite simply, the gradation has changed throughout the sieve ranges. This is evidenced by the comparison of the gradation verification tests done during or shortly after production, and the battery of tests performed on the same materials a year later. While Brent Coe did not appear to want to hear the proof, he admitted himself at the meeting that the aggregates in pile had broken down. This was heard by all in attendance.*

* * *

*After WFLHD said they were hanging their hat on the previous boring results, Brent was asked directly if WFLHD is absolutely responsible for making sure that the source met all contract requirements all the way through production of aggregates. Mr. Coe then correctly replied that "yes, WFLHD is responsible for the entire source". One fact has not changed since this debate started. The Source failed the Sodium Sulfate Soundness test.*

* * *

*As you know, WFLHD's engineers did not retrieve and test any source materials during crushing operations as is required to ensure that the source provides quality material throughout. What is more alarming is the fact that WFLHD didn't follow through with its own self imposed obligation to ensure availability of quality source material even after it was reported to them that the source had failed a source compliance test. The situation degrades from alarming to unbelievable when a person understands that after being notified that the source failed, and then being requested, in writing, to jointly sample the source on numerous occasions, WFLHD has refused to do just that for over six months.*

*It is clear that WFLHD is not operating within its own rules, guidelines, or contract requirements.*

*(Exhibit 10, Dep. of Persoon).*

29. The United States required M.A. DeAtley and DeAtley Crushing to remove the aggregate placed upon the roadway and to deliver new material. *(Complaint, ¶ 10).* Before doing so, the contractors offered to provide a credit to the Government for the Government to accept the material in place. The Government rejected the same. *(Complaint, ¶ 10).*

## III. THE COMPLAINT

30. In its first cause of action, M.A. DeAtley alleged breach of contract based upon the fact that the United States owed a contractual duty to provide source of materials that would allow production of a product within contract specifications. Moreover, the Government had a contractual obligation to perform certain source testing on material sources to ensure that the material sources met contract quality requirements, as well as to act in good faith and cooperate with M.A. DeAtley. The United States failed to perform these obligations and thus breached its contract with M.A. DeAtley causing damages. *(Complaint, ¶¶ 18-23).*

31. The Government breached its contract in at least three different ways. First, the Government was contractually required to perform all testing to investigate and qualify the source to insure that the source would provide sufficient quality material with reasonable production. (*Exhibit 11, Dep. of Persoon; §703.05 Standard Specifications, Defendant's deposition Exhibit 9).* The Government completely failed to perform appropriate source testing. *(Exhibit 32, pp. 6-13; 6-39; Dep. of Cook, p. 37-38; 47-50; Dep. of Prellwitz, pp. 44, 48-49).*

32. Second, the Government was contractually required to perform timely sampling and testing of production material to insure that the Class D

aggregate was competent, durable and sound material, as required by the specifications. *(Exhibit 11, Dep. of Persoon)*. The Government failed to perform any production testing whatsoever. *(Dep. of Linda Persoon, pp. 63-64)*.

33. Third, the Government was required to apply industry standard tolerances in its acceptance inspections. *(§ 106.05 Standard Specifications, Defendant's deposition Exhibit 9)*. The Government applied no such tolerances, but instead rejected the contractor's crushed material that at least according to one test was less than .1% in excess out of 10% max. (*Exhibit 20, Dep. of Persoon).* By refusing to apply industry standard tolerances, the Government breached its contract.

34. Under its second cause of action, M.A. DeAtley alleged defective specifications under the Spearin doctrine. As this cause of action alleges, when the Government provides design specifications, it impliedly warrants such specifications, if followed, would produce a satisfactory result. As the facts alleged in the Complaint, M.A. DeAtley and DeAtley Crushing followed the specifications. However, the aggregate placed upon the roadway was unacceptable. M.A. DeAtley was required to remove the material and replace it, causing M.A. DeAtley to incur additional costs. M.A. DeAtley is entitled to those costs. *(Complaint, ¶¶ 24-28)*.

