temporary stabilization including perimeter controls for an individual lot prior to occupation of the home by the homeowner and informing the homeowner of the need for, and benefits of, final stabilization. (Homeowners typically have an incentive to put in the landscaping functionally equivalent to final stabilization as quick as possible to keep mud out of their homes and off sidewalks and driveways.); or

3. For construction projects on land used for agricultural purposes (e.g., pipelines across crop or range land), final stabilization may be accomplished by returning the disturbed land to its preconstruction agricultural use. Areas disturbed that were not previously used for agricultural activities, such as buffer strips immediately adjacent to "water of the United States," and areas which are not being returned to their preconstruction agricultural use must meet the final stabilization criteria (1) or (2) above.

J. Flow-Weighted Composite Sample means a composite sample consisting of a mixture of aliquots collected at a constant time interval, where the volume of each aliquot is proportional to the flow rate of the discharge.

K. Large and Medium Municipal Separate Storm Sewer System means all municipal separate storm sewers that are either:

1. Located in an incorporated place (city) with a population of 100,000 or more as determined by the latest Decennial Census by the Bureau of Census (these cities are listed in Appendices F and G of 40 CFR 122); or

2. Located in the counties with unincorporated urbanized populations of 100,000 or more, except municipal separate storm sewers that are located in the incorporated places, townships or towns within such counties (these counties are listed in Appendices H and I of 40 CFR 122); or

3. Owned or operated by a municipality other than those described in paragraph (1) and (2) and that are designated by the Director as part of the large or medium municipal separate storm sewer system.

L. NOI means Notice of Intent to be covered by this permit (see Part II of this permit.)

M. NOT means Notice of Termination (see Part VIII of this permit).

N. Operator for the purpose of this permit and in the context of storm water associated with construction activity, means any party associated with a construction project that meets either of the following two criteria:

1. The party has operational control over construction plans and specifications, including the ability to make modifications to those plans and specifications; or

2. The party has day-to-day operational control of those activities at a project which are necessary to ensure compliance with a storm water pollution prevention plan for the site or other permit conditions (e.g., they are authorized to direct workers at a site to carry out activities required by the SWPPP or comply with other permit conditions).

*This definition is provided to inform permittees of EPA's interpretation of how the regulatory definitions of "owner or operator" and "facility or activity" are applied to discharges of storm water associated with construction activity.*

O. Owner or operator means the owner or operator of any "facility or activity" subject to regulation under the NPDES program.

P. Point Source means any discernible, confined, and discrete conveyance, including but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock concentrated animal feeding operation, landfill leachate collection system, vessel or other floating craft from which pollutants are or may be discharged. This term does not include return flows from irrigated agriculture or agricultural storm water runoff.

Q. Pollutant is defined at 40 CFR 122.2. A partial listing from this definition includes: dredged spoil, solid waste, sewage, garbage, sewage sludge, chemical wastes, biological materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial or municipal waste.

R. Runoff coefficient means the fraction of total rainfall that will appear at the conveyance as runoff.

S. Storm Water means storm water runoff, snow melt runoff, and surface runoff and drainage.

T. Storm Water Associated with Industrial Activity is defined at 40 CFR 122.26(b)(14) and incorporated here by reference. Most relevant to this permit is 40 CFR 122.26(b)(14)(x), which relates to construction activity including clearing, grading and excavation activities that result in the disturbance of five (5) or more acres of total land area, or are part of a larger common plan of development or sale.

U. Waters of the United States means:

1. All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

2. All interstate waters, including interstate "wetland";

3. All other waters such as interstate lakes, rivers, streams (including intermittent streams), mudflat, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce including any such waters:

a. Which are or could be used by interstate or foreign travelers for recreational or other purposes;

b. From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

c. Which are used or could be used for industrial purposes by industries in

interstate, commerce;

4. All impoundments of waters otherwise defined as waters of the United States under this definition;

5. Tributaries of waters identified in paragraphs (a) through (c) of this definition;

6. The territorial sea; and

7. Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraph 1. through 6. of this definition.

Waste treatment systems, including treatment ponds or lagoons designed to meet the requirement of the CWA (other than cooling ponds for steam electric generation stations per 40 CFR 423) which also meet the criteria of this definition) are not waters of the United States. Waters of the United States do not include prior converted cropland. Notwithstanding the determination of an area's status as prior converted cropland by any other federal agency, for the purposes of the Clean Water Act, the final authority regarding Clean Water Act jurisdiction remains with EPA.

