# FINAL CONTRACTING OFFICER'S DECISION

WA PFH 158-1(2)
FLOWERY TRAIL ROAD
CONTRACT NO. DTFH70-01-C-00011

CONTRACTOR: M.A. DeATLEY CONSTRUCTION, INC.

DECEMBER 11, 2003

U.S. Department of Transportation
Federal Highway Administration

WESTERN FEDERAL LANDS HIGHWAY DIVISION
610 EAST FIFTH STREET
VANCOUVER, WA 98661-3801
(360) 619-7700 FAX: (360) 619-7846

**CERTIFIED MAIL - RETURN RECEIPT REQUESTED** December 11, 2003

Mr. Craig T. Owens
Project Manager
M.A. DeAtley Construction, Inc.
PO Box 490
Clarkston, WA 99403

Re: Claim on WA PFH 158-1(2) Flowery Trail Road
Contract No. DTFH70-01-C-00011

Dear Mr. Owens:

This Contracting Officer's Decision was prepared in response to your September 18, 2003 request for a Contracting Officer's Decision in the amount of $277,833.55 on the above project.

## Claim

M.A. DeAtley is claiming a differing site condition in relation to the quality of rock encountered during the crushing of Item 30101 Aggregate base grading D from Stations 18+700 to 18+900. M.A. DeAtley claims that the area in question did not meet the quality requirements for the sodium sulfate soundness test. This in turn caused the aggregate to break down in the stockpile over the winter, thus resulting in gradations that did not meet the contract requirements. M.A. DeAtley is seeking $277,833.55.[1]

## Facts

**1. Contract**

**A. Bid Item**

The contract contained Item 30101 Aggregate base grading D in the amount of 21,500 metric tons.

**B. Physical Data**

FAR Clause 522.236-4 Physical Data listed various Geotechnical reports, none of which contained any data relating to the specific quality requirement for the stations that are at issue in this claim. Geotechnical Report 2-99 contained a site investigation of the location in question and two borings were obtained from the area; however, no quality tests were performed at that time of the writing of the report.

[1] $164,223.55 for M.A. DeAtley and $113,610.00 for subcontractor DeAtley Crushing.

BUCKLE UP AMERICA

The Government later performed quality tests on these cores and presented that information and design recommendations in Geotechnical Memorandum 14-99. This memorandum was not listed in the Physical Data FAR Clause, so was not available to contractors at the time of bid. As noted below, these test results, along with other test results for the location in question, are contained in Appendix B.

**C. Contract Specifications.** The following are excerpts from the contract specifications.

**Section 105. – Control of Material**

**105.05 Use of Material Found in the Work.** Material, such as stone, gravel, or sand, found in the excavation may be used for another pay item when acceptable. When there is an applicable excavation item in the bid schedule, such material will be paid both as excavation and as the other pay item for which it is used. Replace material so used and needed for embankment or backfill with acceptable material at no cost to the Government. Excavate or remove material only from within the grading limits, as indicated by the slope and grade lines.

Rock material located between Stations 17+940 and 18+900 has been found to meet the quality requirement for select borrow, riprap, boulders, and select topping.

Rock material located between station 18+700 and 18+900 has been found to meet the quality requirement for aggregates under Section 301 and 309.

[text omitted]

**Section 106. – Acceptance of Work**

**106.01 Conformity with Contract Requirements.** [text omitted]

References to standard test methods of AASHTO, ASTM, GSA, and other recognized standards authorities refer to the methods in effect on the date of solicitation for bids. The twentieth edition of the AASHTO Standard Specifications for Transportation Materials and Methods of Sampling and Testing, and Appendix A and B of the Federal Lands Highway Field Materials Manual are applicable to this project.

[text omitted]

**Section 301 – Untreated Aggregate Courses**

**Material**

**301.02** Conform to the following Subsections:

| | |
|---|---|
| Aggregate | 703.05 |

**Section 703. – Aggregate**

**703.05 Subbase, Base, and Surface Course Aggregate.**

**(a) General.** Aggregate shall consist of hard, durable particles or fragments of crushed stone, crushed slag, or crushed gravel hard, durable particles or fragments of crushed stone meeting the appropriate gradation of Table 703-2A and conforming to the following:

**(1)** Los Angeles abrasion, AASHTO T 96 — 35% max.

**(2)** Sodium sulfate soundness loss (5 cycles), AASHTO T 104 (coarse and fine) — 12% max.

**(3)** Durability Index, AASHTO T 210 (coarse and fine) — 35 min.

**(4)** Dimethyl Sulfoxide (DMSO), WFLHD Test for Accelerated Weathering of Aggregate by use of Dimethyl Sulfoxide — 12% max.

