# DeAtley Crushing Company

4307 Snake River Avenue • P.O. Box 759 • Lewiston, Idaho 83501 • 208-743-6550 • Fax 208-743-6474

RECEIVED

December 23, 2002

M. A. DeAtley Construction Company
Attn: Mr. Craig T. Owens
P O Box 490
Clarkston, Wa. 99403

**RE: Flowery Trail / Project #DTFH70-01-C-00011**
**Agg Base "D" / WFLHD Source**

Dear Craig:

DeAtley Crushing Company is in receipt of a copy of the WFLHD letter of 12-19-02, authored by Linda Persoon, regarding the Aggregate Base Grading "D" produced last year for the above mentioned project. Again, Linda avoids the real area of concern, which is the source of the materials. This WFLHD provided source has failed the Sodium Sulfate Test (AASHTO T-104) which is a required source compliance test to insure quality materials are available to the contractor.

WFLHD has clearly acknowledged the fact that the materials produced by DeAtley Crushing Company from this source did, in fact, meet contract gradation specifications. WFLHD has also clearly acknowledged the fact that the materials have showed a considerable change over the winter with regards to the gradation of the materials. A look at the gradation of the materials initially placed on the roadway shows a change in the gradation of the material from the upper sieves on down. We do not have any knowledge of how M.A. DeAtley Construction may, or may not have, taken care of the stockpiles after we produced the materials. Of more concern is that WFLHD is again purposely avoiding the fact that the source they provided does not guarantee materials that assure M.A. DeAtley Construction the opportunity to meet contract specifications on the roadway.

You can reach me at our Lewiston office should you have any questions.

Sincerely,
DeAtley Crushing Company

Greg Graybill
Administrator

M.A. DEATLEY
CONSTRUCTION, INC.

P.O. Box 490 • Clarkston, WA 99403 • 509-751-1580 • Fax 509-751-1922

January 13, 2003

Linda M Persoon, Project Engineer
Federal Highway Administration
P.O. Box 1220
107 W. Main
Chewelah, WA 99109

Ref: W A PFH 158-1(2) Flowery Trail Road

Dear Linda,

We are forwarding a letter M.A.DeAtley received on December 23, 2002 from DeAtley Crushing with concerns to the letter from WFLHD Dated 12/19/02 Source Compliance Testing. M.A.DeAtley shares the same concerns addressed in DeAtley Crushing's letter.

In reference to your letter dated December 19, 2002 the WFLHD stated that because of poor stockpiling techniques resulting in contamination after the material was crushed in the upper range of the maximum allowable gradations. Even if conditions were extreme in the area the stockpiles were placed the samples we took from the stockpiles along the roadway and at station 18+600 were from the middle of the stockpile, which was uncontaminated. This showed the same results that both Budinger and the WFLHD test showed. The gradation changed through the nine month time period from when it was manufactured until placed on roadway.

The test results M.A.DeAtley, Budinger and DeAtley crushing took from the source clearly shows the sodium sulfate soundness test (AASHTO T- 104) failing. The material was taken from the source using an excavator and supervised by M.A.DeAtley, Budinger and DeAtley crushing, WFLHD chose not to have a representative watch the sample being pulled. Budinger did pull and split the sample, which the WFLHD refused the split and said they will use the aggregate D material that was crushed for their samples.

We are still asking for compensation for our subcontractor DeAtley Crushing and the hardships M.A.DeAtley construction encountered due to the 30301 Aggregate base D breaking down.

We would like to set up a meeting with WFLHD and DeAtley Crushing to follow up with the potential claim and questions that arise on the source compliance issue. Our goal as a contractor would be to reach an agreement that benefits both parties without filing a claim.

M.A.DeAtley would like a response by January 17, 2003. We can be reached in Clarkston at (509-751-1580) if you have any questions.

Sincerely,

M.A.DeAtley Construction Inc.

