IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DEATLEY CONSTRUCTION CO.,

Plaintiff,

vs. No. 04-1052C
(Judge Edward J. Damich)

THE UNITED STATES,

Defendant.

DEPOSITION OF MICHAEL OSBORN

Deposition upon oral examination of Michael Osborn, taken at the request of the Defendant, before Paul D. Sublette, a Notary Public, at the offices of the U.S. Attorney, 920 West Riverside Avenue, 3rd Floor, Spokane, Washington, commencing at or about 8:02 a.m., on Friday, September 30, 2005, pursuant to the Rules of the United States Court of Federal Claims.

COPY

A. They're WAQT certified labs.
Q. What certification do you have?
A. At that time I was WAQT certified.
Q. And what about now?
A. No. It drops every two years, and I had to go back next year or skip it. I chose to skip it.
Q. Does DeAtley Crushing's lab need certification if you're only doing the gradation tests for your own internal purposes?
A. No, you don't.
Q. Why did you get it?
A. Our labs are certified yearly because of we do State work. I mean, you don't move as much as we do and crush in all different places. You have to have them all certified.
Q. Okay. So if you are acting as the prime contractor, then you would need to have a certified lab?
A. Right. And in Oregon we are -- in most cases we are the testing facility being used. The Federal Government is just a little bit different, and we want to make sure we stay away from that.
Q. You say you want to stay away from contracts with the Federal Government?
A. That's just a personal opinion.

Q. Okay. Now skipping ahead for a moment to August of 2002 after the material was rejected, when did you first get involved at that point?

A. Craig Owens called me, or it was Mark DeAtley, one of those two, and stated that the material is -- the 200s are coming out a little high. And so at that time I came up to find out what was going on. Normally it's usually the blade operator doing windrows and screwing it up. So I went up there and observed that, made sure the blade operator was working in the correct manner, and we were still getting ten ones, ten twos, you know, just two-tenths of a percent out. And they were being told to tear that material back up. So then we stockpile sampled, and the stockpile samples were coming out wrong. Then M.A. DeAtley, you know, was pointing the finger at us. We're like going -- so we went to the big pile, the bulk stockpile, worked out of there. Some of the samples came out okay, nine eights, but still very high and very marginal. And we were going to try to use the bulk stockpile at least and utilize what we could. And then we were going along there and then we got, I believe, a ten two or a ten three, something like that, and then we were just dead in the water. And at that

time we decided, God, we'd better check the source.
And that's when we came up with some of the answers we did, brought up reasonable cause.
Q. Okay. And who made the decision to waste all the aggregate D that had been crushed as opposed to trying an alternative method of salvaging it?
A. The final decision was between Brian DeAtley and myself -- or Brian Wilsey and myself. Excuse me.
Q. Okay. What alternatives did you consider?
A. Well, we thought about making a chip to blend in there, and it came out it would take a day extra to make it, and then there would be waste material from the chip. So it was just cheaper and faster to make it all by itself, just make it again.
Q. And were there problems when you crushed the aggregate D at the ski area with respect to meeting the gradation specs?
A. Other than the boulders there we did not have any large-scale problems.
Q. Do you remember how many days it took?
A. Not at this -- not at this time. It went pretty quick, though.
Q. Were you there when these samples were taken from the face of the cuts?
A. Yes.

A. Yeah, was done.
Q. -- was done. Why wouldn't it have been recorded in this memo that the initial problems that we saw with Budinger's testing were resolved to your satisfaction?
A. Because of our testing results matching.
Q. Right. But is there any indication of that in this memo dated November 12th, 2001?
A. No, there's not.
Q. Okay. Are you aware of any documents that we could look at to determine whether or not the problems with Budinger's lab were resolved?
A. No documents, just the testing results.
Q. We don't have the testing results?
A. That's what he said.

MS. OHTA: I have no further questions. And partly because we're simply out of time.

MR. BISSELL: I've got a question for him.

MS. OHTA: Okay. Which may lead to more questions.

EXAMINATION

BY MR. BISSELL:

Q. Ms. Ohta asked you earlier in your deposition if you were relying on the expertise of Budinger as to

the cause for the change in gradation. And I believe you said that you had. Can you elaborate on that? What were you relying upon?

A. I was relying upon their test results, not the -- how would you say that? Not the basis of what the decision was that was made. I made the decision on my own experience and knowledge. I have a running, or have been to an unknown amount of quarries and rock and everything else. I've crushed in Idaho, Washington, Oregon, California. I didn't get in Nevada, but I could throw a rock at it. And I've been everywhere, and I've seen most all types of rocks in the Northwest. We knew what we -- I knew what I was doing when we went after that source and looked at it and took that answer.

FURTHER EXAMINATION

BY MS. OHTA:

Q. I'm not sure what you meant when you said when I made the decision, my decision was based on my experience and knowledge. What decision? The decision to recrush?

A. To resample the source.

Q. Okay.

A. You know, because we were trying to find out the answer to why these rocks were -- why these piles

were degradating so bad. And so we went back and did the source testing.

Q. That was your idea to go back and test the source?

A. Correct.

Q. So it wasn't Budinger's idea?

A. No.

Q. So Budinger was simply following your directions?

A. Correct.

Q. Okay. And what is the basis for your expertise to be able to evaluate the meaning of a single test result?

A. What is -- a single test result?

Q. Right.

A. I did not want a single test result. I wanted more, but I wanted federal involvement. I wanted the owner of the project to be there. I honestly wanted to test it more. I could not get any involvement from the other side.

Q. Are you holding yourself out as an expert regarding the issue in this case pertaining to the cause of the placed aggregate D failing the 75-micron gradation specification?

A. I believe I am, yes.

Q. And what is the basis of your expertise?

A. Thirteen years of experience.