IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| M.A. DEATLEY CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1052C |
| | ) | (Chief Judge Edward J. Damich) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF BRENT COE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

1. I am the Contract Administration Engineer within the Western Federal Lands Highway Division ("WFLHD") of the Federal Highway Administration ("FHWA"). My duties and responsibilities include the collection and handling of documents relating to claims against FHWA filed in this office.

2. Prior to my present position, I was the Construction Operations Engineer for WFLHD construction work performed in the State of Washington.

3. The information in this declaration is based upon my personal knowledge and upon information contained in the WFLHD official file pertaining to the contract in question.

4. On February 9, 2001, M. A. DeAtley Construction, Inc. ("DeAtley") was awarded a construction contract in the amount of $7,618,162.32, by the Western Federal Lands Highway Division ("WFLHD") of the Federal Highway Administration ("FHWA").

5. The contract required that DeAtley reconstruct an existing one-lane gravel road into a two-lane paved highway. Work that DeAtley was required to perform included roadway excavation, embankment construction, culvert installation, aggregate production and placement, and asphalt paving. The notice to proceed was effective April 16, 2001. The original

completion date was August 2, 2002. The actual completion date was November 12, 2002.

6. I executed most of the 25 contract modifications on this project. Those that I did not sign were signed by my immediate supervisor, David Heckman. Nineteen of the contract modifications involved changes in the contract price, with an overall upward adjustment of contract price of $668,722.36.

7. Linda Persoon was the project engineer on the DeAtley contract. I was Ms. Persoon's supervisor. As such, I drafted letters, attended meetings, and worked closely with Ms. Persoon in connection with the issue that arose during DeAtley's performance under the contract when the aggregate was rejected in August 2002 because it did not meet the contract specifications.

8. The information contained within this declaration is based upon my personal knowledge or upon documents contained within the contract file, including DeAtley's certified claim.

9. The contract required that DeAtley place a layer of aggregate base grading D ("aggregate") on the prepared surface of the roadbed, prior to paving the road with asphalt.

10. DeAtley used a Government provided source of rock from which it crushed the aggregate.

11. DeAtley, through its subcontractor, DeAtley Crushing Company, began crushing aggregate on November 2, 2001, and finished crushing on November 12, 2001.

12. DeAtley stockpiled the aggregate over the winter of 2001 -2002.

13. Gradation testing is performed on a sample of aggregate taken from the aggregate that has been placed on the roadbed. If the aggregate passes the gradation tests, the Government

then accepts the aggregate, and pays the contract price for that portion of aggregate represented by the test. Such payment compensates the contractor for the crushing and placement of the aggregate.

14. In August of 2002, DeAtley began to place the aggregate on the roadbed.

15. On August 21, 2002, the Government suspended DeAtley's performance because the placed aggregate failed to meet one of the contractual specifications.

16. On August 22, 2002, and again on August 27, 2002, the Government suspended DeAtley's performance because the placed aggregate failed to meet one of the contractual specifications.

17. On August 29, 2002, DeAtley began removing the rejected aggregate, and hauling it to a waste area..

18. In September, 2002, DeAtley crushed replacement aggregate, and placed it on the roadbed.

19. By September 18, 2002, DeAtley had finished the removal of the rejected aggregate and the crushing of the replacement aggregate.

20. After the aggregate was rejected, DeAtley went back to the roadside cut from which the rock used to produce the rejected aggregate was taken.

21. DeAtley hired Budginger and Associates to take rock samples from the cut and to perform aggregate quality tests on those samples.

22. Such test were not required to be performed under the contract.

23. According to the spreadsheet that documented the costs claimed by DeAtley in its certified claim, DeAtley included costs for Budginger performing the aggregate quality tests.

24. By contract modifications, the contract value was increased by $668,722.36.

25 After adjusting for underruns, the final contract value was $7,863,292.78.

26. On September 18, 2003, DeAtley filed a certified claim, with the contracting officer, seeking an additional $277,833.55.

27. DeAtley certified it incurred $277,833.55 in additional or uncompensated costs and profit because of an alleged differing site condition.

28. Of the $277,833.55, DeAtley sought $164,223.55. The remaining amount was sought upon behalf of DeAtley Crushing, DeAtley's subcontractor.

