


# Bores B-28 and B-29 and Distribution of Quartzite and Argillite

EXHIBIT
A

Date: Tuesday, June 5, 2001
Weather: Cool and drizzle off and on

**Work of Inspectors:** John Foster to serve as assistant project engineer on site – coordinating with contractor's superintendent, Sam Stamper. Thomas Siniscal watched the construction clearing operations and video taped the processor / skidder working on decking logs for Vaaugen Brothers.

About 9:45 am John Foster came down to the (5) project where I was in a plan review with the designers and Kerry Cook. Foster noted that John Cooper had dug three test pits in the area of the big thru cut at Sta 18+800 and wasn't able to find rock. Kerry Cook and myself drove to the site with a copy of the geotech report.

The first pit we looked at was down 3.8 m. There was a 1 meter topsoil layer and then a layer of decomposed rock, breaking into 100 to 150 mm size. This material was showing signs of sloughing into the trench on the vertical sides of the pit. At 3.8 meter (the bottom reach of the excavator) was the top of a harder layer. Cook noted this matches what is seen in the corings. There were two corings taken at Sta 18+850 showing: a silt, sandy, dry, tan material down to 1.5 m; an argillite (highly fractured, brownish gray) from 1.5 m to 3.6 m; an argillite (moderately fractured and weathered, brownish gray) from 3.6 m to 6.61 m; an argillite ( with clay alteration in fractures, brown to gray with Fe stains) from 6.61 m to 8.53; and a quartzite (fractured and weathered, gray) from 8.83 m to 16.1 m. The second coring has a similar description except it called the highly fractured zone a quartzite. In both cores the RQD % was 0 to 8 down thru the highly fractured area, but then going to 32 – 90% recovery of 4"+ rock to the bottom of the cores in the moderate / slightly / competent / very hard quartzite below. From our witnessing the test pits and reviewing the geotech report we discussed the following:

- The rock material in the upper 4 to 5 meter is too soft to use for base. Kerry Cook agreed it could be used in subexcavations provided it was clean enough. It also could be used on the slope armors.
- We discussed with Cooper that the rock from the beginning of the project to Sta 18+700 could well be used for base if quality testing showed compliance with contract requirements. The only reason the area from 18+700 to 18+900 was listed as having base material is because samples from this area have passed quality testing.
- Cooper noted this changes their plans. They expected to remove 1-2 meters of topsoil and then have competent base rock. He stated he would have to reconsider when to bring in his crusher and where to locate it.
- We discussed the stability of the zone of highly fractured rock 1.5 to 4 or 5 meters deep. The cross sections show us having this material at a 2:1 (metric) slope as is the competent material below it. We looked at options for laying back this portion of the cut slope. But there isn't enough ROW to do this. This is private property and would take considerable time to get additional ROW. Cook agreed the material could be built per plan, but this upper slope will slough material into the ditch. The ditch has been designed in this area to handle the expected sloughing rock.

Exhibit 12
Date: 8/24/05
Rider & Associates
800-869-0864

EXHIBIT 8

- We questioned why the ROW wasn't obtained between the new alignment and the old road in this area of rock. We are making this deep through cut and leaving a somewhat unsightly bank of rock.

Both John Cooper and Sam Stamper seem unfamiliar with the geotech report. A couple of weeks ago I asked Scott Palmer, M.A. DeAtley's engineer/estimator if he had a copy of the geotech report. Scott noted he did have a copy and he had used the report in conjunction with the cross sections to develop the takeoffs for rock materials when bidding the project.



One meter of topsoil; 0.6 meters of soil; then highly fractured rock



Test Pit 20' deep. No material encounter that gave resistance to backhoe.



Down 20'; Still In Highly Fractured Rock

**Conversation with Stevens County Representatives:**
About 11:00 am Jason Hart and a ROW person from the county office were on site. Jason noted the vast progress on the clearing of the Stimson property. He asked me if I knew how many loads of logs had been taken. I noted we don't have a count, since the self loaders are here before we start in the morning and after we leave some days. I stated I was hoping he could provide me with a count. I would like to know

the quantity and dollar value so we can have some data for the next project engineer's estimate.

I asked Jason and the ROW person why the county didn't purchase the small sliver of land between the roads. They were both surprised that this hadn't been done and stated it looks like an oversight. They noted that it would look odd to leave the chunk of rock standing there between the new road and the obliteration. Jason agreed to look into it. They also discussed how difficult it would be to negotiate with Stimson. Jason asked me what we could give Stimson. I noted I don't know what more we can do. We are already building them 5 approaches, 3 more than existing.

