IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| M.A. DeATLEY CONSTRUCTION, INC., | ) | Case No.: 041052C |
| | ) | (Judge Edward J. Damich) |
| | ) | |
| Plaintiff, | ) | **RESPONSE TO GOVERNMENT'S** |
| | ) | **PROPOSED FINDINGS OF** |
| vs. | ) | **UNCONTROVERTED FACTS** |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

M.A. DeAtley Construction, Inc. ("M.A. DeAtley"), by and through its attorneys of record, hereby submits the following additional Proposed Uncontroverted Facts in response to the Government's Proposed Statement of Uncontroverted Facts.

## I. FACTS

M.A. DeAtley relies upon its proposed Findings of Uncontroverted Facts filed on September 13, 2006 and the following:

1. On February 9, 2001, M.A. DeAtley Construction, Inc. ("DeAtley") was awarded a construction contract in the amount of $7,618,162.32, by the Western Federal Lands Highway Division ("WFLHD") of the Federal Highway Administration ("FHWA").

Declaration of Brent Coe in support of defendant's opposition to plaintiff's motion for summary judgment, ("Coe Decl."), ¶ 4.

No dispute that DeAtley entered into a fixed price contract that allowed for specified quantities with the Government for construction.

2. The contract required that DeAtley place a layer of aggregate base grading D ("aggregate") on the prepared surface of the roadbed, prior to paving the road with asphalt. Id. at ¶ 9.

No dispute.

3. DeAtley used a Government provided source of rock from which it crushed the aggregate. Id. at ¶ 10.

No dispute.

4. DeAtley crushed aggregate from November 2, 2001, through November 12, 2001. Id. at ¶ 9.

No dispute, except that Plaintiff notes it had to recrush aggregate in 2002 because of the inadequate government source.

5. DeAtley stockpiled the aggregate over the winter of 2001-2002. Page 20 of Exhibit A to affidavit of Mark DeAtley, submitted in support of DeAtley's motion for summary judgment ("DeAtley Aff."); Coe Decl. at ¶ 12.

No dispute.

6. Gradation testing is performed on a sample of aggregate taken from the aggregate that has been placed on the roadbed. If the aggregate passes the gradation tests, the Government then accepts the aggregate, and pays the contract price for that portion of aggregate represented by the test. Such payment compensates the contractor for the crushing and placement of the aggregate. Id. at ¶ 13.

DeAtley does not dispute; however, the Government does not pay for rejected aggregate, the cost to get the aggregate to that point, nor for the cost of re-crushing and replacing the aggregate.

7. In August of 2002, DeAtley began to place the aggregate on the roadbed. Id. at ¶ 14.

No dispute.

8. On August 21, 2002, the Government suspended DeAtley's performance because the placed aggregate failed to meet one of the contractual specifications. Id. at ¶ 15.

No dispute.

9. On August 22, 2002, and again on August 27, 2002, the Government suspended DeAtley's performance because the placed aggregate failed to meet one of the contractual specifications. Id. at ¶ 16.

No dispute.

10. On August 29, 2002, DeAtley began removing the rejected aggregate and hauling it to a waste area. Page 21 of Exhibit A to DeAtley Aff.; Coe Decl. at ¶ 17.

No dispute.

11. In September, 2002, DeAtley crushed replacement aggregate and placed it on the roadbed. Coe Decl. at ¶ 18.

No dispute.

12. By September 18, 2002, DeAtley had finished the removal of the rejected aggregate and the crushing of the replacement aggregate. Id. at ¶ 19.

DeAtley does not dispute that most of the removal was done by September 18, 2002. However, other work was still being done on the Project.

13. After the aggregate was rejected, DeAtley went back to the roadside cut from which the rock used to produce the rejected aggregate was taken. Id. at ¶ 20.

No dispute.

14. DeAtley hired Budinger and Associates to take rock samples from the cut and to perform aggregate quality tests on those samples. Id. at ¶ 21.

No dispute.

15. Such tests were not required to be performed under the contract. Id. at ¶ 22.

No dispute. The Government is correct that the Budinger tests were in addition to the work required under the contract.

16. According to the spreadsheet that documented the costs claimed by DeAtley in its certified claim, DeAtley included costs for Budinger performing the aggregate quality tests. Id. at ¶ 23.

No dispute. Plaintiff did include the costs of the additional Budinger tests in its claim.

17. By contract modifications, the contract value was increased by $668,722.36. Id. at ¶ 24.

No dispute. But, as set forth in the Owens and Cooper affidavits, those increases did not include amounts in the claim.

