H

Briefs and Other Related Documents

**Long Island Savings** Bank, FSB v. U.S.C.A.Fed.,2007.Only the Westlaw citation is currently available.

United States Court of Appeals,Federal Circuit.

The **LONG ISLAND SAVINGS** BANK, FSB, and the **Long Island Savings** Bank of Centereach FSB, Plaintiffs-Appellees,

v.

UNITED STATES, Defendant-Appellant.

**No. 2006-5029.**

Feb. 1, 2007.

**Background:** Savings bank and its owners brought *Winstar*-related action against United States contending that enactment of Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) breached enforceable contract with government to treat supervisory goodwill, which was created as result of acquisition of failed thrift, as regulatory capital. The United States Court of Federal Claims, Lawrence S. Margolis, J., 54 Fed.Cl. 607, granted summary judgment for plaintiffs. United States appealed.

**Holdings:** The Court of Appeals, Gajarsa, Circuit Judge, held that:

(1) government did not have to prove justifiable reliance or injury;

(2) certification required by assistance agreement constituted submitted claim to government;

(3) certification was false;

(4) chief executive officer's (CEO) knowledge of falsity of certification could be imputed to savings bank;

(5) adverse interest exception did not apply;

(6) CEO's knowledge of falsity of certification could be imputed to savings bank even if adverse interest exception did apply; and

(7) CEO had intent to defraud government in submitting false certification.

Reversed.

**[1] United States 393 120.1**

**393 United States**
**393VIII Claims Against United States**
**393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims**
**393k120.1 k. In General. Most Cited Cases**

**Government did not have to prove justifiable reliance or injury, on its claim of forfeiture in *Winstar*-related case that was made on basis that financial institution's claim was fraudulent. 28 U.S.C.A. § 2514.**

**[2] United States 393 120.1**

**393 United States**
**393VIII Claims Against United States**
**393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims**
**393k120.1 k. In General. Most Cited Cases**

**Certification required by assistance agreement constituted submitted claim to government, as required for government to succeed on its claim of forfeiture in *Winstar*-related case that was made on basis that financial institution's claim was fraudulent, where agreement conditioned government's obligations on receipt of certificate "signed by the Chairman of the Board of [financial institution] stating," inter alia, that "representations and warranties of [institution] . . . are true and substantially correct as of the Purchase Date," and chairman and CEO of institution had authority to submit certification and did so. 28 U.S.C.A. § 2514.**

**[3] United States 393 120.1**

**393 United States**
**393VIII Claims Against United States**
**393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims**
**393k120.1 k. In General. Most Cited Cases**

**Certification made by financial institution to government regarding "true and substantially correct" nature of representations and warranties made in assistance agreement was false, as required for government to succeed on its claim of forfeiture in *Winstar*-related case that was made on basis that institution's claim was fraudulent, where institution represented and warranted that**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

it would not "omit to state a material fact necessary to be stated in order to make the statements contained therein not misleading," but chief executive officer of institution was in breach of his fiduciary duties to institution and profited personally from that breach. 28 U.S.C.A. § 2514; 12 C.F.R. § § 500.3, 563.17(a), 563.39.

[4] United States 393 120.1

393 United States
393VIII Claims Against United States
393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
393k120.1 k. In General. Most Cited Cases

Knowledge by chief executive officer (CEO) of falsity of certification made by financial institution to government regarding "true and substantially correct" nature of representations and warranties made in assistance agreement could be imputed to institution, on government's claim of forfeiture in *Winstar*-related case that was made on basis that institution's claim was fraudulent, since CEO was agent of institution and had knowledge that his compensation scheme made certification false. 28 U.S.C.A. § 2514.

[5] Principal and Agent 308 177(1)

308 Principal and Agent
308III Rights and Liabilities as to Third Persons
308III(E) Notice to Agent
308k177 Imputation to Principal in General
308k177(1) k. In General. Most Cited Cases

Principal and Agent 308 180

308 Principal and Agent
308III Rights and Liabilities as to Third Persons
308III(E) Notice to Agent
308k180 k. Adverse Interest of Agent. Most Cited Cases

Under the general common law of agency, except where the agent is acting adversely to the principal, the principal is affected by the knowledge which an agent has a duty to disclose to the principal to the same extent as if the principal had the information. Restatement (Second) of Agency § 275.

[6] Principal and Agent 308 177(1)

308 Principal and Agent
308III Rights and Liabilities as to Third Persons
308III(E) Notice to Agent
308k177 Imputation to Principal in General
308k177(1) k. In General. Most Cited Cases

Principal and Agent 308 180

308 Principal and Agent
308III Rights and Liabilities as to Third Persons
308III(E) Notice to Agent
308k180 k. Adverse Interest of Agent. Most Cited Cases

In general, under New York law, knowledge acquired by an agent acting within the scope of his or her agency is imputed to the principal and the latter is bound by that knowledge even if the information is never actually communicated; an exception to this rule occurs when the agent has abandoned his principal's interests and is acting entirely for his own or another's purposes, but it cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal.

[7] United States 393 120.1

393 United States
393VIII Claims Against United States
393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
393k120.1 k. In General. Most Cited Cases

Adverse interest exception did not apply to preclude imputation to financial institution of knowledge by chief executive officer (CEO) of falsity of certification made by financial institution to government regarding "true and substantially correct" nature of representations and warranties made in assistance agreement, on government's claim of forfeiture in *Winstar*-related case that was made on basis that institution's claim was fraudulent, since CEO had not abandoned institution's interest entirely; although CEO pursued his own interests in his improper compensation arrangement with his law firm, arrangement ensured that institution's representation requirements were met. 28 U.S.C.A. § 2514.

[8] United States 393 120.1

393 United States
393VIII Claims Against United States

393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
393k120.1 k. In General. Most Cited Cases

Knowledge by chief executive officer (CEO) of falsity of certification made by financial institution to government regarding "true and substantially correct" nature of representations and warranties made in assistance agreement could be imputed to institution, on government's claim of forfeiture in *Winstar*-related case that was made on basis that institution's claim was fraudulent, even if adverse interest exception were to apply, since certification signed by CEO fulfilled explicit provision of assistance agreement with government and institution knowingly retained benefits reaped by certification even after discovering its fraudulent nature. 28 U.S.C.A. § 2514; Restatement (Second) of Agency § 282(2)(c).