35. The Government's specifications were defective in two ways. First,

the Government specified an unsuitable source with highly variable, highly weathered rock. The specification of this material was defective. Secondly, the Government specifications contained no criteria which would allow for normal degradation of this material after the crushing operation. DeAtley properly crushed the material which was tested to be in compliance with the specifications. The material naturally degraded outside of the allowable specification range. The Government should have recognized the natural gradation process in the material in question and allowed either a pay factor adjustment or a larger allowable range of gradation.

36. In its third cause of action, M.A. DeAtley alleges differing site conditions. Specifically, M.A. DeAtley alleged that it encountered subsurface physical conditions differing materially from those indicated in the contract and that those differing site conditions could not have been ascertained by a reasonable pre-bid inspection. Furthermore, the United States misrepresented the conditions actually encountered, thus entitling M.A. DeAtley to an equitable adjustment in contract price under the changed condition clause of the contract. *(Complaint, ¶¶ 29-33)*.[4]

37. In its fourth cause of action, M.A. DeAtley alleged constructive change. The Government constructively changed the contract requirements in

---

[4] In its Motion to Dismiss, the United States does not seek to dismiss M.A. DeAtley's Third Cause of Action for Differing Site Conditions.

several ways. First, the contract required application of tolerances for acceptance testing. (*§ 106.05, Standard Specifications, Exhibit 9)*. But, the Government refused to allow application of tolerances, thereby constructively changing the contract scope. Second, the contract required and the Government confirmed that they would perform all durability testing during production. (*Exhibit 11; §703.05 Standard Specifications)*. The Government did not. (*Dep. of Persoon, pp. 63-64)*.

38. Third, the contractor is contractually entitled to rely upon a Government designated source to consistently make a quality product that will satisfy contract durability requirements. (*Exhibit 11, Dep. of Persoon)*. Ms. Persoon's contract interpretation that the contractor is required to "hunt and peck" for competent rock is a constructive change for which the contractor is entitled to compensation. Because of these constructive changes, DeAtley suffered delays, disruptions, and additional costs to its planned performance and is entitled to an equitable adjustment in the contract price. *(Complaint, ¶¶ 34-38)*.

39. In its fifth cause of action, M.A. DeAtley alleged that the Government's unreasonable rejection of the delivered material and ordering M.A. DeAtley to replace the material without application of tolerances entitles M.A. DeAtley to damages. *(Complaint, ¶¶ 39-41)*. While this cause of action is entitled "Failure to Mitigate Damages", in substance it is a claim based upon the doctrine of economic waste, first adopted in Granite Constr. Co. v. United States,

962 F.2d 998 (1992). *<u>See</u> Section G herein for the legal analysis of the cause of action.*

40. Factually speaking, the cause of action is based on the Government's directive on August 22, 2002 when the Government issued a stop work order to the contractor's operation because of the failing tests. *(Exhibit 20, Dep. of Persoon).* Initially Ms. Persoon questioned how to handle material that was beyond contract limits. (*Dep. of Persoon, p. 138*). Using a pay factor approach would have resulted in a pay factor of 90%. (*Exhibit 22, Dep. of Persoon*). Yet, ultimately the Government rejected the entire material as being out of specification even though the contract required application of industry standard tolerances. *(Exhibit 15, Dep. of Persoon; § 106-04 Standard General Conditions).* Faced with no viable option to bring the subject material into specification, the contractor was forced to remove the material from the roadway and to move to a new material source and recrush. *(Complaint, ¶ 9-12).* It is these recrushing costs and the costs of removing the degraded material which are at issue in this case.