**Part X. Permit Conditions Applicable to Specific States, Indian Country Lands, or Territories**

The provisions of this Part provide modifications or additions to the applicable conditions of Parts I through IX of this permit to reflect specific additional conditions required as part of the State or Tribal CWA Section 401 certification process, or Coastal Zone Management Act certification process, or as otherwise established by the permitting authority. The additional revisions and requirements listed below are set forth in connection with, and only apply to, the following States, Indian Country lands and Federal facilities.

Region 10

1. AKR10*###: The State of Alaska, Except Indian Country Lands

a. Part II.C.2 is added to the permit as follows:

Special NOI Requirements for the State of Alaska. A copy of the Notice of Intent must be sent to the Department of Environmental Conservation offices as listed below:

For projects nearest to Anchorage or Fairbanks: Alaska Department of Environmental Conservation, Water Quality Permitting Section/Storm Water, 555 Cordova Street, Anchorage, AK 99501, (907) 563-6529, FAX (907) 562-4026.

For projects in southeast Alaska, nearest to Juneau: Alaska Department of Environmental Conservation, Water Quality Permitting Section/Storm Water, 410 Willoughby Avenue, Juneau, AK 99801.

b. Part IV.A.3 is added to the permit as follows:

Special Storm Water Pollution Prevention Plan Requirements for the State of Alaska. Permittees shall obtain DEC approval of the Storm Water Pollution Prevention Plan for the construction site pursuant to 18 AAC 72.600(a). Plans are to be approved and sealed by a Professional Engineer registered in the State of Alaska, shall be submitted to the same DEC office that the Notice of Intent is sent to, and shall be accompanied by any State-required fee. A failure to secure approval as provided in this paragraph shall be deemed a violation of this general permit, but shall not prevent storm water discharges from being authorized by this general permit. (18 AAC 72.600(a), 18 AAC 72.610(a)(8), and 18 AAC 72.990(32)).

c. Part IV. D.2.b.(3) is added to the permit as follows:

Special Storm Water Management Requirements for the State of Alaska. The permittee is responsible for any post-stabilization requirements, such as the removal of pollution control devices and the control of pollutant discharges at that time, if these devices are not a permanent part of the pollution prevention controls after final stabilization.

d. Part VIII.B.2 is added to the permit as follows:

Special NOT Requirements for the State of Alaska. NOTs shall also be submitted to the State of Alaska at the same time they are submitted to EPA. NOTs are to be sent to the address given in Part II.C.2.s.

2.AKR10*##I: Indian Country Lands in Alaska - No additional requirements.

*#3 - #5 permits specific to states other than AK or WA.*

6. WAR*##F: Federal Facilities in the State of Washington, Except Those Located on Indian Country Lands - The Washington Department of Ecology includes these conditions to ensure compliance with R.C.W. 90.48.080 and rules referenced in the conditions above established in accordance with R.C.W. 90.48.035.

a. Part III.F.1 is added to the permit as follows:

Special Requirements for Federal Facilities in the State of Washington. The permittee is responsible for achieving compliance with State of Washington surface water quality standards (Chapter 173-201A WAC), sediment management standards (Chapter 173-204 WAC), ground water quality standards (Chapter 173-200 WAC), and human health based criteria in the National Toxics Rule (Federal Register, Vol. 57, No. 246, Dec. 22, 1992, pages 60848-609233).

b. Part III.F.2 is added to the permit as follows: Special Ground Water

Protection Requirements for Federal Facilities in the State of Washington.



M.A. DeATLEY 01879



000344

Diversion of storm water discharges to ground water from existing discharges to surface water shall not be authorized by this permit if this causes a violation or the potential for violation of ground water standards (Chapter 173-200 WAC). Such discharges below the surface of the ground are also regulated by the Underground Injection Control Program (Chapter 173-218 WAC).

c. Part III.F.3 is added to the permit as follows:

Special Numeric Limitations for Federal Facilities in the State of Washington.

Discharges of storm water to surface water from concrete batch or hot mix asphalt plants covered by this permit shall have an average monthly or daily maximum pH between 6.0-9.0 and a turbidity of less than 50 NTUs.

Discharges of storm water to the ground from concrete batch or hot mix asphalt plants covered by this permit shall have an average monthly or daily maximum pH between 6.5-8.5.