Furnish a material that is free from organic matter and lumps or balls of clay. Do not use material that breaks up when alternately frozen and thawed or wetted and dried.

Obtain the aggregate gradation by crushing, screening, and blending processes as necessary. Fine aggregate, material passing the 4.75 millimeter sieve, shall consist of natural or crushed sand and fine mineral particles.

**(b) Subbase or base aggregate.** In addition to **(a)** above, furnish subbase or base aggregate which conforms to the following:

**(1)** Fractured faces, ASTM D 5821 — 50% min.

**(2)** SE/$P_{75}$ Index (SEP) — 1.000 min.

**Table 703 – 2A**
**Target Value Ranges for Subbase and Base Gradation**

| Sieve Size | Percent by Mass Passing Designated Sieve (AASHTO T 27 and T 11) | | | | |
|---|---|---|---|---|---|
| | Grading Designation | | | | |
| | A (Subbase) | B (Subbase) | C (Base) | D (Base) | E (Base) |
| 63 mm | 100(1) | | | | |
| 50 mm | 97 - 100(1) | 100(1) | 100(1) | | |
| 37.5 mm | | 97 - 100(1) | 97 - 100(1) | 100(1) | |
| 25 mm | 65 - 79 (6) | | | 97 - 100(1) | 100(1) |
| 19 mm | | | 67 - 81 (6) | | 97 - 100(1) |
| 12.5 mm | 45 - 59 (7) | | | | |
| 9.5 mm | | | | 56 - 70 (7) | 67 - 79 (6) |
| 4.75 mm | 28 - 42 (6) | 40 - 60 (8) | 33 - 47 (6) | 39 - 53 (6) | 47 - 59 (7) |
| 425 µm | 9 - 17 (4) | | 10 - 19 (4) | 12 - 21 (4) | 12 - 21 (4) |
| 75 µm | 10 max (1) | 10 max (1) | 10 max (1) | 10 max (1) | 10 max (1) |

(1) Statistical procedures do not apply.
( ) Allowable deviations (±) from the target values.

[text omitted]

**2. Standard Method of Test for Soundness of Aggregate by Use of Sodium Sulfate or Magnesium Sulfate - American Association of State Highway and Transportation Officials (AASHTO) Test T-104**

This test is designed to represent how the material will perform over the life of the roadway with respect to the freezing and thawing of the roadway. The test simulates the numerous freeze/thaw cycles the material would experience over its life. The general testing and reporting procedures are described here. The specific steps can be found in the test procedure, a copy of which is included in Appendix A.

For the test the material is divided into specific sieve sizes. Each sieve size is soaked in a solution[2] for a set time then dried. This is done five times and after the final drying each sieve size is washed and dried. The weight of the material for each sieve size is compared to the original weight to determine the percent loss for each sieve.

The percent loss for the coarse portion of the sample is a weighted average of the loss for the coarse sieves. The percent loss for the fine portion of the sample is a weighted average of the loss for the fine sieves. The percent loss for the entire sample is the weighted average of the coarse and fine losses. [3]

**3. The Excess Fines**

When the contractor crushed the Aggregate D Base material, the average production data showed that the material met the Aggregate D Base material contract gradation requirements. With a maximum amount passing the 75 µm sieve set contractually at 10%, the average of the contractor production gradation tests was 7.93% and the average of the Government production gradation tests was 8.54%. The material was then stockpiled over the winter, some in a long windrow along the edge of the road and some in a larger stockpile partially along the road and partially in a new alignment section. When the material was placed from the stockpile onto the roadway, the average amount passing the 75 µm sieve was 12.42% from the windrow stockpile and 11.05% from the larger stockpile. Additional samples from the larger stockpile yielded 10.1% passing the 75 µm sieve. The contractor had to perform extra work to remove the out of compliance material and replace it with in compliance material.

**4. Test Results**

The Government and M.A. DeAtley performed AASHTO T-104 tests of the material in question. Copies of these test results can be found in Appendix B. The test results are summarized in the Analysis section below.

---

[2] The contract required the use of Sodium Sulfate.
[3] The test procedures also have a specific guidance for testing large rock to evaluate a potential source. The guidance is to not determine the fine sieve loss, so the loss for the sample is only based on the coarse sieves. However, this contract required the reporting of both the coarse and fine loss, so for all samples (potential sources and crushed product), both losses would be determined during the test procedure.