Craig T. Owens
Project Manager

Cc: Brent Coe

U.S. Department
of Transportation
**Federal Highway Administration**

FLOWERY TRAIL ROAD
WA PFH 158-1(2)
105 S 3rd St East
Chewelah, WA 99109
(509) 935-7175
FAX (509) 935-7188

Facsimile:

Date: January 22, 2003

Refer to: DAC 156
Crushing claim, 1/22/03

Craig Owens, Project Manager
M. A. DeAtley Construction, Inc.
P.O. Box 490
Clarkston, WA 99403

WA PFH 158-1(2)
Flowery Trail Road
Contract Number DTFH70-01-C-00011

RE: DeAtley Crushing claim

Dear Mr. Owens:

On January 16, 2003 I received your letter dated January 13, 2003 along with the attached letter from Greg Graybill dated December 23, 2002. DeAtley Crushing's letter of December 23, 2002 states: *"WFLHD has clearly acknowledged the fact that the materials produced by DeAtley Crushing Company from this source did, in fact meet contract gradation specifications."* I do not agree with this statement.

Gradation test results during crushing were highly variable. Inputting your production test results (Buddinger) into QL Pay resulted in rejected material with a pay factor of 0.82 (see attached). While WFLHD expressed concern to you with the test results at the time, since acceptance is based on testing during placement of the material, no action was taken by the Government.

Later, when the issue of material source quality was raised, the Government took representative samples from the actual material crushed (production sample splits) and tested for sodium sulfate soundness loss. None of the samples tested by the Government showed a problem nor did they confirm the failing test result that you received. Since the samples the Government took were taken from the produced material, the test results are reflective of the quality of the

material you produced. Your one sample was taken from material that was not used to produce the aggregate and since the Government was not given the opportunity to witness the taking of the sample, we do not really know where it came from. Therefore, we do not have confidence in your one test result.

You have asked us to pay for the additional costs associated to remove the 30101 material and reproduce and place new 30101. At this time you have not presented any information that would cause us to agree with your request. I do not want to mislead you into thinking that we can reach a settlement, however if you would still like to meet to discuss this issue please contact me at 360-619-7929.

Linda Persoon
*Linda Persoon*
Project Engineer

cc: Central files, Brent Coe
Project files

Mon Dec 16 09:56:19 2002 West[illegible]n Federal Lands Highway Division

Project Name: Flowery Trail (2) Item Number: claim
Project Number: WA PFH 158-1(2) Lot Number: 1
P[illegible]ject ID: DTFH70-01-C-00011 Lab: Engr's Field Lab

| Quality Charac-teristic | TV | Allowable Devia-tion | Category | Mean | Standard Devia-tion | Est. no. Samples | Actual no. Samples | Quality Level | Current Pay Factor |
|---|---|---|---|---|---|---|---|---|---|
| 9.5mm | 63.73 | 7 | 1 | 63.73 | 7.376 | 18 | 18 | 34 | 0.84 |
| 4.75mm | 40.59 | 6 | 1 | 40.59 | 6.482 | 18 | 18 | 36 | 0.82 |
| 425µm | 15.80 | 4 | 2 | 15.80 | 2.957 | 18 | 18 | 18 | 1.00 |
| 75µm | 10 | max | | 7.93 | 1.526 | 18 | 18 | 9 | 1.01 |

TESTING COMPLETED
FINAL PAY FACTOR: 0.82

Lot Terminated: Corrective Action Required

Production—Process Control
DeAtley testing

2001

Project Name: Flowery Trail (2) Item Number: claim
Project Number: WA PFH 158-1(2) Lot Number: 1
Project ID: DTFH70-01-C-00011 Lab: Engr's Field Lab

** ACCEPTANCE PARAMETERS **

Quality Characteristic:

| | 9.5mm | 4.75mm | 425µm | 75µm |
|---|---|---|---|---|
| Target Values: | 63.73 | 40.59 | 15.80 | 10 |
| Allowable Deviation: | 7 | 6 | 4 | max |
| Est. No. Tests: | 18 | 18 | 18 | 18 |
| Category: | 1 | 1 | 2 | |
| Actual No. Samples: | 18 | 18 | 18 | 18 |