29. DeAtley Crushing, DeAtley's subcontractor, is not seeking in its pass-though claim, the costs it incurred in crushing the aggregate in November 2001. DeAtley Crushing is only claiming those costs incurred in connection with the additional work required to crush aggregate in September 2002, after the aggregate crushed in November 2001 had been rejected by the Government. Mark DeAtley, the president of M. A. DeAtley Construction, is the brother of Brian DeAtley, the president of DeAtley Crushing.

30. The $164,223.55 included labor costs of $42,865.66; equipment costs of $70,968.49,and material/rental costs of $50,389.41. All amounts included ten percent profit.

31. Attached, and made part of DeAtley's certified claim, was a spreadsheet labeled "Deatley Crushing Invoice Agg D" at the bottom of each page.

32. The spreadsheet contained the following information: the names of DeAtley's employees who worked on the Flowery Trail project; the rates at which those employees were paid; the date those employees worked on the project; and the number of hours each employee worked on the date indicated.

33. The period of time covered by the spreadsheet includes November 2, 2001, through September 18, 2002.

34. The amount DeAtley claimed for additional labor incurred as the result of the allegedly differing site condition is based upon the amounts paid to each of the employees as indicated on the spreadsheet, plus ten percent profit.

35. The amount claimed by DeAtley for additional labor costs, incurred as the result of the allegedly differing site condition, includes the cost of work performed by DeAtley from November 2, 2001, when DeAtley began crushing aggregate, until September 18, 2002, when DeAtley finished the removal of the rejected aggregate and the crushing of the re-placement aggregate.

36. The amount claimed by DeAtley for additional equipment costs incurred as the result of the allegedly differing site condition was derived from the same spreadsheet.

37. The amount claimed by DeAtley for additional equipment costs incurred as the result of the allegedly differing site condition includes costs for equipment used from November 2, 2001, when DeAtley began crushing aggregate, until September 23, 2002, when DeAtley finished the removal of the rejected aggregate and the crushing of the replacement aggregate.

38. The amount claimed by DeAtley for additional material/rental costs incurred as the result of the allegedly differing site condition was derived from the Materials/Rental Sheet included in the claim.

39. The amount claimed by DeAtley for additional material/rental costs incurred as the result of the allegedly differing site condition includes costs incurred by DeAtley from

August 19, 2002, until September 23, 2002.

40. DeAtley incurred costs for placing aggregate after September 2, 2002, that are not included in its claim. Such costs were compensated by the Government payment of the contract amount.

41. Costs for labor, equipment, and material that were incurred by DeAtley before the Government suspended work on August 19, 2002, was for work DeAtley was required to perform under the contract.

42. The amount claimed by DeAtley under materials/rental includes costs for Budinger to test aggregate on August 19, 2002.

43. The testing performed by Budinger on August 19, 2002, was required to be performed under the contract and was performed prior to August 21, 2002, the date the Government suspended work.

44. Budginger performed production testing for DeAtley on the aggregate prior to August 19, 2002, the costs of which DeAtley did not include in its claim. Budginger also performed additional testing after August 19, 2002, related to the aggregate, the costs of which were not included in the claim. Such costs were compensated by the Government payment of the contract amount.

45. The amount claimed by DeAtley under materials /rental includes the cost of hiring Budinger, after the aggregate was rejected, to test samples of rock obtained from the site from which the rock used to produce the aggregate was taken.

46. That testing performed by Budinger was not work that DeAtley was required to performed under the contract.

47. Because the Government denied DeAtley's certified claim based upon DeAtley's contention that the Government provided source for the aggregate constituted a differing site condition, the Government did not pay DeAtley any costs that DeAtley incurred for the additional work that DeAtley performed in removing that portion of the aggregate that DeAtley had placed before it was rejected, re-crushing the aggregate, placing the newly crushed aggregate on that portion of the roadbed from which the rejected aggregate had been removed, and performing the contractually required tests upon such newly crushed aggregate.

48. According to the Final Estimate No. 015, the Government paid DeAtley the total amount of $7,863,292.78. This amount covered all work performed under the original contract, as modified by the contract modifications.

49. The $7,863,292.78 paid to DeAtley by the Government under the contract included all costs for which DeAtley invoiced the Government that related to all of the work that DeAtley was required to perform under the contract.

50. On March 22, 2005, I participated in a settlement meeting held in Spokane, Washington, that was attended by representatives of DeAtley and DeAtley Crushing and their attorneys.

51. During that meeting, DeAtley was informed that we considered that its claim contained false statements with respect to certain items because those costs were not incurred as the result of the alleged differing site condition. DeAtley has not revised the amount of its claim.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 11, 2006.

Brent Coe