**Conversation with Forest Service Representative:**

Late in the afternoon Bruce Bailey called and we discussed:

- There is a fishery crew that will involved in a month long study and he asked when it work in the contractor's schedule to have them on the project. We discussed having them start next week; report to the flagger at 7:00 am Monday morning and discuss where to park. They should wear vest and hard hats. They will start on the east end of the project and slowly work west. They are counting ponds, etc in the steams and creeks
- Bruce questioned if I had heard from my supervisors about the FS issuing the use permit to FHWA for the Kings Lake Pit. I noted we had spoken with the environmental section and they were all right with environmental reviews having been complete. So it will work to issue us the permit.
- I questioned Bruce if he knew if the Kings Lake Pit had been cored by WFL for quality. Bruce recalled that Marion thought the pit was unacceptable, but he thought she learned it to be all right "just before she left".
- We will meet tomorrow morning as part of the line and grade review on the (3) job with the designers.
- I would like to have Bruce visit an area near Sta 22+200 where the contractor would like to stage his equipment trailer temporarily.

Linda M. Persoon
6/5/01



6

M.A. DEATLEY
CONSTRUCTION, INC.

P.O. Box 490 • Clarkston, WA 99403 • 509-751-1580 • Fax 509-751-1922

RECEIVED
OCT 26 2001
By Project Engineer

October 25, 2001

Linda Persoon
Federal Highway Administration
PO Box 1220
Chewelah, WA 99109

RE: Flowery Trail Road WA PFH 158-1(2) Contract No.DTFH70-01-C00011

Dear Linda,
In response to your letter of October 22, 2001 regarding winter shutdown on the Flowery Trail project we request you reconsider your intention of not extending the date of winter shutdown,

We propose to begin crushing on October 29, 2001. We would cut the unsuitable material from the roadway from Sta. 17+940 to !9+700(where ever subgrade hubs begin) and place the material from the first couple of shifts on this area to a width of 22'. After this area is covered we would then cut the mud from Sta. 19+700 to 20+600 and place Surface Course D on this area to a depth deep enough to stockpile the quantity for the entire project, with the material being weighed in the Catwagon for Material on Hand on the crusher scales. We would blade off this material and allow traffic to run over it until traffic is diverted onto the existing road at Sta. 20+600. Traffic would re enter the new alignment at Sta. 20+580. From Sta. 20+580 the mud would be cut off and a temporary layer of Surface Course D would be placed approximately 100mm deep to allow traffic to run for the winter. The Surface Aggregate Course would be picked up and weighed across our certified scales prior to placement on approved subgrade.

Please note that with the excess material we have encountered we have had to haul to 49 Degrees North Ski Area(refer to your letter of October 11, 2001). This added haul has caused M.A. DeAtley Construction, Inc. a significant delay in bringing in our crushing sub contractor. We have currently hauled over 21,000m3 to the ski area, with the majority of this material coming from the area where we planned to place the crusher. In light of this delay M.A. DeAtley Construction, Inc. will manufacture and place the temporary rock for our cost of $6.00 per tonne

Please respond to this request by October 26, 2001. Please call with questions.

Sincerely,

M.A. DeAtley Construction, Inc.

John Cooper
Project Manager



EXHIBIT
C

7

US DEPARTMENT OF TRANSPORTATION
Federal Highway Administration

# CONTRACTOR DAILY QUALITY CONTROL REPORT

Project WA PFH 158-1(2) FLOWERY TRAIL ROAD

Contractor/Subcontractor M.A. DeAtley Construction

Date 11-7-01 Day Wednesday

Weather Partly Sunny, cold, ≈ 45°

**Quality Control Inspection Narrative**

Crusher still crushing Agg. Base Grading D ~~neat~~ aggregate. All tests run today by Budinger met the specs. 1st day that all tests were in.

DeAtley Crushing caught the big sample for the Humphries test that the Federal Highway Administration will be doing. They caught this sample around 11:00 A.m. I was not present when they caught the sample but I made sure that they were running consistent at the exact time they caught the sample.

Robert (Quality Control Person for DeAtley Crushing) was down at the Fed's lab today with Budinger representatives trying to figure out why Budingers tests have been jumping around + not DeAtley Crushing tests. Robert thinks it is the shaker that Eric + Steve are using. They are going to need to shake their samples a little longer.

Erosion control crew still working. Kris is keeping a close eye on this crew.

Material Source seems to be very dirty still. Crusher is producing a lot of rejects. Our trucks can hardly keep up!

It is hereby certified that the information contained in this record is accurate, and that all work documented herein complies with the requirements of the contract. Any exceptions to this certification are documented as a part of this record.