18. After adjusting for underruns, the final contract value was $7,863,292.78. Id. at ¶ 25.

DeAtley does not dispute it was paid this amount; however, this amount does not pay DeAtley for the additional work it performed. There was no contractual pay item for the additional scope of work M.A. DeAtley performed.

19. DeAtley was paid $7,863,292.78, the full contract value, by the Government. Id. at ¶ 48.

No dispute. DeAtley notes that the payment did not include any amounts included in its claim and that it reserved the claim at issue.

20. The $7,863,292.78 covered all work performed under the original contract, as modified by the contract modifications. Id. at ¶¶ 48 and 49.

Plaintiff does not dispute that it was paid for all work required under the contract. Its claim is for work that was in addition to that anticipated under the contract. It has not been paid for that work. Plaintiff reserved the claim in its request for final payment.

21. On September 18, 2003, DeAtley filed a certified claim with the contracting officer seeking an additional $277,833.55. Id. at ¶ 26.

No dispute.

22. DeAtley certified it incurred $277,833.55 in additional or uncompensated costs and profit because of an alleged differing site condition. Page 2 of Exhibit A to DeAtley Aff.; Coe Decl. ¶ 27.

DeAtley does not dispute it certified that it incurred $277,833.55; however, this was for the additional work. DeAltey has more than one theory for recovery.

23. Of the $277,833.55, DeAtley sought $164,223.55. The remaining amount was sought on behalf of DeAtley Crushing, DeAtley's subcontractor. Coe Decl. ¶ 28.

No dispute.

24. DeAtley Crushing, DeAtley's subcontractor, is not seeking in its pass-though claim the costs it incurred in crushing the aggregate in November 2001. DeAtley Crushing is only claiming those costs incurred in connection with the additional work required to crush aggregate in September 2002, after the aggregate crushed in November 2001 had been rejected by the Government. Mark DeAtley, the president of M.A. DeAtley Construction, is the brother of Brien DeAtley, the president of DeAtley Crushing. Id. at ¶ 29.

No dispute.

25. The $164,223.55 included labor costs of $42,865.66, equipment costs of $70,968.49, and material/rental costs of $50,389.41. All amounts included ten percent profit. Page 14 of Exhibit A to DeAtley Aff.; Coe Decl. at ¶ 30.

No dispute.

26. Attached, and made part of DeAtley's certified claim, was a spreadsheet labeled "Deatley Crushing Invoice Agg D" at the bottom of each page. Page 6-12 of Exhibit A to DeAtley Aff.; Coe Decl at ¶ 31.

No dispute.

27. The spreadsheet contained the following information: the names of DeAtley's employees who worked on the Flowery Trail project, the rates at which those employees were paid, the date those employees worked on the project, and the number of hours each employee worked on the date indicated. Id. at ¶ 32.

No dispute.

28. The period of time covered by the spreadsheet includes November 2, 2001, through September 18, 2002. Id. at ¶ 33.

No dispute.

29. The amount DeAtley claimed for additional labor incurred as the result of the allegedly differing site condition is based upon the amounts paid to each of the employees as indicated on the spreadsheet, plus ten percent profit. Pages 6-12 and 14 of Exhibit A to DeAtley Aff.; Coe Decl. at ¶ 34.

No dispute; however, DeAtley has many theories of recovery.

30. The amount claimed by DeAtley for additional labor costs, incurred as the result of the allegedly differing site condition, includes the cost of work performed by DeAtley from November 2, 2001, when DeAtley began crushing aggregate, until September 18, 2002, when DeAtley finished the removal of the rejected aggregate and the crushing of the re-placement aggregate. Coe Decl. at ¶ 35.

Disputes to the extent the fact is misleading and suggests that DeAtley seek all costs incurred between November 2, 2001 and September 2002. DeAtley disputes this fact as it distorts DeAtley's claim and shows the Government's misunderstanding of the claim. Below, in further responses, specifically to Facts 32 and 39, DeAtley shows why this statement is inaccurate and incomplete.

31. The amount claimed by DeAtley for additional equipment costs incurred as the result of the allegedly differing site condition was derived from the same spreadsheet. Pages 6-12 of Exhibit A to DeAtley Aff.; Coe Decl. at ¶ 36.

While the spreadsheet does represent the costs, DeAtley derived the amount of additional equipment costs from a review of records. An explanation of costs included in the claim that the Government questions is set forth in responses to Facts 32 and 39.