[9] United States 393 120.1

393 United States
393VIII Claims Against United States
393k120 Making or Presentation of False Claims and Other Offenses Relating to Claims
393k120.1 k. In General. Most Cited Cases

Chief executive officer (CEO) of financial institution had intent to defraud government in submitting false certification under assistance agreement, as required for government to succeed on its claim of forfeiture in *Winstar*-related case that was made on basis that institution's claim was fraudulent, where CEO certified that there were no omissions of material fact regarding institution's compliance with the law, CEO received two legal opinions before submitting certification regarding prohibited conduct, CEO signed certification and continued to engage in prohibited conduct, and government would have considered such conduct important in deciding whether to consummate contract. 28 U.S.C.A. § 2514.

[10] Fraud 184 50

184 Fraud
184II Actions
184II(D) Evidence
184k50 k. Presumptions and Burden of Proof. Most Cited Cases

The fact of misrepresentation coupled with proof that party making it had knowledge of its falsity is enough to warrant drawing inference that there was fraudulent intent; thus, circumstantial evidence may permit inference of intent, and, in determining whether such inference can be drawn, it is proper to consider degree of materiality of the information.

Appealed from United States Court of Federal Claims, Judge Charles F. Lettow.

Richard C. Tufaro, Milbank, Tweed, Hadley, & McCloy, LLP, of Washington, DC, argued for plaintiffs-appellees. With him on the brief was William W. Wallace III. Of counsel on the brief were David S. Cohen, and Andrew M. Leblanc.
Jeffrey T. Infelise, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director. Of counsel on the brief were Jeanne E. Davidson, Deputy Director, Timothy J. Abraham, and Elizabeth A. Holt, Trial Attorneys. Of counsel was Jerome A. Madden, Attorney.

Before MAYER, GAJARSA, and LINN, Circuit Judges.
GAJARSA, Circuit Judge.
*1 In this *Winstar*-related case, the United States appeals a decision of the United States Court of Federal Claims granting a motion for summary judgment by the Long Island Savings Bank, FSB ("LISB") and the Long Island Savings Bank of Centereach FSB ("Centereach") on the government's counterclaim and affirmative defenses. *Long Island Sav. Bank, FSB v. United States (LISB Summ. J.),* 54 Fed.Cl. 607 (Fed.Cl.2002). The United States also appeals the decision of the Court of Federal Claims after trial awarding breach of contract damages to LISB and Centereach in the amount of $435,755,000. *Long Island Sav. Bank, FSB v. United States (LISB Trial),* 67 Fed.Cl. 616 (Fed.Cl.2005). Because we hold the claims against the government to be forfeited under 28 U.S.C. § 2514, we reverse.

## I. BACKGROUND

*1 This case is another of the many *Winstar*-cases arising from the savings and loan crisis of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1980s. *See generally* *United States v. Winstar Corp.,*K"http://www.westlaw.com/Find/Default.wl?rs=dfa1.0&vr=2.0&DB=708&FindType=Y&SerialNum=1996145466" 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The facts and procedural history pertinent to this appeal follow.

A. *The Parties and the Contract*

*1 In April 1982, the Federal Savings and Loan Insurance Corporation ("FSLIC") created Suffolk County Federal Savings and Loan Association ("Suffolk County") by merging two thrifts on Long Island that were incurring significant operating losses. K"http://www.westlaw.com/Find/Default.wl?rs=dfa1.0&vr=2.0&DB=613&FindType=Y&ReferencePositionType=S&SerialNum=2007310316&ReferencePosition=619"*LISB Trial,* 67 Fed.Cl. at 619. In October 1982, FSLIC undertook a national solicitation for potential acquirers of Suffolk County because its financial condition continued to decline. *Id.* at 620. FSLIC determined that of the six bids received, the bid from LISB, a conservatively run and healthy thrift bank with branches in New York state, was the most favorable. *Id.* at 621. Negotiations began, and the parties executed a final Assistance Agreement on August 17, 1983. *Id.*

*1 Under the Assistance Agreement, Suffolk County converted "from a federal mutual savings and loan association into a federal stock savings bank" and changed its name to Centereach, LISB acquired Centereach as a wholly owned subsidiary, and the government made a direct cash contribution of $75 million to Centereach's net worth. (Assistance Agreement at 1; *id.* § 3.) In addition, the government agreed that LISB and Centereach could use "the accounting principles in effect for mergers and acquisitions prior to the issuance of FASB # 72" to account for the acquisition. (*Id* . § 10.) Those accounting principles enabled Centereach to account for approximately $625.4 million of goodwill to be amortized over forty years by the straight-line method. *LISB Trial,* 67 Fed.Cl. at 622. *See generally* *Winstar,* 518 U.S. at 853-56 (describing goodwill accounting allowed by FSLIC and advantages to acquiring institutions).

*1 The Assistance Agreement conditioned FSLIC's obligations on, inter alia, FSLIC's "receipt of a certificate, dated as of the Purchase Date, signed by the Chairman of the Board of LISB, stating that" the "representations and warranties of LISB set forth in § 11(b) are true and substantially correct as of the Purchase Date." (Assistance Agreement § 2(c)(7).) Of pertinence here, LISB represented and warranted in section 11(b)(5) (emphasis added) the following:

*2 Compliance With Law. Except as disclosed in Exhibit G, *LISB is not in violation of any applicable statutes, regulations* or orders of, or any restrictions imposed by, the United States of America or any state, municipality or other political subdivision or any agency of the foregoing public units, regarding the conduct of its business and the ownership of its properties, including without limitation, all applicable statutes, regulations, orders and restrictions relating to savings and loan associations, equal employment opportunities, employment retirement income security, and environmental standards and controls where such violation would materially and adversely affect LISB's business, operations or condition, financial or otherwise.

*2 LISB also represented and warranted in section 11(b)(9) (emphasis added):

*2 Material Facts. This Agreement and *all information furnished by LISB in connection with this Agreement or the Master Agreement do not contain any untrue statement of a material fact or omit to state a material fact necessary to be stated in order to make the statements contained therein not misleading;* and there is no fact which materially adversely affects or in the affect the business operation, affairs or condition, financial or otherwise, of LISB or any of its properties or assets which has not been set forth in this Agreement, the Master Agreement or the other documents furnished under either Agreement.