## IV. <u>ARGUMENT</u>

### A. <u>Standard Of Review For Subject Matter Jurisdiction Issues.</u>

The United States waives sovereign immunity for cause of action based upon an express or implied contract with the United States. 28 U.S.C. § 1491 (2005). When deciding a motion to dismiss based upon lack of subject matter

jurisdiction, the Court must assume all facts alleged in the Complaint are true and must draw all reasonable inferences in favor of the non-moving party's favor. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

## B. Standard For Review For Failure To State A Claim Issues.

Under RCFC 12(b)(6), a complaint fails to state a claim upon which relief can be granted if it appears beyond a doubt that the plaintiff can prove no set of fact in support of its claim which would entitle them to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In deciding a motion to dismiss for failure to state a claim, the Court must assume the facts in the Complaint are true and indulge all reasonable inferences in favor of the non-movant. Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001). Here, it is clear by looking at the allegations in the Complaint that M.A. DeAtley states claims upon which relief can be granted and meets its burden under RCFC 12(b)(6).

## C. This Court Possesses Jurisdiction For M.A. DeAtley's Claim For Interest And Attorneys Fees.

As an initial point, M.A. DeAtley acknowledges that it is not entitled to interest above the statutory rate and therefore only seeks interest that is allowable by law. Thus, this Court has jurisdiction to award M.A. DeAtley interest on any sum it recovers. See 41 U.S.C. § 611 (2005). If M.A. DeAtley is successful, this Court will then be in the position to award interest at the statutory rate.

Moreover, the United States' argument that this Court does not have

jurisdiction over M.A. DeAtley's request for attorney fees until there is a final judgment entered is wholly without merit. M.A. DeAtley recognizes that the Court cannot award attorneys fees until after a final judgment is entered. Moreover, M.A. DeAtley acknowledges that EAJA is the applicable statute that governs the imposition of attorney fees and costs against the Government.

These facts, however, do not deprive this Court of jurisdiction over M.A. DeAtley's attorney fee and cost request. Consequently, the United States' motion to dismiss M.A. DeAtley's claims for interest and attorneys fees and costs must be denied.

**D. M.A. DeAtley's Breach Of Contract Claim Should Not Be Dismissed.**

To state a cause of action for breach of contract, M.A. DeAtley must allege a valid contract, breach, and damages caused by the breach. Demarco Durzo Development Co. v. United States, 60 Fed.Cl. 632, 636 (2004). If a party alleges those elements, it states a claim for breach of contract upon which relief can be granted. Id.

Here, the Complaint specifically alleges, that M.A. DeAtley had a valid contract with the United States. (*Complaint, ¶ 4*). The Complaint also alleges that the United States was under an obligation to provide source materials that would allow production of a product within a specification. (*Complaint, ¶ 19*). In addition, the Government had an obligation to perform certain source testing to

ensure that the material sources met contract quality and had the obligation to act in good faith and cooperate with M.A. DeAtley. (*Complaint, ¶¶ 19-20*). As alleged in the Complaint, the United States failed to perform those obligations and breached the contract. (*Complaint, ¶¶ 21-23*). Such breach has caused M.A. DeAtley damages. (*Complaint, ¶¶ 21-23*). The facts alleged in the Complaint sufficiently state a claim upon which relief can be granted and therefore the United States' motion to dismiss M.A. DeAtley's first cause of action for breach of contract must be denied.

Moreover, the facts as asserted in DeAtley's proposed Amended Complaint clearly assert appropriate claims for breach of contract. The Government was contractually required to perform all testing to insure that the source would provide sufficient quality material with reasonable production. The Government completely failed to perform appropriate source testing. *(¶ 38, Proposed Amended Complaint).*

The Government was contractually required to perform timely sampling and testing or production material to insure that the Class D Aggregate was competent, durable and sound material, as required by the specifications. The Government failed to perform any production testing whatsoever. *(¶ 39, Proposed Amended Complaint).*

The Government was required to apply industry standard tolerances in its

acceptance inspections. The Government applied no such tolerances, but instead rejected the contractor's crushed material that was in some cases less than .1% out of 10% max. By refusing to apply industry standard tolerances, the Government breached its contract. *(¶ 39, Proposed Amended Complaint).*