It needs to be reiterated that this permit does not authorize the discharge of process water from concrete batch or hot mix asphalt plants.

d. Part III.F.4 is added to the permit as follows:

Special Requirement for Federal Facilities in the State of Washington. "Comeback Asphalt" must be contained within a lined area so that no leaching to ground or surface water can occur.

7. WAR10*##I: Indian Country Lands in the State of Washington

a. Confederated Tribes of the Chehalis Reservation. Copies of Notices of Intent (NOI) and Storm Water Pollution Prevention Plans (SWPPPs) must be submitted to the Chehalis Tribal Department of Natural Resources.

(1) Part II.C.2 is added to the permit as follows:

Special NOI Requirements for the Confederated Tribes of the Chehalis Reservation.

NOI shall also be submitted to the Confederated Tribes of the Chehalis Reservation at the same time they are submitted to EPA at the following address: Confederated Tribes of Chehalis Reservation, Department of Natural Resources, 420 Howanut Road, Oakville, WA 98568.

(2) Part IV.A.3 is added to the permit as follows:

Special Storm Water Pollution Prevention Plan Requirements for the Confederated Tribes of the Chehalis Reservation. Storm Water Pollution



M.A. DeATLEY 01880



000345

Prevention Plans (SWPPPs) must be submitted to the Chehalis Tribal Department of Natural Resources for review and approval prior to the beginning of any discharge activities taking place. SWPPPs are to be sent to the address given in Part II.C.2.

(3) Part III.I is added to the permit as follows:

Special Water Quality Standard Requirements for the Confederated Tribes of the Chehalis Reservation - The permittee shall be responsible for achieving compliance with Confederated Tribes of Chehalis Reservation's Water Quality Standards.

b. Puyallup Tribe of Indians - Copies of Notices of Intent (NOI) and Storm Water Pollution Prevention Plans (SWPPPs) must be submitted to the Puyallup Tribe Environmental Department.

(1) Part II.C.2 of the permit is added as follows:

Special NOI Requirements for the Puyallup Tribe of Indians - NOIs shall also be submitted to the Puyallup Tribe Environmental Department at the same time they are submitted to EPA at the following address: Puyallup Tribe Environmental Department, 2002 E. 28th St., Tacoma, WA 98404.

(2) Part IV.A.3 is added to the permit as follows:

Special Storm Water Pollution Prevention Plan Requirements for the Puyallup Tribe of Indians - Storm Water Pollution Prevention Plans (SWPPPs) must be submitted to the Puyallup Tribe Environmental Department for review and approval prior to the beginning of any discharge activities taking place. SWPPPs are to be sent to the address given in Part II.C.2.

(3) Part III.F. is added to the permit as follows:

Special Water Quality Standard Requirements for the Puyallup Tribe of Indians - Each permittee shall be responsible for achieving compliance with the Puyallup Tribe's Water Quality Standards.

c. All Other Indian Country lands in Washington - No additional requirements.

**Addendum A--Endangered Species**

I. Instructions for Applicants

A. Background - To meet its obligations under the Clean Water Act and the Endangered Species Act (ESA) and to promote these Acts' goals, the Environmental Protection Agency (EPA) is seeking to ensure the activities regulated by the Construction General Permit (CGP) are protective of endangered and threatened species and critical habitat. To ensure that those goals



M.A. DeATLEY 01881

are met, applicants for CGP coverage are required under Part I.B.3.e. to assess the impacts of their storm water discharges and storm water discharge-related activities on Federally listed endangered and threatened species ("listed species") and designated critical habitat ("critical habitat") by following Steps One through Six listed below. EPA strongly recommends that applicants follow these steps at the earliest possible stage to ensure that measures to protect listed species and critical habitat are incorporated early in the planning process. At minimum, the procedures should be followed when developing the storm water pollution prevention plan.