## Analysis

M.A. DeAtley is claiming a differing site condition for the quality of the rock between Stations 18+700 and 18+900. M.A. DeAtley claims that the rock quality was not in conformance with the contract requirements, specifically the sodium sulfate soundness loss (AASHTO T 104). Since the contract documents indicate that the material will meet the quality requirements, this is a type 1 Differing Site Condition.

### Type 1 Differing Site Condition Analysis

There are four requisite elements a contractor must establish to support a Type 1 differing site condition claim. First, the contractor must prove that actual subsurface or latent physical conditions at the site differed materially from those indicated in the contract documents. Second, it must establish that the differing site condition could not have been ascertained by a reasonable pre-bid site inspection and review of the contract documents. Third, the contractor must prove that it reasonably relied upon its interpretation of the contract documents when preparing its bid. Finally, the contractor must establish that it was financially damaged as a result of the differing site condition.

**First Element**
The first element M.A. DeAtley needs to establish is that the quality of the material between Stations 18+700 and 18+900 was materially different than indicated in the contract. By virtue of stating the material would comply with the quality requirements, the contract indicates that the sodium sulfate soundness loss (AASHTO T 104) would be a maximum of 12%. The question to be answered is whether the sodium sulfate soundness loss for the material in this location was equal to or less than 12%. A summary of the sodium sulfate soundness loss tests performed by the Government and the contractor follows.

**Government tests obtained pre-bid**
Geotechnical memorandum 14-99 contained a test result of 2% loss. This test was done on the cores from the borings from the location at issue. The coarse loss was 1% and the fine loss was 3%.

**Government tests obtained from crushed material**
During production of the aggregates, split samples of the produced material were provided to the Government.[4] The Government later tested three of these samples for sodium sulfate soundness loss. These are the only test results obtained from the actual crushed material.

<u>Sample 1</u>

| | |
|---|---|
| Coarse | 3% |
| Fine | 3% |
| Weighted average | 3% |

[4] These samples were taken by the contractor of the produced material (after crushing) as it came off the final crusher belt – prior to hauling or stockpiling.

| Sample 2 | |
|---|---|
| Coarse | 7% |
| Fine | 7% |
| Weighted average | 7% |

| Sample 9 | |
|---|---|
| Coarse | 2% |
| Fine | 5% |
| Weighted average | 3% |

**M.A. DeAtley tests obtained post-crushing**
M. A. DeAtley allegedly[5] took samples from the cut slope after the slope was finished, in the area where the material in question was mined.

| North Slope | |
|---|---|
| Coarse | 1% |
| Fine | 10% |
| Weighted Average[6] | 6% |

| South Slope | |
|---|---|
| Coarse | 8% |
| Fine | 19% |
| Weighted Average[6] | 14% |

| Windrow Stockpile | |
|---|---|
| Coarse | 3% |
| Fine | 10% |
| Weighted average[6] | 7% |

The difference between the coarse and fine loss of these tests is much higher than would normally be expected, especially given the minor differences for all of the Government tests. Since the Government was not present to witness the samples, I have some doubt to the connection of the results to the material actually used to produce the crushed aggregate.

Looking at the totality of the testing information, I must conclude that the aggregate encountered at this location does have a sodium sulfate soundness loss equal to or less than 12%. All the Government test results from the crushed material meet the requirements. All the contractor's tests results except one meet the requirements. With one test result out of seven being outside the specification limit, and with the other six test results having an average weighted loss of less than 5% when the maximum allowed loss is 12%, the best reading of the evidence is that the material met the sodium sulfate soundness test. Having one test outside of the maximum 12%

[5] The Government did not witness the taking of these samples. There is a disagreement between the Government and the Contractor as to whether the Government was given the opportunity to witness the sampling.
[6] The Contractor did not report the weighted average. This number was calculated by the Government.

loss limit does not demonstrate a failure with respect to the excavated material.[7] I conclude that the rock quality met the contract requirements and therefore it is not materially different from what was represented in the contract. Because this element of the differing site condition analysis is not met, there is no need to evaluate the second, third and fourth elements. The evidence does not support a differing site condition.

**Gradation Problems**

The allegation of a differing site condition arose because of the problems with gradation. When tested during production, the fines (the material passing the 75 µm sieve) were within contract requirements. When tested after the winter and during placement, the fines in the aggregate were outside of the contract limits. This difference in the gradation is illustrated in the test averages set forth below.