** TEST RESULTS **

| Sample Number | 9.5mm | 4.75mm | 425µm | 75µm |
|---|---|---|---|---|
| 1 | 55.7 | 34.2 | 13.7 | 6.9 |
| 2 | 57.8 | 38.8 | 18.5 | 9.0 |
| 3 | 73.1 | 45.4 | 16.8 | 8.0 |
| 4 | 51.5 | 29.7 | 12.8 | 6.3 |
| 5 | 65.8 | 40.2 | 13.0 | 6.4 |
| 6 | 79.7 | 57.3 | 24.2 | 12.1 |
| 7 | 64.9 | 41.8 | 15.9 | 8.1 |
| 8 | 76.8 | 51.9 | 19.8 | 10.2 |
| 9 | 61.0 | 36.8 | 14.0 | 7.1 |
| 10 | 61.6 | 39.1 | 15.5 | 7.2 |
| 11 | 65.9 | 40.8 | 15.8 | 8.1 |
| 12 | 59.0 | 43.1 | 18.6 | 9.4 |
| 13 | 64.9 | 39.5 | 14.0 | 6.9 |
| 14 | 56.3 | 33.6 | 13.2 | 7.0 |
| 15 | 57.6 | 34.6 | 12.9 | 6.3 |
| 16 | 67.2 | 42.4 | 14.2 | 7.0 |
| 17 | 61.9 | 38.8 | 15.3 | 7.8 |
| 18 | 66.5 | 42.7 | 16.2 | 8.9 |

# DeAtley Crushing Company

4307 Snake River Avenue • P.O. Box 759 • Lewiston, Idaho 83501 • 208-743-6550 • Fax 208-743-6474

February 26, 2003

M. A. DeAtley Construction Company
Attn: Mr. Craig T. Owens
P O Box 490
Clarkston, Wa. 99403

**RE: Flowery Trail / Project #DTFH70-01-C-00011**
**Agg Base "D" / WFLHD Source**

Dear Craig:

After our joint meeting with WFLHD on in Chewelah on the 14th, we would offer some follow up comments. We'd like to thank M.A. DeAtley Construction for setting up the meeting and allowing both M.A. DeAtley Construction and DeAtley Crushing Company the opportunity to show WFLHD the evidence regarding the source face to face. Sadly, we are not surprised at the outcome of this meeting. It has become apparent that the WFLHD staff operates under the guise that they can use as they see fit, or ignore when it's to their benefit, the contract guidelines and clear Special Contract Requirements, as well as the Federal Highway Administration Field Materials Manual. Mr. Coe flatly refused to answer direct questions put to him on numerous occasions. As was stated previously by DeAtley Crushing Company, we do not believe that WFLHD will acknowledge the truth or treat the contractor fairly unless forced to do so through a claim by M.A. DeAtley Construction.

We would like to recap the meeting points that we see as all important. All parties are in agreement that the stockpiled materials have broken down since being produced and stockpiled. Quite simply, the gradation has changed throughout the sieve ranges. This is evidenced by the comparison of the gradation verification tests done during or shortly after production, and the battery of tests performed on the same materials a year later. While Brent Coe did not appear to want to hear the proof, he admitted himself at the meeting that the aggregates in pile had broken down. This was heard by all in attendance. WFLHD was provided with the reasons why testing finished products by use of the Sulfate Soundness test method as a way to determine if the source meets contract requirements is not reliable or proper procedure, not the least important of which would be the fact

that the Special Contract Requirements clearly identify that the material is to be taken from the source and NOT from stockpiles of finished product. A representative from Buddinger and Associates, an independent laboratory, provided a clear analogy of the differences between "source testing" and testing of finished products.

After the discussion about what materials were to be used, and where the materials should be retrieved from, to ensure proper source testing, WFLHD then changed its position somewhat. At that point, Linda and Brent stated that WFLHD was "hanging its hat on the test results from the two test borings of the source". These test results apparently sufficiently indicated to WFLHD that the materials did meet, and would continue to meet, all contract source compliance requirements. After WFLHD said they were hanging their hat on the previous boring results, Brent was asked directly if WFLHD is absolutely responsible for making sure that the source met all contract requirements all the way through production of aggregates. Mr. Coe then correctly replied that "yes, WFLHD is responsible for the entire source". One fact has not changed since this debate started. The Source failed the Sodium Sulfate Soundness test.