Reported by: Dusty Foremann
Contractor Quality Control Manager

Reviewed by: [signature]
Federal Highway Administration

EXHIBIT D

8

WFLHD-465 (Rev. 10/90)

U. S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
WESTERN FEDERAL LANDS HIGHWAY DIVISION

FEDERAL LANDS HIGHWAY — "Commitment to Excellence"

## CONTRACTOR'S DAILY RECORD OF CONSTRUCTION OPERATIONS

PROJECT: WA PFH 128-1(2) FLOWERY TRAIL ROAD

CONTRACTOR/SUB-CONTRACTOR: M.A. DeAtley

DATE: 11-7-01 DAY: Wednesday

WEATHER: Partly Sunny, Cold, ≈ 45°

SHIFT: ___ TO: ___

**DESCRIPTION AND LOCATION OF WORK (PLEASE BE CONCISE)**

(A) • Stockpile Grading D along roadway
(B) • Stockpile Rejects at 20+700
(C) • Push to Crusher between 18+700 - 18+900
(D) • Erosion Control
(E) • Servicer/Mechanic Equip
(F) •
(G) •
(H) •
(I) •
(J) •
(K) •

| NO. | LABOR CLASSIFICATION | NO. | EQUIPMENT TYPE | (A) | (B) | (C) | (D) | (E) | (F) | (G) | (H) | (I) | (J) | (K) | EQUIPMENT TIME WORK | IDLE | DOWN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Operator | | Crusher Loader (days) | 5 | | | | | | | | | | | | | |
| | Operator | | Crusher Loader (night) | 5 | | | | | | | | | | | | | |
| | Operator | | D8N Dozer (days) | | 3 | | | | | | | | | | | | |
| | Operator | | D8N Dozer (night) | | 3 | | | | | | | | | | | | |
| 3 | Driver | 3 | End Dump (days) | 27 | | | | | | | | | | | | | |
| 3 | Driver | 3 | End Dump (nights) | 27 | | | | | | | | | | | | | |
| 2 | Driver | 2 | End Dump (days) | | 18 | | | | | | | | | | | | |
| | Driver | 2 | End Dump (night) | | 18 | | | | | | | | | | | | |
| | Operator | | D10N Dozer (days) | | | 9 | | | | | | | | | | | |
| | Operator | | D10N Dozer (nights) | | | 9 | | | | | | | | | | | |
| 8 | Laborers | | | | | | 72 | | | | | | | | | | |
| 2 | Servicer/Mechanic | | | | | | | 24 | | | | | | | | | |

CONTINUE TO BACK OF SHEET

BY: Dusty Forsmann

SIGNATURE FOR CONTRACTOR (*): Dusty Forsmann

DATE: 11-7-01

REVIEWED BY: JOHN M FOSTER

SIGNATURE, PROJECT ENGINEER OR INSPECTOR: John M Foster

DATE: 11/08/01

(*) IT IS HEREBY CERTIFIED THAT THE INFORMATION CONTAINED IN THIS RECORD IS ACCURATE, AND THAT ALL WORK DOCUMENTED HEREIN COMPLIES WITH THE REQUIREMENTS OF THE CONTRACT. ANY EXCEPTIONS TO THIS CERTIFICATION ARE DOCUMENTED AS PART OF THIS RECORD. ALSO, I CERTIFY THAT ALL CONSTRUCTION SIGNING AND TRAFFIC CONTROL (INCLUDING TEMPORARY STRIPING) IS CORRECT FOR THE STATUS OF THE PROJECT AND IS IN FULL CONFORMANCE WITH THE "MUTCD" AND THE CONTRACT REQUIREMENTS FOR THE PROJECT IDENTIFIED ABOVE.

US 02979

1/2

DRAFT B. Coe

Flowery Trail Road Project
WA PFH 158-1(2)
February 14, 2003

Meeting with M.A. DeAtley and DeAtley Crushing.

In Attendance:

| FHWA | M.A. DeAtley | DeAtley Crushing | Budinger |
|---|---|---|---|
| Linda Person | Craig Owens | Greg Graybill | Scott Walters |
| Brent Coe | Lou Ruchert | Mike Osborn | |
| | Steve Smitherman | Brian Wilsey | |

Meeting started at 9:00 am with representatives of M.A. DeAtley. (DeAtley Crushing was running late.)