32. The amount claimed by DeAtley for additional equipment costs incurred as the result of the allegedly differing site condition includes costs for equipment used from November 2, 2001, when DeAtley began crushing aggregate, until September 18, 2002,

when DeAtley finished the removal of the rejected aggregate and the crushing of the replacement aggregate. Coe Decl. at ¶ 37.

Disputes. DeAtley does not seek all costs incurred between November 2, 2001 and September 2002. DeAtley disputes this fact as it distorts DeAtley's claim and shows the Government's misunderstanding of the claim. Below, DeAtley shows why this statement is inaccurate and incomplete.

***Accusation #1: Initial Placement of Aggregate: $23,767.34*****.**

In its brief, the Government infers that the $23,767.34 that DeAtley seeks to recover for hauling away aggregate during the initial crushing in November 2001 are the same costs that DeAtley seeks from September 2002 for replacing the rejected aggregate. However, the expense that the Government refers to is actually the additional cost incurred by DeAtley for hauling excess reject material for disposal from the designated quarry source to a stockpile location several miles from the quarry site. (Aff. of Owens). On the Flowery Trail Project, the quarry source was designated by the Government. The Government tested and approved the source as qualified for crushing and production of grade D aggregate. At bid time, M.A. DeAtley anticipated removing an overburden of only 3.5 meters based upon the contract documents. Based upon the geotechnical reports, M.A. DeAtley also anticipated minimal reject material. (Aff. of Owens); (See **Exh. B** to Aff. of Owens). But when M.A. DeAtley began to pioneer the site in preparation for production of the aggregate in June 2001, M.A. DeAtley immediately began to question whether the quarry was a competent source. M.A.

DeAtley's Project Superintendent, Sam Stamper, met at the Project site on June 5, 2001, with Linda Persoon, the Project Engineer representing the Government. The two were present to inspect 20 –foot deep test pits that M.A. DeAtley had dug to confirm the nature of the material. Ms. Persoon's daily report of June 5, 2001, confirms that the test pits showed little or no useable material. (Aff. of Cooper); (See **Exh. B** to Aff. of Cooper). On October 25, 2001, Mr. Cooper notified the Government of this changed condition:

> Please note that with the excess material we have encountered we have had to haul to the 49 Degrees North ski area (refer to your letter of October 11, 2001). This added haul has caused M.A. DeAtley Construction, Inc. a significant delay in bringing in our crushing subcontractor. We have currently hauled over 21,000 m3 to the ski area with the majority of this material coming from the area where we had planned to place the crusher… .

(Aff. of Cooper); (See **Exh. C** to Aff of Cooper). After removing the overburden, M.A. DeAtley began to selectively feed material through the crusher. But the designated material was highly variable and weathered quartzite that basically disintegrated when it was fed into the crusher. This condition caused M.A. DeAtley's crushing subcontractor additional work and delay by requiring a significant amount more material to be fed into the crusher in an effort to achieve an acceptable product. In turn, a large unanticipated volume of reject material was discarded into a stockpile which then needed to be hauled away from the project. (Aff. of Cooper). M.A. DeAtley informed the Government of the problems it was encountering. On November 7, 2001, M.A. DeAtley's daily report (which Federal Highways reviewed and approved) states: "***material source seems to be very dirty still. Crusher is producing a lot of rejects. Our trucks can hardly keep up!***" (Aff. of Cooper);

(See **Exh. D** to Aff. of Cooper). During meetings with the Government, M.A. DeAtley estimated that it was rejecting approximately 70% of the material fed into the crusher. (Aff. of Cooper); (See **Exh. E** to Aff. of Cooper). While M.A. DeAtley anticipated a small percentage of reject material, it never anticipated that 70% of the material M.A. DeAtley was feeding through the crusher would be rejected and have to be hauled away. (Aff. of Cooper). This additional expense was not part of M.A. DeAtley's original scope, nor was M.A. DeAtley ever paid by the Government for this additional work. These additional hauling costs are an appropriate claim item because they arise directly from the inadequate quarry source designated by the Government. (Aff. of Cooper); (Aff. of Owens). The Government did not pay M.A. DeAtley for this added change in scope, thus, the Government's accusation that M.A. DeAtley has already been paid for this work is inaccurate. (Aff. of Cooper).