*2 It is undisputed that LISB's Chairman certified to the government that the "representations and warranties of LISB set forth in § 11(b) are true and substantially correct" as required by § 2(c)(7) of the Assistance Agreement.

*2 Section 16 specified that "[t]his Agreement and the rights and obligations under it shall be governed by the law of the State of New York to the extent that Federal law does not control."

B. *Conway and his Law Firm Compensation*

*2 LISB and Centereach entered into the Assistance Agreement through their Chairman of the Board of Trustees and CEO James J. Conway, Jr. (Assistance Agreement at 31.) During his tenure at LISB and Centereach, Conway also received compensation from the law firm Conway & Ryan. The banks agree that Conway & Ryan was their "primary outside counsel" that "performed mortgage closing services and occasionally represented [LISB] in foreclosure proceedings" and that a "substantial portion" of the law firm's revenues were from the banks' mortgage closing services. The parties' summary

judgment submissions show that the law firm, starting in 1980 and ending with the firm's dissolution in 1992, derived at least 70% of its revenues from LISB.

*2 Conway, an attorney admitted to the New York state bar, had worked for the law firm since 1953. Conway became a member of LISB's Board of Trustees in 1966 and the Chairman in 1976. In 1980, Conway received two legal opinions, one provided unsolicited by a partner at the law firm and one solicited by Conway from an outside attorney, stating that New York law prohibited him from receiving compensation from the law firm for legal services relating to any of the banks' loans.

*3 In January 1982, the Board elected Conway to be LISB's CEO. After becoming CEO of LISB, Conway stopped practicing law and engaging in other professional services for the law firm. However, Conway continued to receive compensation from the law firm, and the banks agree that "Conway's compensation included revenues received by [the law firm] for performing" the "banks' mortgage closing services." From September 1975, when Conway & Ryan was incorporated as a New York professional corporation, to December 1984, Conway owned 65% of the law firm. Accordingly, Conway received at least 60% of the law firm's income for the fiscal years ending in August 1981, 1982, and 1983.

*3 In December 1984, Conway reduced his ownership interest to 9% by, in part, transferring 51 % of the law firm to his daughter. Around that time, Conway had become aware of a thrift regulation restricting his ownership interest in the law firm to less than 10%. Conway retained his 9% ownership interest until December 1989. Conway, his daughter, and his daughter-in-law collectively, however, continued to own at least 60% of the law firm. Accordingly, while Conway received between 9% and 40% of the law firm's annual income after 1984, Conway, his daughter, and his daughter-in-law collectively received at least 60% annually, except for the fiscal year ending in August 1985 when they received 51 %.

*3 Between 1980 and 1989, Conway personally received at least $3.5 million from the law firm. Collectively, Conway, his daughter, and his daughter-in-law received at least $10.9 million from the law firm during the same time period.

*3 While there were multiple opportunities, neither Conway nor LISB disclosed this compensation from the law firm during this time period. In December 1981, LISB "applied for conversion from a state-chartered mutual savings bank to a Federal mutual savings bank charter." To determine eligibility for conversion, the Federal Home Loan Bank Board ("FHLBB") required LISB to answer a management questionnaire, and LISB's president "stated that he [wa]s aware that approval of the application to convert w[ould] require that [LISB] adhere to various Federal and Insurance Regulations." LISB submitted, inter alia, the following responses (in italics) in February 1982.

*3 6. List each enterprise doing business with the institution in which any of the institution's personnel have a direct or indirect interest. If such enterprise has had any business transactions with the institution since the last examination, indicate the nature of the interest and the volume and type of business involved. If the association provides space, employees, equipment, services, or expenses, explain the arrangement in full.

*3 *Officer James J. Conway, Jr. retains an interest in a law firm that presently renders service to the Bank and receives remuneration from outside income of said firm.*

* * *

*3 9. List any affiliated person of the institution who receives any commission, fee, or rebate from outside sources, or benefits, directly or indirectly, from financing or any other business placed through, by, or with the institution, if such information has not been furnished in response to questions six (6), seven (7), and eight (8). Name such persons and state the amount and purpose of, and the basis and reasons for, such disbursements, credits or other benefits.

*4 *NONE*

*4 In February 1983, July 1984, and April 1986, LISB submitted the same answers regarding Conway in response to subsequent FHLBB examinations. In December 1987, FHLBB employed a different management questionnaire, but LISB continued to respond that Conway "retains an interest in a law firm that presently renders service to the Bank and receives

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

remuneration from outside income of said firm."

### C. *Enactment of FIRREA*

*4 On August 9, 1989, the Government enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101-73, 103 Stat. 183 (1989), which restricted Centereach's ability to count supervisory goodwill and capital credit toward compliance with its tangible capital requirement. As the Supreme Court noted in *Winstar,* 518 U.S. at 857, "[t]he impact of FIRREA's new capital requirements upon institutions that had acquired failed thrifts in exchange for supervisory goodwill was swift and severe." Many institutions fell out of compliance and were either seized by government regulators or stayed in business only after "massive private recapitalization." *Id.* at 857-58.

*4 "With FIRREA, Centereach's capital ratio plummeted from more than 8% positive to a negative 11 %." *LISB Trial,* 67 Fed.Cl. at 623. In addition, the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), Pub.L. No. 102-242, 105 Stat. 2236 (1991), established sanctions through regulation to institutions deemed undercapitalized. The management of LISB and Centereach thus embarked on a restructuring plan, which involved selling branches, securities, and loans, paying down other borrowings, merging LISB and Centereach, and writing off goodwill. *LISB Trial,* 67 Fed.Cl. at 625, 627-28.

*4 Several institutions sued the government "[b]elieving that [FHLBB] and FSLIC had promised them that the supervisory goodwill created in their merger transactions could be counted toward regulatory capital requirements," and the Supreme Court subsequently held in *Winstar* that neither the canon of unmistakeability nor the doctrine of sovereign acts prevented the government from being liable for breaching contracts by subsequently changing the relevant law. 518 U.S. at 843, 858, 860.