The United States' reliance on PCL Constr. Services, Inc. v. United States, 47 Fed. Cl. 745, 752 (2000) is misplaced. In PCL, the argument advanced by the Government was the same as it is here. Namely, that when the contract provides for the very condition alleged there is not a breach. Id. However, in PCL the contractor materially breached the contract by failing to perform its work. Additionally, the contractor did not demonstrate any casual relationship between the Government's actions and the delay. See id. Even more telling is that the Court did not decide the matter on the Government's argument. Instead, it found that the Government's termination was proper and did not award the contractor damages. See PCL Constr. Services, Inc. v. United States, 47 Fed. Cl. 745 (2000). Moreover, the PCL Court was deciding the entire case, not merely whether the plaintiff's complaint sufficiently stated causes of action upon which relief could be granted under RCFC 12(b)(6). See id.

Here, however, the United States' failure to provide an adequate source, as well as failed to perform required testing, has caused damages. The instant case is factually different than PCL.

Moreover, a Motion to dismiss is one primarily on the pleadings. RCFC 12(b)(6). The Complaint alleges facts that sufficiently state a cause of action for breach of contract, thus, the Government's motion must fail.

**E. M.A. DeAtley's Defective Specifications Cause Of Action States A Claim Upon Which Relief Can Be Granted.**

A party states a claim upon which relief can be granted under the Spearin doctrine for defective specifications if it alleges that the United States provided certain specifications, the specifications were followed and the result was not satisfactory. Spearin v. United States, 248 U.S. 132, 136-37 (1918). Under Spearin, the United States impliedly warrants that if its specifications are followed, they would produce a satisfactory result. Id.

Here, the facts alleged in the Complaint sufficiently state a claim under the Spearin doctrine. The complaint alleged that the Government provided specifications, those specifications were followed and a satisfactory result was not obtained. *(Complaint, ¶¶ 25-28).* Therefore, the United States' motion to dismiss M.A. DeAtley's second cause of action for defective specifications under the Spearin doctrine must be denied.

The Government argues that because a differing site conditions claim and a defective specifications claim are so intertwined they merge into a single claim. For this proposition it relies on Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002). While the rule of law is correct, application of Comtrol to

this case is inapposite because M.A. DeAtley's claim for defective specifications is not based solely on differing site conditions.

In fact, M.A. DeAtley's defective specification claim is based upon the fact that the Government's gradation specifications did not allow any tolerance for the fine sieve. (See Proposed Amended Complaint). M.A. DeAtley met all contract gradation requirements when it initially crushed the material. When the Government designated highly weathered fractured material, the Government's design should have taken into account the material degradation of the rock. The Government design should have accounted for an increase in fine material as a result of a result of material degradation.

Moreover, it is M.A. DeAtley's position that the material source designated by the Government was poor and a proper source selection and testing would have uncovered the poor quality. This position is the basis for M.A. DeAtley's differing site conditions claim. However, if this claim is rejected and M.A. DeAtley is charged with the knowledge of the poor source material, then the Government is liable under a defective specifications claim. (See Proposed Amended Complaint).

**F. M.A. DeAtley's Cause Of Action For Constructive Change Should Not Be Dismissed.**

A party states a claim for constructive change upon which relief can be granted if it alleges that: 1) the Government directed a change outside the scope of

the contract; and 2) the Government's fault caused the need for additional work. Flink/Vulcan v. United States, 63 Fed.Cl. 292, 303 (2004).

In its fourth cause of action, M.A. DeAtley alleged constructive change. The Government constructively changed the contract requirements in several ways. First, the contract required application of tolerances for acceptance testing. The Government refused to allow application of tolerances. Second, the contract required and the Government confirmed that they would perform all durability testing during production. The Government did not. Third, the contractor is contractually entitled to rely upon a Government designated source to consistently make a quality product that will satisfy contract durability requirements. The Government's interpretation that the contractor was required to "hunt and peck" for competent rock is a change for which the contractor is entitled to compensation.