Permittees and applicants also have an independent ESA obligation to ensure that their activities do not result in any prohibited ``takes" of listed species.\1\ Many of the measures required in the CGP and in these instructions to protect species may also assist permittees in ensuring that their construction activities do not result in a prohibited take of species in violation of section 9 of the ESA. Applicants who plan construction activities in areas that harbor endangered and threatened species are advised to ensure that they are protected from potential takings liability under ESA section 9 by obtaining either an ESA section 10 permit or by requesting formal consultation under ESA section 7 (as described in more detail in Step Seven below). Applicants who seek protection from takings liability should be aware that it is possible that some specific construction activities may be too unrelated to storm water discharges to be afforded incidental take coverage through an ESA section 7 consultation that is performed to meet the eligibility requirements for CGP coverage. In such instances, applicants should apply for an ESA section 10 permit. Where applicants are not sure whether to pursue a section 10 permit or a section 7 consultation for takings protection, they should confer with the appropriate Fish and Wildlife Service (FWS) or National Marine Fisheries Service (NMFS) office.

---

\1\ Section 9 of the ESA prohibits any person from ``taking" a listed species (e.g., harassing or harming it) unless: (1) The taking is authorized through a ``incidental take statement" as part of undergoing ESA Sec. 7 formal consultation; (2) where an incidental take permit is obtained under ESA Sec. 10 (which requires the development of a habitat conservation plan); or (3) where otherwise authorized or exempted under the ESA. This prohibition applies to all entities including private individuals, businesses, and governments.

---

This permit provides for the possibility of multiple permittees at a construction site. Applicants should be aware that in many cases they can meet the permit eligibility requirements by relying on another operator's certification of eligibility under Part 1.B.3.e.(2)(a), (b), or (c). this is allowed under Part I.B.3.e.(2)(d) of the permit. However, the other operator's certification must apply to the applicant's project area and must address the effects from the applicant's storm water discharges and storm water discharge-related activities on listed species and critical habitat. By certifying eligibility under Part I.B.3.e.(2)(d), the applicant agrees to comply with any measures or controls upon which the other operator's certification under Part I.B.3.e.(2)(a), (b) or (c) was based. This situation will typically occur where a developer or primary contractor, such as one for construction of a subdivision or industrial part, conducts a comprehensive assessment of effects on listed species and critical habitat for the entire construction project, certifies eligibility under Part I.B.3.e.(2)(a), (b) or (c), and that certification is relied upon by other operators (i.e., contractors) at the site. However, applicants that consider relying on another operator's certification should carefully review that certification along with any supporting information. If



M.A. DeATLEY 01882

000347

an applicant does not believe that the operator's certification provides adequate coverage for the applicant's storm water discharges and storm water discharge-related activities or for the applicant's particular project area, the applicant should provide its own independent certification under Part I.B.3.e.(2)(a), (b), or (c).

B. Procedures

To receive coverage under the Construction General Permit, applicants must assess the potential effects of their storm water discharges and storm water discharge-related activities on listed species and their critical habitat. To make this assessment, applicants must follow the steps outlined below prior to completing and submitting Notice of Intent (NOI) form. Applicants who are able to certify eligibility under Parts I.B.3.e.(2)(b), (c) or (d) because of a previously issued ESA section 10 permit, a previously completed ESA section 7 consultation, or because the applicant's activities were already addressed in another operator's certification of eligibility may proceed directly to Step Six.

*Note: The revised NOI form which was included in the CGP (see 62 FR 29822-29823, June 2, 1997) requires that applicants provide detailed certification information on listed species. That form is still under development and is not expected to be finalized before this permit is issued. Until the revised NOI form is finalized, applicants must use the existing NOI form which does not contain the specific certification provisions relating to listed species and critical habitats at construction projects. However, use of the existing NOI form does not relieve applicants of their obligation to follow the procedures listed below to determine if their construction storm water discharges or storm water discharge-related activities meet permit eligibility requirements for the protection of listed species and critical habitat. By following these instructions, applicants will have sufficient information on listed species and critical habitat in order to complete either the existing or revised NOI form and sign the certification statement.*

Step One: Determine if the Construction Site is Found Within Designated Critical Habitat for Listed Species - Some, but not all, listed species have designated critical habitat. Exact locations of such habitat is provided in the Service regulations at 50 CFR Parts 17 and 226. To determine if their construction site occurs within designated critical habitat, applicants should either:

Contact the nearest Fish and Wildlife Service (FWS) and National Marine Fisheries Service (NMFS) Office. A list of FWS and NMFS offices is found in Section II of this Addendum; or

Contact the State or Tribal Natural Heritage Centers. These centers compile and disseminate information on Federally listed and other protected species. They frequently have the most current information on listed species and critical habitat. A list of these centers is provided in Section III of this Addendum; or

Review those regulations (which can be found in many larger libraries).