**Contractor Production Gradation**
A copy of the production data, along with a QL Pay determination, from the crusher (DeAtley Crushing) can be found in Appendix C. The average of the production data was

(18 samples)

| | |
|---|---|
| 9.5 mm | 63.7 |
| 4.75 mm | 40.7 |
| 425 mm | 15.8 |
| 75 µm | 7.93 |

**Government Production Gradation**
A copy of the Government production data, along with a QL Pay determination, can be found in Appendix D. The average of the splits from the production data was

(9 samples)

| | |
|---|---|
| 9.5 mm | 63.0 |
| 4.75 mm | 41.3 |
| 425 mm | 15.9 |
| 75 µm | 8.54 |

**Contractor Placement Gradation**
A copy of the Contractor placement data, along with a QL Pay determination, can be found in Appendix E. The average of the placement data from the roadway was:

Lot 1 windrow stockpile (5 samples)

| | |
|---|---|
| 9.5 mm | 70.5 |
| 4.75 mm | 50.2 |
| 425 mm | 21.8 |
| 75 µm | 12.42 |

[7] This test was not taken of the material actually used but rather was taken of adjacent material. Further, the exact location where the sample was taken has not been shared with the Government. Finally, it remains possible that the test result, being so far out of line from the other test results, simply was the result of some mistake.

Lot 2 large stockpile (6 samples)

| | |
|---|---|
| 9.5 mm | 63.1 |
| 4.75 mm | 44.5 |
| 425 mm | 20.1 |
| 75 µm | 11.05 |

**Contractor Stockpile Samples (Not Placement Samples)**

Large stockpile (3 samples)

| | |
|---|---|
| 9.5 mm | 66.2 |
| 4.75 mm | 45.0 |
| 425 mm | 20.3 |
| 75 µm | 10.1 |

**Analysis of the Gradations**

Given that the rock met the sodium sulfate soundness tests, the question arises as to the cause for the failure of the aggregate to meet the gradation requirements when placed. The facts seem to point to the method of processing and handling the material as the most likely cause. Although a loss of 19%[8] indicates a lesser quality of material than a loss of 12%, over one winter you would not anticipate a significant change in the gradation for material with a loss of 19%. One year of freeze/thaw cycles at a 19% sodium sulfate soundness loss rate would not increase the fines from 7.93% or 8.54% to over 10%.

Other causes are more likely. This rock was stockpiled on a bed of saturated fine material, as shown in the photos contained in Appendix F. The material, when stockpiled, contained pockets of a high concentration of fines as shown by the near vertical face seen in the photographs. Aggregate without a high concentration of fines will not stand at a near vertical face. The material stockpiled along the road was subjected to the interjection of fines from snowplowing activities and other road activity. Further, not all of the production tests fell under the 10% maximum, leading to the possibility that some of the higher test material was what was retested in the placement tests.

In any event, the contract required the material to be placed to meet the aggregate gradation requirements of the contact. The sodium sulfate soundness test results demonstrate that the gradation problems were not due to the rock being different from that represented in the contract. The processing and handling of the material remains as the most likely cause for the failure of the aggregate to meet the contract requirements.

[8] The 19% rate represents the highest rate found for the fines in the samples taken from the cut slope after the slope was finished. The weighted average of that sample (the coarse and fine aggregate) was 14%. These losses do not represent the amount of breakdown over a single winter, but rather are an indicator of the the potential for the material to breakdown over the life of the roadway.

# Decision

Given all of the test results and the conditions of the stockpiling, I determine that the difference in gradation was due to methods of handling the material and not the degradation of the material due to a high sodium sulfate soundness loss. Therefore this claim is denied.

This is the final decision of the Contracting Officer. This decision may be appealed to the Department of Transportation Board of Contract Appeals, 400 Seventh Street SW, Washington, D.C. 20590. If you decide to make such an appeal, you must mail or otherwise furnish written notice to the Board of Contract Appeals within 90 days from the date you receive this decision. A copy of the notice shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, should reference this decision, and identify the contract by number. With regard to appeals to the Department of Transportation Board of Contract Appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims $100,000 or less. In lieu of appealing to the Board of Contract Appeals, you may bring action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

William L. Parsons

William L. Parsons
Contracting Officer

cc: Art Hamilton, FLH Headquarters
Tim Binder, WFL
Ronald Carmichael, WFL
Brent Coe, WFL
Elizabeth Firestone, WFL
Dave Heckman, WFL
Linda Persoon, WFL
Ricardo Suarez, WFL
File

Appendix A

# Appendix A

**Standard Method of Test for**

**Soundness of Aggregate by Use of Sodium Sulfate or Magnesium Sulfate**

**AASHTO T-104**