We would like to offer M.A. DeAtley the following information derived from and quoted exactly as stated in the Federal Highway Administration Field Materials Manual.

***"1.0 POLICY STATEMENT***

***.......The sampling and testing methods contained in this manual will be used for all projects awarded under the Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects, (FP-85 and later editions), unless otherwise specified in the Special Contract Requirements."***

***"4.0 MATERIAL SOURCES***

***.......When the material source is shown on the plans or described in the special contract requirements, the Government assumes responsibility that, with reasonable performance, the Contractor will be able to obtain sufficient acceptable material.....***

***.......The Government assumes the responsibilities for such characteristics as soundness, abrasion, stripping resistance of the aggregate and the quantity of the source.....***

***.......During crushing operations the Project Engineer should submit samples of aggregate to confirm the quality of the material and to make certain that the material still meets the requirements for soundness, abrasion, stripping, etc.....***

***.......If a designated source does not contain a sufficient quantity of quality material, the Government is responsible for providing another source.....***

*.......The Contractor will be compensated for increased costs incurred in producing material from a new source upon failure of the designated source. This additional compensation may include the cost of equipment moves and setups, additional haul, and additional costs, if any, producing the material......*

As you know, WFLHD's engineers did not retrieve and test any source materials during crushing operations as is required to ensure that the source provides quality material throughout. What is more alarming is the fact that WFLHD didn't follow through with its own self imposed obligation to ensure availability of quality source material even after it was reported to them that the source had failed a source compliance test. The situation degrades from alarming to unbelievable when a person understands that after being notified that the source failed, and then being requested, in writing, to jointly sample the source on numerous occasions, WFLHD has refused to do just that for over six months.

It is clear that WFLHD is not operating within its own rules, guidelines, or contract requirements. We see no reason to believe that WFLHD will willingly change its course in this instance; therefore we believe the only way that the contractors will be fairly compensated will be through the filing of a claim by M.A. DeAtley.

You can reach me at our Lewiston office should you have any questions.

Sincerely,
DeAtley Crushing Company

Greg Graybill
Administrator

# DeAtley Crushing Company

4307 Snake River Avenue • P.O. Box 759 • Lewiston, Idaho 83501 • 208-743-6550 • Fax 208-743-6474

January 29, 2003

M. A. DeAtley Construction Company
Attn: Mr. Craig T. Owens
P O Box 490
Clarkston, Wa. 99403

**RE: Flowery Trail / Project #DTFH70-01-C-00011**
**Agg Base "D" / WFLHD Source**

Dear Craig:

DeAtley Crushing Company is in receipt of a copy of the WFLHD letter of 1-22-2003, authored by Linda Persoon, regarding the Aggregate Base Grading "D" produced in 2001 for the above mentioned project. Again, WFLHD conveniently avoids the problem. Linda states that WFLHD did not have the opportunity to witness the retrieval of the source samples. This, as we all know, is absolutely untrue. WFLHD was asked to be there to take splits and WFLHD refused to acknowledge what was taking place. WFLHD Project Engineers, including Linda, actually drove by and saw the samples being taken and kept going so that they could not be held to witnessing the samples being taken from the source. WFLHD has also conveniently stated again that they can rely on the test results from Sodium Sulfate Tests run on aggregates a year after production and refuses to acknowledge that this is a SOURCE TEST. WFLHD, for months now, has refused to meet at the SOURCE to take samples of the source materials in the area that was mined. M.A. DeAtley might ask WFLHD to explain exactly how the Sodium Sulfate test works and exactly what is occurring during the test. DeAtley Crushing Company pointed out some of the reasons that this is designed and shown in the Contract Specifications as a SOURCE TEST only, with materials for testing being taken from the SOURCE. It seems that WFLHD only adheres to the contract requirements when they feel it is beneficial for them to do so. This WFLHD provided source has failed the Sodium Sulfate Test (AASHTO T-104) which is a required source compliance test to insure quality materials are available to the contractor, period.