Meeting opened with a discussion regarding the volume of material moved from the "red clay" cut on the east end of the project. M.A. DeAtley believes that they moved an additional 38,000 cubic meters of material than was represented by the design earthwork. Their numbers are based on load counts and cost code billings by their employees. We (FHWA) explained that the contract allows for adjustments in the earthwork if the slope stakes don't catch as shown in the design or if a re-measure (survey cross sections) prior to disturbance shows an error in the original topography. Craig explained that this is where they are having problems because according to their surveyors the slope stakes did catch in the correct location and that no additional survey was completed. They asked if we could consider changing the method of measurement to load counts since they can prove that on the rest of the project their load counts are within a 1000 cubic meters of the design. We explained that we could not change the method of measurement or increase the quantity without proper survey notes measuring the area in question.

The next issue discussed was a variation in the amount of water for dust control. The final quantity is a 144% of the bid quantity. Craig said that he had been reading FAR clause 52.211-18, Variation in Estimated Quantity. Craig seemed to believe that just because the quantity overran that he could get additional compensation above the bid price. We explained to him that that equitable adjustment could only be based on an increase in costs due solely to the variation above 15%. We then gave them the following example: *In this case they could be due additional compensation if they had to bring on a second water truck. They may be due the cost of the mobilization.* We also explained to him that with variation in quantity that they could see a decrease in costs due to the additional work. With that Craig was planning to review the matter further.

Discussed topsoil. M.A. DeAtley is trying to figure out why their records show $33,000 being billed to this item but that they have only been paid $ 5,000. We explained that to receive payment for this item they need to submit measurement notes. One of the

Exhibit 25
Date: 1/24/05
Rider & Associates
800-869-0864

EXHIBIT
E

US 02149

10

2/3

problems is that they have no measurement notes from 2001. They asked if they could be paid for areas where topsoil was placed then covered up with additional material that was used to flatten slopes. We said yes as long as they can provide the necessary quantity documentation. When looking at their costs we reminded them that they need to take in consideration topsoil material that was improperly disposed of yet their employees used that cost code. We then showed them a picture from 2001 where Linda had to shutdown and operation because they were trying to build the embankment with topsoil.

At 10:20 am representatives from DeAtley Crushing arrived. The discussion then turned to the aggregate base rock that was rejected for failing to meet the gradation requirements of the 75μm sieve. The material was produced with a 0.82 pay factor.

DeAtley Crushing claims that there is a reasonable doubt that the source (roadway cut) that was listed in subsection 105.05 can consistently produce material that meets the contract quality requirements, specifically the Sodium Sulfate Soundness test.

Their argument is based on the results they received from two samples. Apparently Budinger took two samples from the north side of the cut and two samples from the south side of the finished cut. They then combined the tests into composite samples for each side of the cut (# 2 – South and # 3 – North). The test from the north side meets the contract requirements but the test from the South side failed the Sodium Sulfate Soundness Fine test (19% loss). They also took a sample of from the "windrow" stockpile (#1) which passed the Sodium Sulfate Soundness test.

We explained that FHWA sent in three production samples and all three samples passed the Sodium Sulfate Soundness test.

Scott from Buddinger then explained that he does not believe that production samples represent the source material and that they will always have better test results. He said that the crushing process removes most if not all of the lesser quality material. He said that the source test results that failed should cause concern that the source was questionable. He also commented that the State DOT's would not allow the use of production samples to represent the source.

DeAtley Crushing did say that they were rejecting approximately 70% of the material fed to the crusher.

We explained that the production samples do represent the material that was placed in the stockpiles and that if the samples meet the quality requirements we have a hard time believing that the material is breaking down.

5/3

Questions that were then asked:
Greg Gray bill wanted to know what happened to the 1" rock if it wasn't breaking down. DeAtley Crushing provided tables and graphs that show the production vs acceptance sample results for the various sieves. During production 99.81% of the material passed the 1" sieve and for the acceptance samples 100% passed the 1" sieve. Therefore Greg wanted to know what happened to the 1" rock.

Greg Graybill wanted to know how why we were using statistical analysis on the production samples. He said that is not required by the contract. We did explain that they were to mainintain control charts and track there material production. That the QLPay program was one way to see how consistent their material was being produced.

Greg Graybill also wanted to know what our Materials Engineers qualifications were.

From the discussions it appears that where FHWA and DeAtley Crushing disagree is what is represented by the source samples that they took versus the production samples. Their argument is that the source used does not provide consistent material and this is the reason why their acceptance samples are breaking down and failing. We have countered that the material produced and stockpiled did in fact meet the quality requirements and that it was their lack of quality control and handling that caused the material to fail the acceptance requirements.

The meeting ended with FHWA agreeing to have the WFLHD Materials Engineer review the information provided by DeAtley Crushing and providing a response to M.A. DeAtley regarding our position on the issue by the week of March 24. 2003.