***Accusation #2: Placement of New Material: $21,264.35*.**

The Government's next contention is that DeAtley's claim includes labor and equipment costs for placing aggregate on sections of the road bed where rejected aggregate had not been placed. (Aff. of Owens). There are no costs included in M.A. DeAtley's claim for placing aggregate on sections of the road bed, where none of the rejected aggregate had been placed. However, the only costs that M.A. DeAtley seeks on the days in question are for the costs of **picking up and hauling the *reject* material** which had previously been placed on the roadway. (Aff. of Owens); (See **Exh. C** to Aff. of Owens). DeAtley is

entitled to be paid for this extra work because of the failure of the Government source. (Aff. of Owens). For example, the Government's own September 16, 2002 daily report shows that M.A. DeAtley was hauling reject aggregate to the ski area on that day. (Aff. of Owens); (See **Exh. C** to Aff. of Owens). As noted in the Government's report, there were seven end dumps and pumps on the project on September 16, 2002. The daily report also reflects 29 employees employed by M.A. DeAtley on that particular day. However, M.A. DeAtley only seeks to recover labor for the six employees that were hauling reject material away and the associated equipment costs. (Aff. of Owens); (See **Exh. A**, p. 7-8 to Aff. of Owens). This represents only that expense for labor and equipment related to picking up and removing the rock which had previously been rejected. (Aff. of Owens).

33. The amount claimed by DeAtley for additional material/rental costs incurred as the result of the allegedly differing site condition was derived from the Materials/Rental Sheet included in the claim. Page 13 of Exhibit A to DeAtley Aff.; Coe Decl. at ¶ 38.

While the spreadsheet does represent the costs, DeAtley derived the amount of additional equipment costs from a review of records. An explanation of costs included in the claim that the Government questions is set forth above in response to Facts 32 and 39.

34. The amount claimed by DeAtley for additional material/rental costs incurred as the result of the allegedly differing site condition includes costs incurred by DeAtley from August 19, 2000 , until September 23, 2002. Coe Decl. at ¶ 39.

The fact is misleading as it suggests that DeAtley seeks reimbursement for all costs incurred between August 2000 and September 2002. An explanation of costs included in the claim that the Government questions is set forth above in response to Facts 32 and 39.

35. DeAtley incurred costs for placing aggregate after September 2, 2002, that are not included in its claim. Such costs were compensated by the Government payment of the contract amount. Id. at ¶ 40.

The statement of fact is misleading in that it infers that DeAtley is requesting payment for costs between November 2001 and September 2002. An explanation of costs included in the claim that the Government questions is set forth above in response to Fact 32.

36. Costs for labor, equipment, and material that were incurred by DeAtley before the Government suspended work on August 21, 2002, was for work DeAtley was required to perform under the contract. Id. at ¶ 41.

The statement of fact is misleading in that it infers that DeAtley is requesting payment for costs between November 2001 and September 2002. An explanation of costs included in the claim that the Government questions is set forth above in response to Fact 32.

37. Costs for labor, material, and equipment that were incurred by DeAtley before the Government suspended work on August 21, 2002, cannot be attributed to additional work due to a differing site condition.

While the spreadsheet does represent the costs, DeAtley derived the amount of additional rental/materials costs from a review of records. An explanation of costs included in the claim that the Government questions is set forth above in response to Fact 32.

38. The amount claimed by DeAtley under materials/rental includes costs for Budinger to test aggregate on August 19, 2002. DeAtley Claim, page 13 of Attachment A to DeAtley's Declaration; Coe Decl. at ¶ 42.

The statement of fact is misleading in that it infers that DeAtley is requesting payment for costs between August 2000 and September 2002. An explanation of the testing costs sought by DeAtley in its claim that are questioned by the Government is set forth below in response to Fact 39.

39. The testing performed by Budinger on August 19, 2002, was required to be performed under the contract and was performed prior to August 21, 2002, the date the Government suspended work. Coe Decl. at ¶ 43.

Dispute that any of the testing costs by Budinger performed in August or September 2002 for which it is seeking compensation in the claim were previously paid for by the Government, included in the original scope of work, or are an unallowable cost of claim preparation. An explanation of the Budinger costs is provided below:

***Accusation #3: Budinger Testing Costs for Testing: $3,247.15*.**

The Government contends that M.A. DeAtley included testing costs that were already paid for by the Government under the contract. It claims that these costs amounted

to $3,247.15. (This total is derived from the entries on the attached claim summary sheet with the date of September 3, 2002, labeled Budinger). Budinger was DeAtley's testing subcontractor during the project. (Aff. of Owens). On September 3, 2002, M.A. DeAtley's crushing subcontractor had remobilized and had begun crushing the replacement material. The $3,247.15 Budinger expenses for September 3, 2002 are costs incurred by M.A. DeAtley for **testing the replacement material** starting on September 3, 2002. These tests were additional work to Budinger's original contract and M.A. DeAtley was required to pay Budinger extra for these tests. (Aff. of Owens).