### D. *Complaint Against the Government, the Discovery of Conway's Law Firm Compensation, and the Government's Affirmative Defenses*

*4 With the enactment of FIRREA, Conway hired an outside law firm to advise the banks. *See Doe v. Poe,* 595 N.Y.S.2d 503, 189 A.D.2d 132 (N.Y.App.Div.1993). In February 1990, Conway, the banks' president, the outside law firm, and another outside law firm that Conway had hired for the banks met to discuss a lawsuit by the banks against the government. The outside law firms "suggested that, in preparation for the pending Federal litigation and upcoming regulatory inspections, they conduct a 'due diligence' inquiry to determine whether the bank[s were] in compliance with all regulatory requirements." Conway and the president of the banks agreed. *See id.* at 503-04. In two meetings that year, the outside law firms discovered the law firm compensation that Conway was receiving, and in August 1990, advised Conway to retain his own counsel. *See id.* at 504. "Sometime thereafter, a special committee of the bank[s'] board of trustees was formed to investigate the relationship between [Conway], his family, and his former law firm." *Id.* Conway attempted, but failed, to enjoin the outside law firms from disclosing to the committee the information learned from the meetings based on attorney-client privilege. *See id.* at 504-05.

*5 The banks assert that they "timely informed OTS of Conway's relationship with [his law firm] upon learning the facts and filed a criminal referral with OTS and other law enforcement agencies." In June 1992, Conway resigned from LISB and Centereach. In August 1992, LISB and Centereach filed a complaint against the government in the Court of Federal Claims alleging that the government breached its contractual obligations by enacting FIRREA.

*5 In February 1993, OTS commenced an investigation into Conway's law firm compensation. In February 1994, OTS and Conway entered into a consent order. Based on its findings, OTS concluded that Conway "engaged in violations of federal conflict-of-interest and disclosure regulations, participated in conflicts of interest constituting an unsafe or unsound practice within the meaning of 12 C.F.R. § 571.7, and breached his fiduciary duty owed to LONG ISLAND SAVINGS." "[W]hile neither admitting or denying the OTS' findings and conclusions," Conway stipulated and consented to the order banning him from the thrift and banking industry and requiring him to pay $1.3 million in restitution to LISB.

*5 In February 1998, Conway pled guilty to a criminal misdemeanor information charging him with violating 18 U.S.C. § 215.[FN1] Specifically, Conway agreed with the following facts: "[i]n his capacity as chief executive officer and Chairman of LISB, ... [Conway] influenced whether LISB continued to use the law firm as its legal counsel for residential mortgage closings"; "[f]rom 1983 through 1989, while holding his executive LISB positions, [Conway] received $3,194,103.87 in compensation from the law firm"; and "[i]n or about and between September 3, 1986, and October 30, 1987, ... [Conway] knowingly, intentionally and corruptly solicit[ed], demanded, accepted and agreed to accept ... funds from the law firm paid directly to him, ... intending to be

influenced and rewarded in connection with ... the assignment of the LISB residential mortgage closing work to the law firm."

*5 This conviction led the New York Supreme Court, Appellate Division, to disbar Conway for professional misconduct in August 2000. *In re Conway,* 712 N.Y.S.2d 610, 275 A.D.2d 24 (N.Y.App.Div.2000). Specifically, the court found:

*5 The mitigating circumstances proffered by the respondent notwithstanding, the fact remains that, while chairman of the board and chief executive officer of a savings bank, he engaged in a scheme of illegal kickbacks, using his daughter and daughter-in-law as conduits to circumvent Federal law prohibiting him from receiving compensation from his former law firm, which relied on the bank for approximately 90% of its business. The payments were substantial, totalling [sic] more than three million dollars. Such misconduct, which went on for several years, can hardly be deemed aberrational.

*5 *Id.* at 611.

*5 In February 2001, the government filed its answer to the complaint in the Court of Federal Claims, including affirmative defenses and counterclaims asserting prior material breach and a special plea in fraud.

### E. *Proceedings Before the Court of Federal Claims*

*6 On December 9, 2002, the Court of Federal Claims decided in favor of LISB and Centereach on the parties' cross-motions for summary judgment on the government's counterclaims and affirmative defenses. *LISB Summ. J.,* 54 Fed.Cl. 607. Specifically, the Court of Federal Claims found that there was no prior material breach by LISB, id. at 614, and that the government's special plea in fraud failed because the government did not establish either that LISB had knowledge of the Conway's misrepresentation or that Conway's conduct should be imputed to LISB, *id.* at 617-19.

*6 On September 15, 2005, after a twenty-four day trial, post-trial briefing, and closing arguments, the Court of Federal Claims issued its opinion and order holding the government liable and awarding $435,755,000 in damages to LISB and Centereach. *LISB Trial,* 67 Fed.Cl. at 618.

*6 The government appeals the granting of summary judgment regarding its affirmative defenses in favor of LISB and Centereach in *LISB Summ. J.* and the determination of damages in *LISB Trial.* The Court of Federal Claims exercised jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), and entered final judgment on September 30, 2005. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II. STANDARD OF REVIEW

*6 The Court of Federal Claims applies the same summary judgment standard as that of federal district courts: summary judgment is proper if the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See* Ct. Fed. Cl. R. 56(c); Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *SmithKline Beecham Corp. v. Apotex Corp.,* 403 F.3d 1331, 1337 (Fed.Cir.2005). Therefore, we review a grant of summary judgment by the Court of Federal Claims de novo, drawing justifiable factual inferences in favor of the party opposing the judgment. *SmithKline,* 403 F.3d at 1337; *Winstar Corp. v. United States,* 64 F.3d 1531, 1539 (Fed.Cir.1995) (en banc). Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Issues of fact are genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## III. DISCUSSION

*6 The Court of Federal Claims held on summary judgment that the government's special plea in fraud under 28 U.S.C. § 2514 did not mandate that the claims of LISB and Centereach be forfeited. *LISB Summ. J.,* 54 Fed.Cl. at 614-20. Section 2514 provides that:

*6 A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

*7 In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*7 Where a plaintiff commits fraud "in regard to the very contract upon which the suit is brought, this court does not have the right to divide the contract under which he practiced fraud against the Government" and "all of his claims under that contract will be forfeited pursuant to 28 U.S.C. § 2514." *Little v. United States,* 138 Ct.Cl. 773, 152 F.Supp. 84 (Ct.Cl.1957).