Here, the Complaint sufficiently alleges facts that show that the United States required M.A. DeAtley to remove stockpiled Aggregate D base material and replace it with new material. (*Complaint, ¶ 35*). This removal and replacement is outside the scope of the original contract and thus constitutes a constructive change. (*Complaint, ¶¶ 35-38*). The Complaint also alleges that it was the Government's fault of providing an unsuitable source and failing to conduct proper source testing that caused the need for the additional work.

(*Complaint, ¶ 20*). It is clear that M.A. DeAtley has alleged a claim upon which relief can be granted. Therefore, the Government's motion to dismiss M.A. DeAtley's fourth cause of action for constructive change must be denied.

The United States' reliance on certain FAR provisions is misplaced. These provisions only require corrective work that is caused by a failure on the part of M.A. DeAtley. Here, as discussed above, it was the Government's failures that necessitated the additional work. Moreover, under the applicable standard of review for a RCFC 12(b)(6) motion, M.A. DeAtley need only allege a claim upon which relief can be granted. Thus, the United States' motion to dismiss M.A. DeAtley's fourth cause of action for constructive change must be denied.

**G. M.A. DeAtley's Claim For Failure To Mitigate Damages Should Not Be Dismissed.**

Despite the fact that this claim is perhaps mislabeled, M.A. DeAtley's failure to mitigate damages claim is a viable cause of action. See Puget Sound Power & Light, Co. v. United States, 23 Ct.Cl. 46, 65 (1991)(analyzing the nature of the conduct not the label of the cause of action for jurisdictional issues). See also Allenfield Assoc. v. United States, 40 Fed.Cl. 471, 479 (1998)(refusing to look at the label of the cause of action in determining res judicata issues).

M.A. DeAtley alleges that the Government's unreasonable rejection of the delivered material and subsequent ordering replacement of that material has caused M.A. DeAtley damages. Under Granite Constr. Co. v. United States, 962

F.2d 998 (Fed. Cir. 1992), a contractor is allowed an equitable adjustment in contract price if the Government unreasonably insists on strict compliance with the contract specifications without providing a rational basis for rejecting the contractor's proposed repairs.

Here, M.A. DeAtley alleged in its Complaint that the Government caused damages by unreasonably rejecting the delivered material and ordering M.A. DeAtley to replace the material. (*Complaint, ¶¶ 40-41*). These allegations sufficiently set forth a claim under Granite upon which relief can be granted. Thus, the United States' Motion to Dismiss M.A. DeAtley's fifth cause of action should be denied.

Instead of addressing the underlying allegations, the United States apparently asserts that because this claim is labeled "Failure to Mitigate Damages," which is typically an affirmative defense, it should be dismissed. In fact, the authority cited by the United States specifically holds that a contractor is entitled to an equitable adjustment if the Government unreasonably rejects the contractor's proposed repairs and insists on strict compliance. See Granite, 962 F.2d at 1008. Here, the Government's unreasonable rejection of the material caused M.A. DeAtley to incur damages above and beyond that it would have incurred had Government reasonably considered M.A. DeAtley's proposed repairs. Therefore, the United States' motion to dismiss M.A. DeAtley's fifth

cause of action must be denied.

## V. CONCLUSION

Pursuant to the foregoing, the United States' Motion to Dismiss must be denied.

DATED this 9th day of January, 2006.

s/ JOHN C. BLACK
JOHN C. BLACK
10 N. Post Street, Suite 200
Spokane, WA 99201-0653
Telephone: (509) 455-8711
Fax: (509) 455-8734

F:\wpdocs\MA DeAtley.1742\Flowery Trail.1806\Response.121305.doc

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 9th day of January, 2006, a copy of the foregoing *Memorandum of Points and Authorities in Response to Defendant United States' Motion to Dismiss* was filed electronically. I understand that notice of this filing will be sent to all parties of record by operation of the Court's electronic filing system. Parties may access this filing through the court's system.

/s/ JOHN C. BLACK
JOHN C. BLACK