If the construction site is not located in designated critical habitat, then the applicant does not need to consider impacts to critical habitat when following Steps Two through Six below. If the site is located within critical habitat, then the applicant must look at impacts to critical habitat when following Steps Two through Six.

*Note that many but not all measures imposed to protect listed species under these steps will also protect critical habitat. Thus, meeting the eligibility requirements of this permit may require measures to protect critical habitat that are separate from those to protect listed species.*

Step Two: Determine if Listed Species are Located in the County(ies) Where the Construction Activity Will Occur - Section IV of the Addendum contains a county-by-county list of listed endangered and threatened species (``listed species"), and proposed endangered and threatened species ("proposed species"). Since the list was current as of September 1, 1997, applicants must also check with other sources for updated species and county information. These sources include: Sections II and III of this Addendum; EPA's Office of Wastewater Management's web page at "http://www.epa.gov/owm" where updates of the county-by-county list will be posted on a periodic basis; Federal Register Notices; State wildlife protection offices; a biologist or similar professional in the environmental field; or any other method which can be reasonably expected to provide this information. Applicants with construction projects located in EPA Region 2 can call the Storm Water General Permits Hotline at (800) 245-6510 for further assistance, while applicants with projects located in EPA Regions 1, 3, 7, 8, 9 and 10 may contact the appropriate EPA Regional Office.

Where a facility is located in more than one county, the lists for all counties should be reviewed. Where a facility discharges into a water body which serves as a border between counties or which crosses a county line which is in the immediate vicinity of the point of discharge, applicants should also review the species list for the county which lies immediately downstream or is across the water body from the point of discharge.

After a review of the available information from the sources mentioned above, if no listed species are located in a facility's county or if a facility's county is not listed, and the construction site is not located in critical habitat as described under Step One, an applicant is eligible for CGP coverage without further inquiry into the presence of, or effect to, listed species. The applicant must check the appropriate certification item on the revised NOI form (Part I.B.3.e.(2)(a)).

Once the applicant has determined which listed species are located in his or her facility's county, the applicant must follow Step Three.

Step Three: Determine if Any Federally Listed Endangered and Threatened Species May Be Present in the Project Area - The project area consists of:

The areas on the construction site where storm water discharges originate and flow toward the point of discharge into the receiving waters (including areas where excavation, site development, or other ground disturbance activities occur) and the immediate vicinity.

Example(s)

1. Where bald eagles nest in a tree that is on or bordering a construction site and could be disturbed by the construction activity.
2. Where grading causes storm water to flow into a small wetland or other habitat that is on the site which contains listed species.

The areas where storm water discharges flow from the construction site to the point of discharge into receiving waters.

M.A. DeATLEY 01884

Example(s)

1. Where storm water flows into a ditch, swale, or gully which leads to receiving waters and where listed species (such as amphibians) are found in the ditch, swale, or gully.

The areas where storm water from construction activities discharge into receiving waters and the areas in the immediate vicinity of the point of discharge.

Example(s)

1. Where storm water from construction activities discharges into a stream segment that is known to harbor listed aquatic species.

The areas where storm water BMPs will be constructed and operated, including any areas where storm water flows to and from BMPs.

Example(s)

1. Where a storm water retention pond would be built.

The protect area will vary with the size and structure of the construction activity, the nature and quantity of the storm water discharges, the storm water discharge-related activities and the type of receiving water. Given the number of construction activities potentially covered by the CGP, no specific method to determine whether listed species may be located in the project area is required for coverage under the CGP. Instead, applicants should use the method which allows them to determine, to the best of their knowledge, whether listed species are located in their project area. These methods may include:

Conducting visual inspections: This method may be particularly suitable for construction sites that are smaller in size or located in non-natural settings such as highly urbanized areas or industrial parks where there is little or no natural habitat, or for construction activities that discharge directly into municipal storm water collection systems.

Contacting the nearest State or Tribal wildlife agency, the Fish and Wildlife Service (FWS), or the National Marine Fisheries Service (NMFS). Many endangered and threatened species are found in well-defined areas or habitats. Such information is frequently known to State, Tribal, or Federal wildlife agencies. A list of FWS and NMFS offices is provided in section II of this Addendum below.

Contacting local/regional conservation groups or the State or Tribal Natural Heritage Centers (see section III of this Addendum). State and local conservation groups may have location specific listed species information. The Natural Heritage Centers inventory species and their locations and maintain lists of sightings and habitats.