Linda states that the fluctuations which occurred on two sieves created an overall pay factor of .82, using the Statistical Analysis for payment, and follows with a statement about WFLHD being concerned at that time but no action was taken. We would ask what "action" might she be referring to that the government would have taken? These materials were within contract guidelines and tolerances. We would point out that production testing is not the point of statistical analysis for pay factor as we are sure Linda is aware. Should WFLHD decide that they wish to change the statistical analysis of aggregates for pay factor to the crusher belt rather than off of the road for future contracts, we would be inclined to agree with that move, and in fact, would welcome it. That, however, is not the case here and WFLHD's comments about the .82 pay factor have no meaning in this situation. WFLHD has all of the information in hand, in the form of Process Quality Control tests that Linda alluded to in her letter, to identify factually that the material was produced within the contract allowable broadband tolerance specifications. In eighteen tests performed by Buddinger there were only two instances where any broadband limits were exceeded, with only one screen exceeding limits. It should be noted as well that the same tests that Linda alludes to in her letter clearly show that the amount passing the #200 screen is, without doubt, within contract requirements. The materials were produced and supplied to M.A. DeAtley within the contract specifications; therefore DeAtley Crushing Company had fulfilled its contract.

WFLHD has provided M.A. DeAtley Construction a faulty source and has refused to prove otherwise. WFLHD has now indicated that the areas used for stockpiles and the fact that the stockpiles were not protected over the winter is the reason for the aggregate failure. Neither of these issues is the responsibility of DeAtley Crushing Company. M.A. DeAtley Construction gave DeAtley Crushing Company the order to crush where we did and what material to crush. We provided materials that met the contract specifications when the materials left the crushing plant. If the stockpiled materials became contaminated due to the fact that M.A. DeAtley Construction could not utilize the stockpile area that it had planned to use and had to use less attractive stockpiling areas, this is of no fault of DeAtley Crushing Company, and we will not be held responsible.

It is our belief that WFLHD will continue to stonewall M.A. DeAtley Construction while refusing to acknowledge the facts. It is our belief that WFLHD will not treat the contractor fairly in this instance unless forced to do so through a claim by M.A. DeAtley Construction against the government. We have strongly urged M.A. DeAtley Construction to, at the very least, seek comments and advice from legal council, whether it is in house or out, because of our belief that WFLHD will not act fairly unless forced to do so. We are not interested in further discussions involving WFLHD on the issue as we believe it is pointless.

To summarize, we contracted with M.A. DeAtley to provide crushing services that would provide M.A. DeAtley Construction aggregates that meet the contract gradation specifications when produced and provided to M.A. DeAtley. M.A. DeAtley Construction is, per our contract, responsible for ALL stockpile site preparation. M.A. DeAtley did not provide DeAtley Crushing Company adequate room for stockpiling at the crusher, nor did it provide proper preparation of stockpile area. The materials were "provided" to M.A. DeAtley when they left the final belt as M.A. DeAtley was responsible for the materials from that point on. It was M.A. DeAtley

Constructions responsibility to exercise proper care of the materials after they were produced and supplied by DeAtley Crushing Company. To ensure that M.A. Deatley Construction's project could be completed without delay, DeAtley Crushing Company interrupted its schedule in 2002 to move a crushing plant back in to produce additional aggregates at the request of M.A. DeAtley. We notified M.A. DeAtley, on July 30, 2002, that we were not responsible for any changes occurring in M.A. DeAtley's stockpiles that were left open and unprotected over the winter. DeAtley Crushing Company fulfilled its contract when initial crushing services were completed in 2001 and must now demand full payment in the amount of $113,610.00 which was invoiced for our Re-Crushing services.

M.A. DeAtley contracted with Buddinger and Associates to provide testing services for this project. We would assume that M.A. DeAtley Construction has in its possession the test summaries from Buddinger that provide a clear comparison of the gradation of the aggregates when produced compared to the gradation of the aggregates over a year later. It is very clear that the entire pile has broken down to a significant degree.

You can reach me at our Lewiston office should you have any questions.

Sincerely,
DeAtley Crushing Company

Greg Graybill
Administrator