***Accusation #4: Budinger Testing Costs – August 22: $4,129.75*****.**

The Government also contends that DeAtley is making claim for costs incurred to hire Budinger "to prove its differing site conditions claim." (Aff. of Owens). The costs that the Government disputes are tests that were done on August 22, 2002 after the Government rejected the Grade D aggregate material that M.A. DeAtley was placing on the roadway. The material had previously passed all testing prior to being placed and the rejection came as a complete surprise to us. M.A. DeAtley immediately asked Budinger to assist us in testing the material to help determine what the problem was and how M.A. DeAtley could remedy the situation. On August 22, 2002, Budinger took tests on the stockpiled material as well as tests on the native material. (Aff. of Owens). M.A. DeAtley notified the Government of M.A. DeAtley's intent to take these tests and it invited them to participate in the test to determine how to solve the problem in question. The Government refused. (Aff.

of Owens). The purpose of these tests was very straightforward. At that point in time, M.A. DeAtley was evaluating its options. One option was to crush new material to blend with the existing stockpile. However, there was a concern whether the existing material was somehow degrading when it was handled and, therefore, would potentially never pass even if M.A. DeAtley was to blend more material into the pile. (Aff. of Owens). Budinger's tests actually confirmed M.A. DeAtley's worst fears. So M.A. DeAtley had no option but to move to another location and to crush all new material a second time. The cost of testing the material was never paid for by the Government and it is appropriate to include the claim because these tests were to determine a possible solution to the problem long before any claim existed. (Aff. of Owens).

40. Included in the amount claimed by DeAtley under materials/rental includes the cost of hiring Budinger, after the aggregate was rejected, to test samples of rock obtained from the site from which the rock used to produce the aggregate was taken. Id. at ¶ 45.

No dispute. An explanation of the testing costs claimed is provided in response to fact No. 39.

41. That testing performed by Budinger was not work that DeAtley was required to performed under the contract and, therefore, does not constitute additional work that was required to be performed under the contract. Id. at ¶ 46.

No dispute that the testing performed by Budinger that is part of the claim was not required under the contract. It was work in addition to the contract scope caused by the Government's inadequate quarry source. An explanation of the testing costs claimed is set forth in response to Fact No. 39.

42. Because the Government denied DeAtley's certified claim based upon DeAtley's contention that the Government provided source for the aggregate constituted a differing site condition, the Government did not pay DeAtley any costs that DeAtley incurred for the additional work that DeAtley performed in removing that portion of the aggregate that DeAtley had placed before it was rejected, re-crushing the aggregate, placing the newly crushed aggregate on that portion of the roadbed from which the rejected aggregate had been removed, and performing the contractually required tests upon the newly crushed aggregate. Id. at ¶ 47.

No dispute that the Government has not paid DeAtley for costs sought in its claim.

43. On March 22, 2005, the Government and DeAtley participated in a settlement meeting held in Spokane, Washington, that was attended by representatives of DeAtley and DeAtley Crushing and their attorneys. Id. at ¶ 50.

No dispute that the parties had a meeting on or about March 22, 2005, the purpose of which was to discuss settlement.

44. During that meeting, DeAtley was informed that the Government considered that its claim contained false statements with respect to certain items because those costs

were not incurred as the result of the alleged differing site condition. DeAtley has not revised the amount of its claim. Id. at ¶ 51.

Objection. This fact attempts to admit confidential settlement negotiations. Without waiving said objection, DeAtley disputes this fact as the Government never informed DeAtley that its claim was false.

DATED this 30th day of October, 2006.

DUNN & BLACK, P.S.

s/ JOHN C. BLACK
JOHN C. BLACK
10 N. Post Street, Suite 200
Spokane, WA 99201-0653
Telephone: (509) 455-8711
Fax: (509) 455-8734

Of Counsel:
J. Michael Littlejohn
Akerman Senterfitt Wickwire Gavin
8100 Boone Boulevard, Suite 700
Vienna, Virginia 22182
(703) 790-8750 - phone
(703) 448-1801- fax

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 30th day of October, 2006, a copy of the foregoing *Response to Government's Proposed Findings of Uncontroverted Facts* was filed electronically. I understand that notice of this filing will be sent to all parties of record by operation of the Court's electronic filing system. Parties may access this filing through the court's system.

/s/ JOHN C. BLACK
JOHN C. BLACK

wpdocs\1742\1806\Resp.PropFacts