A. *Burden of proof*

*7 We have "explained that '[t]o prevail under [§ 2514], the government is required to establish by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims.' " *Glendale Fed. Bank, F S B v. United States,*PERLINK"http://www.westlaw.com/Find/Default.wl?rs=dfa1.0&vr=2.0&DB=506&FindType=Y&ReferencePositionType=S&SerialNum=2001157762&ReferencePosition=1379" 239 F.3d 1374, 1379 (Fed.Cir.2001) (quoting *Commercial Contractors, Inc. v. United States,* 154 F.3d 1357, 1362 (Fed.Cir.1998)); *cf. Young-Montenay, Inc. v. United States,* 15 F.3d 1040, 1042 (Fed.Cir.1994) ("Under 28 U.S.C. § 2514, the government bears the burden of proving that the claimant (1) knew the claim was false and (2) intended to deceive the government by submitting it.").

*7 [1] The parties do not dispute that the government must prove the *Glendale* elements of (1) knowledge of submission of false claims and (2) intent to defraud. There appears to be some uncertainty, however, in the Court of Federal Claims as to whether the government must also prove the common law elements of fraud. Specifically, the Court of Federal Claims observed in this case that § 2514 does not define the applicable elements of fraud and noted that it has used the *Glendale* elements in some cases and the common law fraud elements in other cases. LISB *Summ. J.,*LINK"http://www.westlaw.com/Find/Default.wl?rs=dfa1.0&vr=2.0&DB=613&FindType=Y&ReferencePositionType=S&SerialNum=2002771710&ReferencePosition=615" 54 Fed.Cl. at 615. Use of common law fraud elements adds to the government's burden the elements of (3) justifiable reliance and (4) injury. *See id.* Neither the Supreme Court nor this court has addressed whether the government must also prove these additional common law elements under § 2514.

*7 Requiring proof of justifiable reliance and injury under § 2514 appears to originate in *Colorado State Bank of Walsh v. United States,* 18 Cl.Ct. 611 (1989), a decision of the Claims Court, which is now the Court of Federal Claims.[FN2] *See LISB Summ. J.,* 54 Fed.Cl. at 615; *First Fed. Bank of Hegewisch v. United States,* 52 Fed.Cl. 774, 789-90 (2002); *Landmark Land Co., Inc. v. United States,* 46 Fed.Cl. 261, 274 (2000); *BMY-Combat Sys. Div. of Harsco Corp. v. United States,*YPERLINK"http://www.westlaw.com/Find/Default.wl?rs=dfa1.0&vr=2.0&DB=613&FindType=Y&ReferencePositionType=S&SerialNum=1997118077&ReferencePosition=128" 38 Fed.Cl. 109, 128 (1997). The *Colorado State Bank* court found that we "approached the issue of fraud in forfeiture of claims cases on a case-by-case basis, and applied the common law elements of fraud." 18 Cl.Ct. at 629. While citing no cases requiring justifiable reliance, the *Colorado State Bank* court cited *Crovo v. United States,* 100 Ct.Cl. 368 (1943), for the proposition that there could be no § 2514 forfeiture without injury. 18 Cl.Ct. at 629 n. 17.

*8 In *Crovo,* however, our predecessor court did not hold that § 2514 required proof of government injury. Rather, *Crovo* stated that "[a]lthough it is not necessary to show a pecuniary loss to defeat a fraudulent claim, it is necessary to do so where a claim has been paid and an action is brought to recover the amount paid." 100 Ct. Cl. at 368. *Crovo* also noted that the latter action would not be brought under § 2514.
*8 Nor does section [2514] provide for an action to recover money paid on a false claim. The only remedy given the Government by this section is the forfeiture of the claim, and in consequence the relief of the Government from liability therefor. After payment there is no claim to be forfeited. It may be the Congress might have provided for a suit against a claimant who had been paid on a false claim, if it had thought of it, but it has not done so.

*8 100 Ct. Cl. at 368. Therefore, *Colorado State Bank* and its Court of Federal Claims progeny are based on a legal misinterpretation of our precedent, which states explicitly that "it is not necessary to show a pecuniary loss to defeat a fraudulent claim" under § 2514. 100 Ct. Cl. at 368.

*8 There is no language in the plain meaning of the statute that would impose requirements of reliance and injury, especially when used as an affirmative defense rather than as a cause of action, and we have found nothing in the legislative history of the original Court of Claims Act that indicates otherwise. Indeed, Congress's objective to "guard against ... frauds in the claims in the court" and to impose forfeiture "as a preventative and a penalty" in § 2514 would seem to point against requiring reliance and injury. *O'Brien Gear & Mach. Co. v. United States,* 219 Ct.Cl. 187, 591 F.2d 666, 678 (Ct.Cl.1979) (adopting opinion of trial judge). However, we

need not go any further. The parties have not asked us to extend *Glendale* to require justifiable reliance and injury, and we perceive no reason to do so here.

*8 Accordingly, for the government to prevail in its special plea in fraud in this case, it must prove "by clear and convincing evidence that the contractor knew that its submitted claims were false, and that it intended to defraud the government by submitting those claims." *Glendale,* 239 F.3d at 1379. The government asserts that it has met this burden because LISB certified that the representations and warranties of the Assistance Agreement were true and substantially correct.

B. *Submitted claims*

*8 [2] Section 2(c)(7) of the Assistance Agreement conditioned the government's obligations on the receipt of a certificate "signed by the Chairman of the Board of LISB stating," inter alia, that the "representations and warranties of LISB set forth in § 11(b) are true and substantially correct as of the Purchase Date." It is undisputed that Conway as Chairman and CEO of LISB had the authority to submit the certification and did so. *LISB Summ. J.,* 54 Fed.Cl. at 615-16. In addition, there is no dispute that Conway's conduct in submitting the certification should be imputed to LISB.[FN3] Therefore, the certification required by section 2(c)(7) constituted a submitted claim to the government.

C. *Falsity*

*9 [3] By submitting the certification, LISB certified that the "representations and warranties of LISB set forth in § 11(b) [we]re true and substantially correct as of the Purchase date." The falsity of the certification thus depends on the representation and warranty provisions of the contract.

*9 LISB represented and warranted in section 11(b)(5) of the Assistance Agreement that it was "not in violation of any applicable statutes, regulations or orders." The government argued on appeal that the contract thus required LISB to comply with 12 C.F .R. § 563.17(a) (1984), which provided that LISB and Centereach "shall maintain safe and sound management." In addition, the regulations charged FHLBB with "the enforcement of laws, regulations, or conditions against ... the officers or directors," 12 C.F.R. § 500.3 (1984), and FHLBB required that officers refrain from breaching fiduciary duties involving personal profit, *see* 12 C.F.R. § 563.39 (1984) ("Termination for cause shall include termination because of ... breach of fiduciary duty involving personal profit.").