Submitting a data request to a Natural Heritage Center. Many of these centers will provide site specific information on the presence of listed species in a project area. Some of these centers will charge a fee for researching data requests.

Conducting a formal biological survey. Larger construction sites with extensive storm water



M.A. DeATLEY 01885

discharges may choose to conduct biological surveys as the most effective way to assess whether species re located in the project area and whether there are likely adverse effects. Biological surveys are frequently performed by environmental consulting firms. A biological survey can be used to follow Steps Four through Six of these instructions.

Conducting an environmental assessment under the National Environmental Policy Act (NEPA). Some construction activities may require environmental assessments under NEPA. Such assessments may indicate if listed species are in the project area. Coverage under the CGP does not trigger such an assessment because the permit does not regulate any dischargers subject to New Source Performance Standards under section 306 of the Clean Water Act, and is thus statutorily exempted from NEPA. See CWA section 511(c). However, some construction activities might require review under NEPA because of Federal funding or other Federal involvement in the project.

If no species are found in the project area, an applicant is eligible for CGP coverage. Applicants must provide the necessary certification on the revised NOI form. If listed species are found in the project area, applicants must indicate the location and nature of this presence in the storm water pollution prevention plan and follow Step Four.

Step Four: Determine if Listed Species or Critical Habitat Are Likely To Be Adversely Affected by the Construction Activity's Storm Water Discharges or Storm Water Discharge-Related Activities - To receive CGP coverage, applicants must assess whether their storm water discharges or storm water discharge-related activities are likely to adversely affect listed species or critical habitat. "Storm water discharge-related activities" include:

Activities which cause, contribute to, or result in point source storm water pollutant discharges, including but not limited to excavation, site development, grading, and other surface disturbance activities; and

Measures to control storm water discharges including the siting, construction, operation of best management practices (BMPs) to control, reduce or prevent storm water pollution.

Potential adverse effects from storm water discharges and storm water discharge-related activities include:

Hydrological. Storm water discharges may cause siltation, sedimentation or induce other changes in receiving waters such as temperature, salinity or pH. These effects will vary with the amount of storm water discharged and the volume and condition of the receiving water. Where a storm water discharge constitutes a minute portion of the total volume of the receiving water, adverse hydrological effects are less likely. Construction activity itself may also alter drainage patterns on a site where construction occurs which can impact listed species or critical habitat.

Habitat. Excavation, site development, grading, and other surface disturbance activities from construction activities, including the installation or placement of storm water BMPs, may adversely affect listed species or their habitat. Storm water may drain or inundate listed species habitat.

Toxicity. In some cases, pollutants in storm water may have toxic effects on listed species. The



M.A. DeATLEY 01886

000351

scope of effects to consider will vary with each site. If the applicant is having difficulty in determining whether his or her project is likely to adversely affect a listed specie or critical habitat, then the appropriate office of the FWS, NMFS or Natural Heritage Center listed in sections II and III of this Addendum should be contacted for assistance. If adverse effects are not likely, then the applicant should make the appropriate certification on the revised NOI form and apply for coverage under the permit. If adverse effects are likely, applicants must follow Step Five.

Step Five: Determine if Measures Can Be Implemented to Avoid Any Adverse Effects - If an applicant makes a preliminary determination that adverse effects are likely, it can still receive coverage under Part I.B.3.e.(2)(a) of the CGP if appropriate measures are undertaken to avoid or eliminate the likelihood of adverse effects prior to applying for permit coverage. These measures may involve relatively simple changes to construction activities such as re-routing a storm water discharge to bypass an area where species are located, relocating BMPs, or by changing the "footprint" of the construction activity. Applicants may wish to contact the FWS and/or NMFS to see what appropriate measures might be suitable to avoid or eliminate the likelihood of adverse impacts to listed species and/or critical habitat. (See 50 CFR 402.13(b)). This can entail the initiation of informal consultation with the FWS and/or NMFS which is described in more detail in Step Six.

If applicants adopt measures to avoid or eliminate adverse affects, they must continue to abide by those measures during the course of permit coverage. These measures must be described in the storm water pollution prevention plan and may be enforceable as permit conditions. If appropriate measures to avoid the likelihood of adverse effects are not available to the applicant, the applicant must follow Step Six.