*9 In this case, the Court of Federal Claims found that "Conway and his firm's impropriety under banking laws is evident." *LISB Summ. J.,* 54 Fed.Cl. at 614. Similarly, "based on its findings from the Investigation, the OTS" concluded that Conway "breached his fiduciary duty owed to" LISB. As a result, Conway consented to an order that banned him from the thrift and banking industry and that required him to pay $1.3 million in restitution and reimbursement to LISB. The banks concede that Conway's compensation from the law firms during the time he was Chairman and CEO of LISB and Centereach, between at least 1982 and 1989, "included revenues received by [the law firm] for performing" the "banks' mortgage closing services." Moreover, by pleading guilty to violating 18 U.S.C. § 215, Conway admitted that he committed a crime by corruptly accepting $3,194,103.87 in compensation from the law firm intending to be influenced and rewarded for "the assignment of the LISB residential mortgage closing work to the law firm." Therefore, we agree that Conway breached his fiduciary duties to LISB and Centereach and profited personally from that breach.

*9 Nonetheless, the Court of Federal Claims found that LISB was not operating in an unsafe and unsound manner under 12 C.F.R. § 563.17. The Court of Federal Claims reasoned that "had Conway not accepted compensation related to mortgage closing services of LISB's borrowers, but the relationship between LISB and the firm was otherwise the same, no impropriety would exist." *LISB Summ. J.,* 54 Fed.Cl. at 614. By focusing solely on the relationship between LISB and the law firm, the Court of Federal Claims improperly ignored the relationship between Conway and both LISB and Centereach. Specifically, the Chairman of the Board and CEO of LISB and Centereach breached his fiduciary duties for personal profit. This is not safe and sound management. Even if it were unclear whether Conway's conduct precluded a finding of safe and sound management, LISB represented

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and warranted in section 11(b)(9) of the Assistance Agreement that it would not "omit to state a material fact necessary to be stated in order to make the statements contained therein not misleading." At a minimum, Conway's conduct was a material fact necessary to make LISB's section 11(b)(5) representation and warranty of compliance with law, including safe and sound management, not misleading.

*10 Accordingly, LISB's certification to the government regarding the "true and substantially correct" nature of the representations and warranties made in the Assistance Agreement was false.

D. *Knowledge*

*10 [4] The Court of Federal Claims found that "[a]lthough LISB knew Conway was being compensated by his firm, this Court cannot conclude that [others at] LISB knew that the arrangement was improper, and, therefore, a misrepresentation." *LISB Summ.* J., 54 Fed.Cl. at 616-17. We see no error in this factual conclusion. The critical inquiry thus becomes whether Conway's knowledge of the certification's falsity is imputed to LISB.

1. *Law of knowledge imputation*

*10 Whether federal common law or state law applies to imputation of knowledge under 28 U.S.C. § 2514 is a question of first impression. In *O'Melveny & Myers v.* FDIC, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), the Supreme Court held that state law governs issues of knowledge imputation when the FDIC sues as receiver of a corporation under causes of action created by state law. The Court reasoned (1) that FIRREA, which empowered the FDIC as receiver, did not preempt state imputation law and (2) that judicial creation of a special federal rule was not justified because there was no significant conflict between a federal policy or interest and the use of state law. *See* id. at 85-89; *cf.* *Atherton v. FDIC,* 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997) (holding that state law, not federal common law, governed legal standard of care owed to federally chartered, federally insured institutions). In this case, however, federal law may govern the breach of contract action. *See* *Franconia Assocs. v. United States,* 536 U.S. 129, 141-43, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002) (applying principles of general contract law by relying in part on Restatement (Second) of Contracts (1979) to determine whether contract claim against federal government was within Tucker Act statute of limitations); *cf.* *Wagner Iron Works v. United States,* 146 Ct.Cl. 334, 174 F.Supp. 956, 958 (Ct.Cl.1959). In addition, there may be a significant federal interest in specifying the knowledge imputation rules applicable to 28 U.S.C. § 2514 because § 2514 "is one of the conditions on which the Government gives its consent to be sued and waives its otherwise sovereign immunity." *Kamen Soap Prods. Co. v. United* States, 129 Ct.Cl. 619, 620, 124 F.Supp. 608 (1954). Indeed:

*10 The source of present-day section 2514 of Title 28 is the Court of Claims Act of March 3, 1863, ch. 92, 12 Stat. 765. This statute transformed the Court of Claims from a body merely advisory to Congress into a court with power to entertain claims, subject to a statute of limitations, hear the Government's counterclaims and enter judgments to be paid out of a general appropriation.

*10 *O'Brien,* 591 F.2d at 678. As such, the law governing the elements of § 2514 influences the scope of the federal government's waiver of sovereign immunity.

*10 [5] Under the general common law of agency, "[e]xcept where the agent is acting adversely to the principal ..., the principal is affected by the knowledge which an agent has a duty to disclose to the principal ... to the same extent as if the principal had the information." Restatement *(Second) of Agency* § 275 (1958); *cf. Comty. For Creative Non-Violence v. Reid,* 490 U.S. 730, 751-52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) (relying on Restatement (Second) of Agency to determine whether hired party is employee under general common law of agency for Copyright Act purposes); *Franconia,* 536 U.S. at 141-43 (applying principles of general contract law by relying in part on Restatement (Second) of Contracts (1979) on contract claim against federal government). The Restatement (Second) of Agency § 282 (1958) specifies when an agent is acting adversely to the principal:

*11 (1) A principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes, except as stated in Subsection (2).

*11 (2) The principal is affected by the knowledge of an agent who acts adversely to the principal:

*11 (a) if the failure of the agent to act upon or to reveal the information results in a violation of a contractual or relational duty of the principal to a person harmed thereby;

*11 (b) if the agent enters into negotiations within the scope of his powers and the person with whom he deals reasonably believes him to be authorized to conduct the transaction; or

*11 (c) if, before he has changed his position, the principal knowingly retains a benefit through the act of the agent which otherwise he would not have received.

*11 In addition, the "mere fact that the agent's primary interests are not coincident with those of the principal does not prevent the latter from being affected by the knowledge of the agent if the agent is acting for the principal's interests." Restatement (Second) of Agency § 282 cmt. c.