Step Six: Determine if the Eligibility Requirements of Part I.B.3.e.(2)(b)-(d) Can Be Met - Where adverse effects are likely, the applicant must contact the EPA and FWS/NMFS. Applicants may still be eligible for CGP coverage if any likely adverse effects can be addressed through meeting the criteria of Part I.B.3.e.(2)(b)-(d) of the permit. These criteria are as follows:

1. An ESA Section 7 Consultation Is Performed for the Applicant's Activity (See Part I.B.3.e.(2)(b).

Formal or informal ESA section 7 consultation is performed with the FWS and/or NMFS which addresses the effects of the applicant's storm water discharges and storm water discharge-related activities on listed species and critical habitat. The formal consultation must result in either a "no jeopardy opinion" or a "jeopardy opinion" that identifies reasonable and prudent alternatives to avoid jeopardy which are to be implemented by the applicant. The informal consultation must result in a written concurrence by the Service(s) on a finding that the applicant's storm water discharge(s) and storm water discharge related activities are not likely to adversely affect listed species or critical habitat (for informal consultation, see 50 CFR 402.13).

Most consultations are accomplished through informal consultation. By the terms of this permit, EPA has automatically designated applicants as non-Federal representatives for the purpose of conducting formal consultations. See Part I.B.3.e.(5) and 50 CFR 402.08 and 402.13. When conducting informal ESA section 7 consultation as a non-Federal

M.A. DeATLEY 01887

representative, applicants must follow the procedures found in 50 CFR 402 of the ESA regulations.

Applicants must also notify EPA and the Services of their intention and agreement to conduct consultation as a non-Federal representative. Consultation may occur in the context of another Federal action at the construction site (e.g., where ESA section 7 consultation was performed for issuance of a wetlands dredge and fill permit for the project or where a NEPA review is performed for the project which incorporates a section 7 consultation). Any terms and conditions developed through consultations to protect listed species and critical habitat must be incorporated into the SWPPP. As noted above, applicants may, if they wish, initiate consultation with the Services at Step Five.

Whether ESA section 7 consultation must be performed with either the FWS, NMFS or both Services depends on the listed species which may be affected by the applicant's activity. In general, NMFS has jurisdiction over marine, estuarine, and anadromous species. Applicants should also be aware that while formal section 7 consultation provides protection from incidental takings liability, informal consultation does not.

2. An Incidental Taking Permit Under Section 10 of the ESA is Issued for the Applicants Activity (See Part I.B.3.e.(2)(c)).

The applicant's construction activities are authorized through the issuance of a permit under section 10 of the ESA and that authorization addresses the effects of the applicant's storm water discharge(s) and storm water discharge-related activities on listed species and critical habitat. Applicants must follow FWS and/or NMFS procedures when applying for an ESA Section 10 permit (see 50 CFR section 17.22(b)(1)(FWS) and section 222.22(NMFS)). Application instructions for section 10 permits for NMFS species can be obtained by (1) accessing the ``Office of Protected Resources" sector of the NMFS Home Page at ``http://www.nmfs.gov" or (2) by contacting the National Marine Fisheries Service, Office of Protected Resources, Endangered Species Division, F/PR3,1315 East-West Highway, Silver Spring, Maryland 20910, telephone (301) 713-1401, fax (301) 713-0376.

3. The Applicant is Covered Under the Eligibility Certification of Another Operator for the Project Area (See Part I.B.3.e.(2)(d)).

The applicant's storm water discharges and storm water discharge-related activities were already addressed in another operator's certification of eligibility under Part I.B.3.e.(2)(b), or (c) which also included the applicant's project area. By certifying eligibility under Part I.B.3.e.(2)(d), the applicant agrees to comply with any measures or controls upon which the other operator's certification under Part I.B.3.e.(2)(a), (b) or (c) was based. Certification under Part I.B.3.e.(2)(d) is discussed in more detail in section I.A. of this addendum.

The applicant must comply with any terms and conditions imposed under the eligibility requirements of paragraphs I.B.3.e(2)(a), (b), (c), (d) to ensure that its storm waters discharges and storm water discharge-related activities are protective of listed species and/or critical habitat. Such terms and conditions must be incorporated in the project's



M.A. DeATLEY 01888

SWPPP. If the eligibility requirements of Part I.B.3.e.(2)(a)-(d) cannot be met, then the applicant may not receive coverage under the CGP. Applicants should then consider applying to EPA for an individual permit.