*11 [6] New York state law has similar standards for the general rule of imputation and the adverse interest exception:

*11 In general, knowledge acquired by an agent acting within the scope of his or her agency is imputed to the principal and the latter is bound by that knowledge even if the information is never actually communicated. An exception to this rule occurs when the agent has abandoned his or her principal's interests and is acting entirely for his or her own or another's purposes.

*11 *Christopher S. v. Douglaston Club,* 713 N.Y.S.2d 542, 275 A.D.2d 768 (N.Y.App.Div.2000) (citing *Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d 782, 497 N.Y.S.2d 898, 488 N.E.2d 828, 829-30 (N.Y.1985)). The adverse interest exception "cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal." *Center,* 448 N.E.2d at 830 (citations omitted). However, the general principles of agency and New York state law may diverge on the exceptions enumerated in Restatement (Second) of Agency § 282(2) to the adverse interest exception. Specifically, we have found New York precedent only for § 282(2)(c).

*11 While there may be differences between federal common law and state law, it seems to us imprudent to resolve the question of which law applies to knowledge imputation under 28 U.S.C. § 2514 without briefing. Moreover, we can resolve this case based on where federal and state laws are the same. Namely, the general rule of imputation, the adverse interest exception, and the Restatement (Second) of Agency § 282(2)(c) exception to the adverse interest exception.

*11 Under the general rule of imputation, it is undisputed that Conway was an agent of the banks and had knowledge of his compensation scheme. Therefore, the first step indicates that Conway's knowledge should generally be imputed to the banks, and we proceed to examine whether the adverse interest exception or its exception applies.

### 2. *Adverse interest exception*

*12 [7] The Court of Federal Claims found that Conway "ha[d] abandoned his principal's interest and [wa]s acting to defraud his principal, entirely for his own or another's purpose" because "had the knowledge that the Government seeks to impute to LISB actually been disclosed to LISB, the success of Conway's scheme would have been impaired." *LISB Summ. J.,* 54 Fed.Cl. at 619. We do not agree with this analysis or its conclusions.

*12 It is true that Conway pursued his own interests in his improper compensation arrangement with his law firm. However, this conflict of interest does not mean that Conway abandoned the banks' interest entirely. For example, by causing LISB to utilize the law firm exclusively, Conway continued to serve LISB's interests in part by ensuring that its representation requirements with mortgage loan closings were met. In addition, by signing the false certification under the Assistance Agreement, Conway enabled LISB to acquire Centereach under previously negotiated terms. In hindsight, LISB's interests probably would have been better served had Conway not perpetrated his improper compensation arrangement, but the record fails to support the assertion that Conway entirely abandoned LISB's interests for his own.

*12 Accordingly, the Court of Federal Claims erred in finding that the adverse interest exception should apply to preclude imputation to LISB. *See* Restatement (Second) of Agency § 282 rptr.'s note ("Whether the agent's interests are sufficiently adverse to bring the rule into operation is a question to be decided by the triers of fact.").

### 3. *Restatement (Second) of Agency § 282(2)(c) exception*

*12 [8] Even if the adverse interest exception were to apply, Conway's knowledge would be imputed to LISB if "the principal knowingly retains a benefit through the act of the agent which otherwise he would not have received." Restatement (Second) of Agency § 282(2)(c); *see also In re Maxwell Newspapers, Inc.,* 164 B.R. 858, 867 (Bankr.S.D.N.Y.1994) ("As the Tenth Circuit so aptly put it, 'If the principal disclaims the agent's acts as unauthorized, he has no grounds to retain the fruits thereof; on the other hand, if he retains the fruits of the agent's acts, after

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

knowledge of the facts, he must in fairness be charged with the agent's knowledge.' " (citations omitted)); *Zanoni v. 855 Holding Co., Inc.,* 465 N.Y.S.2d 763, 764-65, 96 A.D.2d 860 (N.Y.App.Div.1983) ("An agent's fraud can be imputed to the corporation, and a corporation will be deemed to have ratified the agent's acts, where, as here, it retains the benefit of those acts for corporate purposes." (citations omitted)).

*12 In this case, the certification signed by Conway fulfilled an explicit provision of the Assistance Agreement with the government and enabled LISB to reap the contractual benefits. Indeed, the breach of contract suit at issue is founded on that Assistance Agreement, and thus, LISB and Centereach have knowingly retained the benefits reaped by Conway's certification even after discovering its fraudulent nature. In effect, the banks have ratified Conway's fraudulent certification, and we would impute Conway's knowledge of the certification's falsity even if the adverse interest exception were to apply.

*13 Accordingly, LISB and Centereach knew by law that the certification to the government was false.

### E. *Intent to defraud*

*13 [9] For the same reasons that allow Conway's knowledge to be imputed to LISB and Centereach, we can impute an intent to defraud from Conway. Therefore, the question becomes whether Conway had an intent to defraud the government in submitting the false certification under the Assistance Agreement.

*13 [10] Where there is no direct evidence of intent to defraud or to deceive, we find our case law in analogous contexts instructive. "Intent need not be proven by direct evidence; it is most often proven by a showing of acts, the natural consequences of which are presumably intended by the actor. Generally, intent must be inferred from the facts and circumstances surrounding the applicant's conduct ." *Molins PLC v. Textron,* Inc., 48 F.3d 1172, 1180-81 (Fed.Cir.1995) (discussing affirmative patent defense of inequitable conduct) (citations omitted); *see also* *In re Watman,* 301 F.3d 3, 8 (1st Cir.2002) (noting that few cases turn on direct evidence of intent and thus, looking instead to circumstances and objective indicia in bankruptcy context).

*13 The fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent. Thus, circumstantial evidence may permit an inference of intent. In determining whether an inference of intent can be drawn from circumstantial evidence, it is proper to consider the degree of materiality of the information.

*13 *Lipman v. Dickinson,* 174 F.3d 1363, 1370 (Fed.Cir.1999) (discussing duty of candor patent applicants owe to PTO) (citations omitted). *But see* *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1069-71 (Fed.Cir.1998).

*13 LISB and Centereach assert on appeal that the government failed to offer any proof that Conway had an intent to defraud when failing to acknowledge his law firm compensation in the Assistance Agreement certification. This is incorrect for the record demonstrates that Conway had knowledge of the certification's falsity. First, as discussed, Conway certified under the Assistance Agreement that there were no omissions of material fact regarding LISB's compliance with the law, including the regulation requiring "safe and sound management," that would mislead the government. Second, Conway received two legal opinions before submitting the Assistance Agreement certification stating that he was legally prohibited from receiving compensation from the law firm for legal services relating to any of the banks' loans. Third, the banks concede that Conway's compensation from the law firms during the time he was Chairman and CEO of LISB and Centereach, between at least 1982 and 1989, "included revenues received by [the law firm] for performing" the "banks' mortgage closing services." Therefore, there was no error in the finding of the Court of Federal Claims that Conway entered into the Assistance Agreement "knowing his conflicting dual relationship with his firm and LISB prohibited him from entering into the Assistance Agreement and from receiving compensation from his firm." *LISB Summ. J.,* 54 Fed.Cl. at 615-16. This record supports an inference of intent.

*14 Moreover, the active breaching of fiduciary duties by the Chairman of the Board and the CEO constitutes material information when the government undertakes a national solicitation for potential acquirers of a declining financial institution, contributes $75 million of cash to the declining institution's net worth, and conditions performance on a representation and warranty of compliance with the law, including regulations requiring "safe and sound management." Indeed, the government's supervisory agent responsible for recommending whether LISB's acquisition of Centereach should be approved in 1983 declared that "[h]ad Mr. Conway correctly and accurately revealed the nature and substance of the kickback scheme ... I would have recommended that we discontinue discussions and negotiations with [LISB]." While these assertions may be true, we hold that the government need not prove that it would have declined the contract had Conway

disclosed the information. Rather, the circumstances of this case indicate that the government would have considered it important in deciding whether to consummate the contract. *Cf. Liquid Dynamics Corp. v. Vaughan Co., Inc.,* 449 F.3d 1209, 1227 (Fed.Cir.2006) (stating in inequitable conduct patent context: "Our inquiry into materiality is an objective one. 'Materiality is not limited to prior art but embraces any information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent.' " (citation omitted)).

*14 Our conclusion that Conway had an intent to defraud is further supported by the facts surrounding the Assistance Agreement. First, neither Conway nor LISB accurately disclosed the compensation from his law firm when prompted by the government in February 1982, February 1983, July 1984, April 1986, or December 1987. In each instance, LISB responded that Conway "retains an interest in a law firm that presently renders service to the Bank and receives remuneration from outside income of said firm." This was false because, as the banks concede, Conway's compensation from the law firm "included revenues received by [the law firm] for performing" the "banks' mortgage closing services." In pleading guilty, Conway also admitted that: "[i]n his capacity as chief executive officer and Chairman of LISB, ... [Conway] influenced whether LISB continued to use the law firm as its legal counsel for residential mortgage closings"; "[f]rom 1983 through 1989, while holding his executive LISB positions, [Conway] received $3,194,103.87 in compensation from the law firm"; and "[i]n or about and between September 3, 1986, and October 30, 1987, ... [Conway] knowingly, intentionally and corruptly solicit[ed], demanded, accepted and agreed to accept ... funds from the law firm paid directly to him, ... intending to be influenced and rewarded in connection with ... the assignment of the LISB residential mortgage closing work to the law firm." LISB and Centereach attempt to minimize the significance of Conway's guilty plea, citing to his trial testimony in this case where he explained that he pled to protect his children. However, "a party cannot simply contradict an earlier sworn statement," and there is no credible evidence here supporting the contradiction. *Cf. Gemmy Indus. Corp. v. Chrisha Creations Ltd.,* 452 F.3d 1353, 1359 (Fed.Cir.2006) (finding summary judgment grant improper where credible evidence supported contradiction).

*15 Second, when the banks' outside counsel, ironically hired by Conway himself, discovered Conway's law firm compensation, Conway attempted but failed to enjoin the outside counsel from disclosing the information to other bank personnel. *See Doe v. Poe,* 595 N.Y.S.2d at 504-05.

*15 Therefore, under the circumstances of this case, the only justifiable inference is that Conway had an intent to defraud, and LISB and Centereach have not presented evidence such that a reasonable jury could return a verdict in their favor. *See Anderson,* 477 U.S. at 248 (stating that issues of fact are genuine for summary judgment purposes only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). Accordingly, the government has proven its special plea in fraud by clear and convincing evidence. Conway knew that the certification he submitted under the Assistance Agreement was false, Conway intended to defraud the government by submitting the certification, and Conway's knowledge and intent should be imputed to LISB and Centereach.

## IV. CONCLUSION

*15 For the reasons discussed above, we reverse judgment of the Court of Federal Claims. Since we hold all asserted contract claims against the government under the Assistance Agreement to be forfeited under 28 U.S.C. § 2514, we do not reach questions of damages.

***REVERSED***

*15 No costs.

FN1. 18 U.S.C. § 215 is a criminal statute governing the receipt of commissions or gifts for procuring loans by an "officer, director, employee, agent, or attorney of a financial institution."

FN2. As noted in *Winstar,* 64 F.3d at 1534 n. 2, "[t]he Federal Courts Administration Act of 1992, Pub.L. No. 102-572, § 902(a), 106 Stat. 4506, 4516, changed the name of the former United States Claims Court to the 'United States

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Court of Federal Claims.' "

FN3. Neither LISB nor Centereach have raised any issues regarding the Assistance Agreement requiring the certification of the Chairman of LISB but not of Centereach. Indeed, for purposes of the special plea in fraud, all of the parties have treated LISB and Centereach as the same in this appeal. Therefore, we do so as well.

C.A.Fed.,2007.
Long Island Savings Bank, FSB v. U.S.
--- F.3d ----, 2007 WL 269433 (C.A.Fed.)

Briefs and Other Related Documents (Back to top)

- RLINK"http://www.westlaw.com/Find/Default.wl?rs=dfa1.0&vr=2.0&FindType=Y&SerialNum=2009511234"2006 WL 1865576 (Appellate Brief) Reply Brief for Defendant-Appellant, the United States (Jun. 1, 2006)
- 2006 WL 1433884 (Appellate Brief) Brief for Plaintiffs-Appellees (Apr. 24, 2006) Original Image of this Document (PDF)
- 2006 WL 951957 (Appellate Brief) Brief for Defendant-Appellant, the United States (Mar. 15, 2006) Original Image of this Document with Appendix (PDF)

END OF DOCUMENT